**ORAL ARGUMENT NOT YET SCHEDULED**

_____

No. 15-1205; consolidated with No. 15-1127

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

BP ENERGY COMPANY,

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

_____

On Petition for Review of the Order of the Federal Energy Regulatory
Commission

_____

**OPENING BRIEF OF PETITIONER**

_____

Betsy R. Carr
BP Energy Company
201 Helios Way
Houston, TX 77079
713.323.6353
Betsy.Carr@bp.com

Virginia Seitz
Erika L. Maley
John T. Hebden
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005
202.736.8961
emaley@sidley.com
*Counsel for Petitioner BP Energy
Company*

November 6, 2015

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The following information is provided pursuant to D.C. Circuit Rule

28(a)(1):

### (A) Parties and Amici

Petitioners in Case No. 15-1127

EarthReports, Inc. (dba Patuxent Riverkeeper)
Sierra Club
Chesapeake Action Network

Petitioner in Case No. 15-1205

BP Energy Company

Respondents

Federal Energy Regulatory Commission
United States

Intervenors for Respondent

Dominion Cove Point LNG, LP
American Petroleum Institute
Statoil Natural Gas, LLC

Amici for Petitioners in Case No. 15-1127

Waterkeepers of Chesapeake
Potomac Riverkeeper, Inc.
Stewards of the Lower Susquehanna, Inc.
Clean Air Council
Allegheny Defense Project
Wild Virginia

i

Calvert Citizens for a Healthy Community
Myersville Citizens for a Rural Community, Inc.

### (B) Rulings Under Review

The consolidated cases are petitions for direct review of the Federal

Energy Regulatory Commission's Order Granting Section 3 and Section 7

Authorizations, 148 FERC ¶ 61,244 (Sept. 29, 2014), entered in Commission

Docket *Dominion Cove Point LNG, LP*, No. CP13-113-000; and Order

Denying Rehearing and Stay, 151 FERC ¶ 61,095 (May 4, 2015), entered in

Commission Docket *Dominion Cove Point LNG, LP*, No. CP13-113-001.

### (C) Related Cases

Other than consolidated Case No. 15-1127, which is a challenge to the

same agency orders on completely different grounds, petitioner is aware of

no cases related to Case No. 15-1205.

The following cases involve substantially the same parties and the

same or similar issues as Case No. 15-1127: *Sierra Club & Galveston*

*Baykeeper v. Federal Energy Regulatory Commission*, No. 14-1275 (D.C. Cir.

filed Dec. 10, 2014); *Sierra Club v. Federal Energy Regulatory Commission*, No.

14-1249 (D.C. Cir. filed Nov. 17, 2014); *Sierra Club v. Federal Energy*

*Regulatory Commission*, No. 15-1133 (D.C. Cir. filed May 11, 2015).

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1, BP Energy Company respectfully submits this Corporate Disclosure Statement and states as follows:

BP Energy Company is incorporated in Delaware.  Its principal office is located at 501 Westlake Park Boulevard, Houston, Texas 77079.  It is wholly owned by BP Company North America Inc.  BP Company North America Inc. is wholly owned by BP Corporation North America Inc.  BP Corporation North America Inc. is wholly owned by BP America Inc.  BP America Inc. is wholly owned by BP America Limited.  BP America Limited is wholly owned by BP Holdings North America Limited.  BP Holdings North America Limited is wholly owned by BP P.L.C., an entity publicly traded on the New York Stock Exchange.

BP Energy Company markets and trades natural gas, natural gas liquids, and power in North America.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES...........i

RULE 26.1 DISCLOSURE STATEMENT ........................................................ iii

TABLE OF AUTHORITIES.................................................................... vi

GLOSSARY ...............................................................................................x

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATUTES AND REGULATIONS........................................................4

STATEMENT OF ISSUES ....................................................................5

STATEMENT OF THE CASE................................................................5

STATEMENT OF FACTS.......................................................................6

      A.    Statutory and Regulatory Background ..........................................7

          1.    Regulation of Discrimination Under the Natural Gas Act ...7

          2.    Regulation of LNG Terminals ...............................................9

      B.    Factual Background ........................................................................12

      C.    Procedural Background ..................................................................18

SUMMARY OF ARGUMENT ...............................................................21

STANDARD OF REVIEW .....................................................................23

STANDING..............................................................................................24

ARGUMENT............................................................................................25

I.    FERC Erred In Holding That Customers Receiving Similar LNG
    Terminal Services Under Different "Regulatory Regimes" Are Not
    Similarly Situated..........................................................................25

A.    The EPAct Prohibits Discrimination Between Customers Under Different Regulatory Regimes ...................................................... 25

    1.    FERC Ignored Clear Statutory Text And Unreasonably Interpreted The Statute ........................................................ 25

    2.    FERC Erred In Relying On Irrelevant Regulatory "Protections" Of Open Access Customers ........................ 30

B.    FERC Failed To Analyze Adequately Whether Statoil And BP Are Similarly Situated ...................................................... 33

    1.    BP's "Regulatory Protections" Do Not Prevent It From Being Similarly Situated To Statoil, Because Statoil May Have Similar Contractual Protections ................................ 33

    2.    FERC's Remaining Reasons Also Fail To Demonstrate That Statoil Received No Undue Preference ...................... 35

C.    FERC Erred In Failing To Analyze Whether Dominion's Turnback Offer To Statoil Was A "Sweetheart Deal." ................ 38

II.    FERC Erred In Holding That Dominion's Tariff Is Adequate To Prevent Undue Discrimination ................................................ 41

CONCLUSION .......................................................................................... 42

CERTIFICATE OF COMPLIANCE .................................................. 43

CERTIFICATE OF SERVICE ............................................................ 44

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Ark. La. Gas Co. v. Hall*,
  453 U.S. 571 (1981) ............................................................................9

*Associated Gas Distribs. v. FERC*,
  824 F.2d 981 (D.C. Cir. 1987) ..........................................................8

*Cities of Bethany v. FERC*,
  727 F.2d 1131 (D.C. Cir. 1984) ..................................................39, 40

*City of Frankfort v. FERC*,
  678 F.2d 699 (7th Cir. 1982) ......................................................30, 33

*Davis v. Latschar*,
  202 F.3d 359 (D.C. Cir. 2000) ........................................................24

*Moreau v. FERC*,
  982 F.2d 556 (D.C. Cir. 1993) ........................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..............................................................24, 35, 41

*NRG Power Mktg., LLC v. FERC*,
  718 F.3d 947 (D.C. Cir. 2013) ....................................................23, 25

*Sacramento Mun. Util. Dist. v. FERC*,
  474 F.3d 797 (D.C. Cir. 2007) ........................................................30

*Town of Norwood v. FERC*,
  587 F.2d 1306 (D.C. Cir. 1978) .............................1, 23, 37, 38, 39

*United Distrib. Cos. v. FERC*,
  88 F.3d 1105 (D.C. Cir. 1996) ....................................................37, 41

\* Denotes authorities most relied upon.

vi

*United Mun. Distribs. Grp. v. FERC,*
  732 F.2d 202 (D.C. Cir. 1984)........................................................40

*Williston Basin Interstate Pipeline Co. v. FERC,*
  519 F.3d 497 (D.C. Cir. 2008)........................................................31

*Wis. Pub. Power, Inc. v. FERC,*
  493 F.3d 239 (D.C. Cir. 2007)........................................................23

STATUTES AND REGULATIONS

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594.....................2, 11

15 U.S.C. § 717 *et seq*.................................................................1

15 U.S.C. § 717a(5).....................................................................9

15 U.S.C. § 717b ...................................... 2, 4, 11, 12, 21, 27, 28, 34, 37

15 U.S.C. § 717c(b).....................................................................8

15 U.S.C. § 717d(a).....................................................................8

15 U.S.C. § 717f......................................................................2, 9, 10

15 U.S.C. § 717r(b)...................................................................4, 24

16 U.S.C. § 824d(b).....................................................................9

16 U.S.C. § 824e(a).....................................................................9

18 C.F.R. § 284.7(b)...................................................................10

18 C.F.R. § 284.8.....................................................................31, 34

18 C.F.R. § 284.9(b)...................................................................10

18 C.F.R. § 284.221...................................................................31, 34

*Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, 50
  Fed. Reg. 42,408 (Oct. 18, 1985).....................................................8

*Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation*, 57 Fed. Reg. 13,267 (Apr. 16, 1992)...............9

**AGENCY DECISIONS**

*Columbia Gas Trans., LLC,*
153 FERC ¶ 61,098 (2015) ...............................................................................26

*Columbia LNG Corp.,*
47 FPC 1624 (1972), *vacated sub nom.* 491 F.2d 651 (5th Cir. 1974).............12

*Cove Point LNG Ltd. P'ship,*
97 FERC ¶ 61,043 (2001) ....................................................................13, 24, 36

*Dominion Cove Point LNG, LP,*
115 FERC ¶ 61,337 (2006), *vacated in part sub nom.* 532 F.3d 928
(D.C. Cir. 2008) ................................................................ 13, 14, 15, 27, 28, 34

*Dominion Cove Point LNG, LP,*
134 FERC ¶ 61,219 (2011) ................................................................................17

*Dominion Cove Point LNG, LP,*
148 FERC ¶ 61,244 (2014) ............ 4, 5, 6, 12, 13, 15, 16, 19, 26, 28, 36, 37, 41

*Dominion Cove Point LNG, LP,*
151 FERC ¶ 61,095 (2015) .......... 3, 4, 20, 21, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 41

*Hackberry LNG Terminal, L.L.C.,*
101 FERC ¶ 61,294 (2002) ...................................................................10, 11, 27

*Natural Gas Pipeline Co. of Am.,*
76 FERC ¶ 61,142 (1996) ..................................................................................25

*Pac. Connector Gas Pipeline,*
139 FERC ¶61,040 (2012) .................................................................................15

*Portland Natural Gas Trans. Sys.,*
137 FERC ¶ 61,004 (2011) ................................................................................26

*Tenn. Gas Pipeline Co.*,
   97 FERC ¶ 61,225 (2001) ...............................................................26

*Trunkline LNG Co.*,
   81 FERC ¶ 61,147 (1997), *aff'd*, 194 F.3d 68 (D.C. Cir. 1999).....................10

OTHER AUTHORITIES

Am. Gas Ass'n, *About Natural Gas*, https://www.aga.org/ about-
   natural-gas (last viewed Oct. 27, 2015) ...........................................6

Bloomberg, *Dominion Resources' CEO Discusses Q4 2010 Results –
   Earnings Call Transcript* (Jan. 28, 2011), *available at*
   http://seekingalpha.com/article/249434-dominion-resources-ceo-
   discusses-q4-2010-earnings-call-transcript?part=qanda...........................18

Christopher J. Castaneda & Clarence M. Smith, *Gas Pipelines and the
   Emergence of America's Regulatory State* (2003)................................7

Energy Info. Admin., *Natural Gas 1996: Issues and Trends* (Apr. 1996),
   http://www.eia.gov/pub/oil_gas/natural_gas/
   analysis_publications/natural_gas_1996_issues_trends/
   pdf/it96ch2.pdf .........................................................................32

Energy Info. Admin., *U.S. Natural Gas Marketed Production* (Sept. 30,
   2015), http://www.eia.gov/dnav/ng/hist/ n9050us2a.htm .................15

John B. McArthur, *Antitrust in the New [De]regulated Gas Industry*, 18
   Energy L.J. 1 (1997) ..................................................................8

Saeid Mokhatab et al., *Handbook of Liquefied Natural Gas* (2014) .....................7

# GLOSSARY

| | |
|---|---|
| BP Energy Company | BP |
| Dominion Cove Point LNG, LP | DCP or Dominion |
| Energy Policy Act of 2005, Pub. L. 109-98, 119 Stat. 594 | EPAct |
| Federal Energy Regulatory Commission | FERC or the Commission |
| Federal Power Act | FPA |
| General Terms and Conditions | GT&C |
| Liquefied Natural Gas | LNG |
| Natural Gas Act, 15 U.S.C. § 717 *et. seq.* | NGA |
| Statoil Natural Gas LLC | Statoil |

## INTRODUCTION

The decision below of the Federal Energy Regulatory Commission ("FERC" or "the Commission") must be reversed because it misreads the clear text of the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, ignores highly relevant factors and authorizes undue discrimination.

To prevent natural gas facilities from abusing their monopoly powers, the Natural Gas Act prohibits them from unduly discriminating against customers. Here, Dominion Cove Point LNG, LP ("DCP" or "Dominion") unduly discriminated against its customer BP Energy Company ("BP") by offering another customer, Statoil Natural Gas LLC ("Statoil"), a valuable opportunity to relinquish or "turn back" unwanted services without offering an equivalent opportunity to BP. Furthermore, the CEO of Dominion's parent company *publicly* stated that the company offered this uniquely beneficial deal to Statoil because a DCP affiliate was working with Statoil on other projects—showing that the turn back opportunity was a prohibited "sweetheart deal," which this Court has ruled constitutes undue discrimination. *Town of Norwood v. FERC*, 587 F.2d 1306, 1313 (D.C. Cir. 1978).

In holding that no undue discrimination occurred, the Commission fundamentally misread the statute. The agency reasoned that BP and Statoil are not "similarly situated," and therefore need not be similarly treated, because their services at DCP's liquefied natural gas ("LNG") terminal are governed by different regulatory regimes: BP receives open-access service pursuant to section 7 of the NGA, 15 U.S.C. § 717f, while Statoil receives non-open access service pursuant to section 3, *id.* § 717b.

The Energy Policy Act of 2005 ("EPAct"), Pub. L. No. 109-58, 119 Stat. 594, was intended to prevent discrimination between customers at LNG terminals in precisely these circumstances. The EPAct allowed open access LNG terminals to also offer non-open access services under section 3, permitting the creation of "mixed" LNG terminals, where customers receiving essentially the same services—such as Statoil and BP—could be differently regulated. 15 U.S.C. § 717b(e).

Significantly, however, the EPAct also prohibited "undue discrimination against existing customers." *Id.* § 717b(e)(4). In other words, the Act prohibits mixed terminals from discriminating against their existing section 7 customers (such as BP) in favor of section 3 customers (such as Statoil). FERC's holding that the difference in regulatory regimes

2

means that Statoil and BP are not similarly situated renders this provision meaningless. Because section 7 and section 3 customers will always be subject to different regulatory regimes, the Commission's holding means that there could never be undue discrimination between them, contrary to the plain language of the statute.

The Commission claimed that the difference in regulatory regimes is relevant because "as an open access customer, BP has protections not afforded Statoil," but the "protections" FERC cited are not remotely analogous to turn-back rights. *Dominion Cove Point LNG, LP*, 151 FERC ¶ 61,095, ¶ 13 ("Rehearing"). Critically, they do not allow customers to terminate their commitments, and do not protect against a downturn in the imported LNG market. FERC did not offer any other basis for concluding that BP and Statoil are not similarly situated, and did not dispute BP's showing that the two companies receive fundamentally the same services and are exposed to the same risks. Its decision that no undue discrimination occurred should be reversed.

Further, FERC's inquiry into the facts supporting BP's discrimination claim was wholly inadequate. While holding that BP and Statoil are not similarly situated because BP has certain regulatory rights as an open

3

access customer, FERC failed to determine whether Statoil has equivalent rights under its contract, as the record suggests.  And while recognizing that a sweetheart deal for Statoil "might have constituted discrimination against another such customer for inappropriate reasons," FERC refused to consider whether it constituted undue discrimination here.  Rehearing ¶ 16.  Because it ignored these highly relevant factors in analyzing discrimination, FERC's decision is arbitrary and capricious and a remand is therefore necessary.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 717r(b).  FERC's Order Granting Section 3 and Section 7 Authorizations was entered on September 29, 2014.  *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 ("Order").  Its final Order Denying Rehearing and Stay was entered on May 4, 2015.  151 FERC ¶ 61,095.  BP Energy Company timely filed a petition for review on July 2, 2015.

## STATUTES AND REGULATIONS

15 U.S.C. § 717b(e)(4) provides:

> An order issued for an LNG terminal that also
> offers service to customers on an open access basis
> shall not result in subsidization of expansion
> capacity by existing customers, degradation of

4

service to existing customers, or undue
discrimination against existing customers as to their
terms or conditions of service at the facility, as all of
those terms are defined by the Commission.

## STATEMENT OF ISSUES

1.     Whether the Commission's conclusion that Dominion did not

unduly discriminate against BP by granting Statoil but not BP an

opportunity to turn back unwanted services was arbitrary and capricious,

and contrary to law under the Natural Gas Act.

2.     Whether the Commission's acceptance of Dominion's proposed

revisions to section 30 of the General Terms and Conditions ("GT&C") of

its tariff was arbitrary and capricious, and contrary to law, because it was

based upon the erroneous holding that Dominion did not unduly

discriminate against BP.

## STATEMENT OF THE CASE

In 2013, Dominion applied to FERC for authorization to construct

and operate the Cove Point Liquefaction Project ("Export Project") and

related facilities, in order to add the ability to export natural gas at its

marine terminal in Calvert County, Maryland (the "Cove Point Terminal").

Order ¶ 1.  BP intervened.  BP did not oppose the Export Project, but

protested that Dominion had acted in an unduly discriminatory manner by

5

offering Statoil but not BP an opportunity to relinquish its terminal service. *Id*. ¶ 42.

Even though the EPAct specifically prohibits such discrimination, the Commission rejected BP's protest.  The agency held that BP and Statoil were not similarly situated because BP received open access services pursuant to section 7 of the NGA, while Statoil received non-open access services pursuant to section 3.  *Id.* ¶ 47.

BP moved for rehearing, arguing that FERC had misinterpreted the statute, allowed undue discrimination, and erred in refusing to consider relevant factors.  BP Application for Rehearing (Oct. 28, 2014) ("Rehearing Br.").  FERC denied BP's motion for rehearing on May 4, 2015, again holding that BP and Statoil were not similarly situated due to differences in regulatory regimes.  Rehearing ¶ 13.  BP petitioned this Court for review.

**STATEMENT OF FACTS**

Natural gas supplies about one quarter of the energy used in the United States.  Am. Gas Ass'n, *About Natural Gas,* https://www.aga.org/about-natural-gas (last visited Nov. 5, 2015). Natural gas is generally transported over land by pipeline; it may also be cooled and turned into liquefied natural gas ("LNG") for transportation

6

overseas by ship.  *See* Saeid Mokhatab et al., *Handbook of Liquefied Natural Gas*, § 1.4 (2014).

LNG transported by ship can be delivered to LNG terminals , which are purpose-built facilities used to import LNG.  *Id.* § 1.4.6.  At the terminal, the LNG is offloaded from the ship and can be stored or converted back into gas, a process called "regasification."  *Id.*  Once regasified, imported natural gas can be transported from the terminal via pipeline for delivery to customers.  *Id.*  When natural gas is exported, the process is reversed: the gas is transported via pipeline to an LNG export terminal, where it is liquefied into LNG, and stored until it is loaded onto a ship for transportation overseas.  *Id.*  Several LNG terminals originally built as import facilities, such as the Cove Point Terminal, are currently adding equipment to allow them to also engage in export operations.

A.     **Statutory and Regulatory Background**

1.     **Regulation of Discrimination Under the Natural Gas Act**

Prior to 1938, no federal law regulated the natural gas industry.  *See* Christopher J. Castaneda & Clarence M. Smith, *Gas Pipelines and the Emergence of America's Regulatory State* 4-7 (2003).  Due to high

7

infrastructure costs, natural gas pipelines were naturally monopolistic, allowing for "a high level of power and market abuse," including discrimination against unaffiliated customers.  John B. McArthur, *Antitrust in the New [De]regulated Gas Industry*, 18 Energy L.J. 1, 7-8, 59-60 (1997). "Congress affirmatively addressed itself to [this] issue" in the Natural Gas Act of 1938, "giving the Commission power to stamp out undue discrimination."  *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 998 (D.C. Cir. 1987).  As this Court has explained, "[t]he Act fairly bristles with concern for undue discrimination."  *Id.*; *see, e.g.*, 15 U.S.C. §§ 717c(b), 717d(a).

FERC's major orders further addressed undue discrimination in the natural gas industry.  In the 1980s, FERC found that pipelines were refusing to transport unaffiliated companies' gas on a nondiscriminatory basis.  *See, e.g.*, *Associated Gas*, 824 F.2d at 993.  Finding that "permitting pipelines to unduly discriminate ... is inconsistent with the fundamental goals of consumer protection and competition in the Natural Gas Act," FERC responded by requiring most pipelines to allow nondiscriminatory access to transportation, and to allocate capacity on a first-come, first-served basis.  Order No. 436, *Regulation of Natural Gas Pipelines After Partial*

*Wellhead Decontrol*, 50 Fed. Reg. 42,408, 42,411, 42,424 (Oct. 18, 1985).  FERC

further promoted nondiscrimination by requiring that open access

transportation services be "equal in quality for all gas supplies," whether

purchased from the pipeline or elsewhere.  Order No. 636, *Pipeline Service*

*Obligations and Revisions to Regulations Governing Self-Implementing*

*Transportation*, 57 Fed. Reg. 13,267, 13,282 (Apr. 16, 1992).

Because the Natural Gas Act's prohibitions against undue preference

and discrimination are fundamental elements of energy utility regulation,

they are mirrored in the legal regimes governing other utilities, including

the Federal Power Act ("FPA").  *See* 16 U.S.C. §§ 824d(b), 824e(a).  Because

these provisions of the NGA and the FPA "are in all material respects

substantially identical," courts follow an "established practice of citing

interchangeably decisions interpreting the pertinent sections of the two

statutes."  *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981).

### 2.    Regulation of LNG Terminals

All persons engaged in the interstate transportation or sale of natural

gas are subject to section 7 of the NGA.  *See* 15 U.S.C. §§ 717a(5), 717f(c) &

(d).  Under section 7, a natural gas company may not transport natural gas

or operate natural gas facilities without obtaining a certificate of public

convenience and necessity from the Commission.  *Id*. § 717f(c).  Most

section 7 facilities are required to function as open access transporters: they

cannot favor transportation of their own gas or that of affiliated customers,

but must offer the same transportation service on a first-come, first-served

basis to all interested shippers.  *See* 18 C.F.R. §§ 284.7(b), 284.9(b),

284.221(c).

FERC initially regulated both LNG terminals and pipelines under

section 7, requiring cost-of-service rates and open access terms of service.

*See, e.g.*, *Trunkline LNG Co.*, 81 FERC ¶ 61,147, 61,666 (1997).  This regime,

however, was criticized as impeding the development of new LNG

terminal projects.

In 2002, the Commission changed course.  While it continued to

regulate *pipelines* under section 7, FERC decided to regulate LNG *terminals*

more lightly under section 3, in order to "provide incentives to develop

additional energy infrastructure to increase much needed supply into the

United States, while at the same time ensuring competitive commodity

prices and an open-access interstate pipeline grid."  *Hackberry LNG*

*Terminal, L.L.C.*, 101 FERC ¶ 61,294, ¶ 23 (2002).  *Hackberry* allowed the

rates, terms and conditions of services at LNG terminals to be set as agreed

10

upon by contracting parties, and held that LNG terminals would no longer be required to offer open access service.  *Id.* ¶¶ 2, 22.

At the same time, FERC continued to prohibit LNG terminals from unduly discriminating, stating: "Section 3 of the Natural Gas Act reserves for the Commission the ability to 'make such supplemental order in the premises as it may find necessary or appropriate.'  We will use such authority in the future if we receive complaints of undue discrimination or other anti-competitive behavior."  *Id.* ¶ 22.

In 2005, Congress essentially codified *Hackberry*'s approach in the EPAct, amending the Natural Gas Act.  15 U.S.C. § 717b(e); Pub. L. No. 109-58, § 311(c)(2), 119 Stat. at 686.  The EPAct prohibited FERC, prior to 2015, from conditioning an order authorizing an LNG terminal on (1) "a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant," (2) "any regulation of the rates, charges, terms, or conditions of service of the LNG terminal," or (3) "a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal."  15 U.S.C. § 717b(e)(3)(B)(ii).

This change made possible "mixed" LNG terminals, where customers receiving essentially the same services could be regulated under different provisions of the Natural Gas Act: Terminals that had existing customers receiving open access service under section 7 could, following the change, seek to add new customers on a non-open access basis under section 3.  *See* Order ¶ 106.  Cove Point is such a mixed facility.  Importantly, to protect terminals' existing open access customers, the Energy Policy Act included a new nondiscrimination provision, stating "[a]n order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in ... degradation of service to existing customers, or undue discrimination against existing customers."  15 U.S.C. § 717b(e)(4).

## B.     Factual Background

In 1972, FERC's predecessor authorized Columbia LNG Corporation and Consolidated System LNG Company to import LNG, to construct and operate a marine terminal and regasification facilities at Cove Point (the "Cove Point Terminal"), and to construct and operate a pipeline from the Cove Point Terminal to Loudon County, Virginia (the "Cove Point Pipeline").  *Columbia LNG Corp.*, 47 FPC 1624 (1972).  These facilities were

transferred to Cove Point LNG Limited Partnership ("Cove Point"), and later to Dominion Cove Point LNG, LP. *See* Order ¶ 3.

LNG imports to the Cove Point Terminal were suspended in 1980. *Id.* ¶ 4. In 2001, FERC authorized Cove Point to construct new facilities and reactivate existing import facilities at the Cove Point Terminal. *Cove Point LNG Ltd. P'ship*, 97 FERC ¶ 61,043, 61,220-21 (2001). Cove Point did not have export facilities at the time.

Cove Point held an open season allowing companies to bid for these services on an open access basis, pursuant to section 7. *Id.* at 61,192-93. Three companies, including BP, successfully bid for terminal services including unloading, storing and vaporizing LNG, as well as for the capacity to deliver the gas via the Cove Point Pipeline. *Id.* at 61,194, 61,220. BP and the other companies each contracted to receive these services until 2023, at a current cost of approximately $25 million per year. *Id.* at 61,195; Protest of BP Energy 3 (May 3, 2013) ("Protest").

In 2006, the Commission approved a major expansion of the Cove Point facilities, and the construction of new downstream pipeline and storage facilities. *See Dominion Cove Point LNG, LP,* 115 FERC ¶ 61,337, ¶ 10

13

(2006). Statoil, the sole expansion customer, contracted to receive terminal and pipeline services for 20 years. *Id.* ¶¶ 13, 23.

Since the expansion occurred subsequent to *Hackberry* and the EPAct, Statoil entered into a non-open access service agreement with Dominion under section 3 for its additional storage and regasification services at the Cove Point Terminal. *Id.* ¶¶ 13, 150. Statoil and Dominion also entered into an agreement under section 7 for additional pipeline capacity on the Cove Point Pipeline. *Id.* Dominion continued to "provid[e] cost-of-service rates for its other existing customers," including BP. *Id.* ¶ 106.

In authorizing the expansion, FERC noted "[t]his is a case of first impression in which an applicant proposes *Hackberry* rate treatment for a portion of its LNG storage service while providing cost-of-service rates for its other existing customers," which "raises a number of issues concerning how to ensure that Cove Point LNG's existing customers will not ... be discriminated against." *Id.* Dominion assured FERC that it "will not ... unduly discriminate in service terms and conditions against existing customers," *id.* ¶ 13, and "agreed to reference certain provisions at proposed section 30 [of the GT&C] to ensure that wherever the Section 3 Firm Services interact with existing services provided by Cove Point LNG,

14

both existing and expansion customers are treated in a not unduly discriminatory manner," *id.* ¶ 18.  Based on the tariff information provided, FERC found "that there will be no undue discrimination against the existing LTD customers as to their terms and conditions of service in the critical tariff areas," *id.* ¶ 150, and approved the expansion.

Over the following years, the value of LNG import services sharply declined, due to tremendous growth in the amount of domestically produced natural gas.  Energy Info. Admin., *U.S. Natural Gas Marketed Production* (Sept. 30, 2015), http://www.eia.gov/ dnav/ng/hist/n9050us2a.htm.  By 2012, "only 3 of the 12 existing United States LNG terminals [were] operating at more than 5 percent of their capacity," and other companies abandoned plans to construct import facilities, concluding they are "not viable under current market conditions."  *Pac. Connector Gas Pipeline*, 139 FERC ¶61,040, ¶¶ 23, 24 (2012).

Reacting to these market changes, in 2013 Dominion applied to FERC for authorization to construct and operate *export* facilities at Cove Point.  *See* Order ¶ 7.  In connection with the export facilities, Dominion conducted a "reverse open season," where customers could relinquish their

15

existing transportation services on the Cove Point Pipeline. *Id*. ¶ 40. The reverse open season did not provide an opportunity to relinquish LNG storage and regasification capacity at the Cove Point Terminal. *See id.* ¶ 42. Relinquishing pipeline capacity would render the costly terminal capacity essentially worthless, because a customer would have no ability to ensure transportation of imported gas from the facility. Protest 8-9. No one took the offer: Dominion received no bids on the reverse open season for the stand-alone pipeline capacity. Order ¶ 40.

Dominion then offered Statoil, but not BP, a different and far more favorable deal: an early termination of both its pipeline capacity *and* its LNG storage and regasification capacity at the terminal. *Id*. ¶ 42. Unlike the opportunity to relinquish only the pipeline capacity, the opportunity to turn back both the pipeline and the terminal services was highly valuable, allowing Statoil to escape from an expensive contract that was no longer commercially useful given the virtual collapse of the LNG import market. *See* Protest 3, 8-9.

Dominion and Statoil did not claim that any term of their 2006 contract gave Statoil a right to turn back these terminal services; rather, Dominion stated that it "negotiated changes in its ... service agreement

16

with Statoil," *see* DCP Answer 10-11 (May 20, 2013) ("DCP Answer"), and "did not receive any termination or exit fee, or additional monetary compensation, from Statoil as part of the agreement restructuring." *Dominion Cove Point LNG, LP*, 134 FERC ¶ 61,219, ¶ 12 (2011).[1]  In 2013, Dominion and Statoil agreed to "further modification of the terms of the Cove Point Expansion service agreements" to allow an even "earlier termination of the contracts" for both terminal and pipeline services in return for an "exit fee" of an undisclosed amount.  DCP Answer 10-11.

When asked in an earnings call on January 28, 2011 why DCP had granted Statoil what "seems like a pretty substantial concession with nothing else in hand," the Chief Executive Officer of DCP's parent company responded by identifying plans "to work with our partner [Statoil] at the Cove Point expansion in development of infrastructure out of the Marcellus region in other ways, in addition to a potential

---

[1] Dominion obtained FERC's approval of its 2011 agreement to shorten the term of Statoil's section 7 pipeline transportation service under a provision of the tariff, but did not request or obtain approval in 2011 to shorten the term of Statoil's section 3 contract for terminal service. 134 FERC ¶ 61,219, ¶ 11; *but see* DCP Answer 10 (suggesting that Statoil and Dominion also agreed in 2011 upon "a corresponding term shortening and quantity reduction ... for the Cove Point Expansion terminal services").

liquefaction facility." Bloomberg, *Dominion Resources' CEO Discusses Q4 2010 Results – Earnings Call Transcript* (Jan. 28, 2011), *available at* http://seekingalpha.com/article/249434-dominion-resources-ceo-discusses-q4-2010-earnings-call-transcript?part=qanda. These comments reveal that Dominion gave Statoil the unique opportunity to relinquish its expensive and uneconomic contractual obligations in order to advance other commercial arrangements between Statoil and unregulated affiliates of DCP.

## C. Procedural Background

In May 2013, BP protested DCP's application, contending that "by offering Statoil an opportunity to simultaneously 'turn back' storage, regasification, and Cove Point Pipeline capacity, without also offering the same opportunity to BP Energy, DCP .... unduly discriminated against BP Energy." Protest 9. BP requested that the Commission "explore DCP's underlying motivations [for the turn-back offer] in data requests," explaining that the CEO's public comments showed that the turn-back offer was inappropriately based on "related commercial arrangements between Statoil and other members of the DCP corporate family." *Id.* 4 n.7. BP further requested that the Commission require Dominion to offer BP "a

18

meaningful and similar 'turn back' option," and to revise section 30 of the

GT&C "to govern the interaction among the various classes of customers."

*Id.* 11-12.

On September 29, 2014, the Commission denied BP's protest. The

Commission recognized that "EPAct 2005 amended the NGA to prohibit

undue preferences and undue discrimination in the context of LNG

terminals providing service authorized under both sections 3 and 7 of the

NGA, which is the case at Cove Point." Order ¶ 45. Nonetheless, the

Commission concluded that DCP had not granted an unlawful preference

to Statoil, for three reasons. First, "Dominion has not proposed to change

the terms and conditions of service for BP." *Id.* ¶ 46. Second, BP and

Statoil were not similarly situated because BP was "receiving open access

terminal services provided under section 7 of the NGA, while Statoil is an

expansion customer receiving non-open access service under NGA section

3." *Id.* ¶ 47. Third, the Commission was "not concerned with the fact that

in addition to relinquishing section 3 terminal service Statoil also turned

back section 7 service on the Cove Point Pipeline because Dominion held

an open season providing all shippers an opportunity to turnback this

service." *Id.*

19

BP applied for rehearing, arguing that "the Commission's legal conclusion was wrong" and "would effectively render meaningless the antidiscrimination provision of Section 3 governing mixed terminals." Rehearing Br. 2, 10.  In fact, BP argued, it and Statoil are similarly situated because the services they receive are "for all practical purposes, identical," and Statoil "assumed the same risk" of market change.  *Id.* 13-14.  Further, "reaping additional commercial benefits for an affiliate engaged in unregulated joint projects with a 'partner' who is the beneficiary of the inappropriate preferential treatment would clearly constitute undue discrimination."  *Id.* 8.

FERC did not dispute that "the terminal service that [BP] receives from Dominion is fundamentally the same as that provided to Statoil," Rehearing ¶ 14, and "BP and Statoil may face the same risk that the market for imported natural gas might change." *Id.* ¶ 13.  The agency, however, again held that "the difference in 'regulatory regime' between open access and non-open access service is a relevant one," and therefore "BP and Statoil are not similarly situated." *Id.*  Specifically, the agency reasoned that "as an open access customer, BP has protections not afforded Statoil," including "a regulatory right to release all or a portion of its terminal

20

service to another shipper" and "regulatory rights regarding retention of its capacity upon expiration of its initial service agreement." *Id.*

FERC refused to consider BP's argument that "Dominion provided Statoil with inappropriate preferential treatment in consideration for commercial benefits to Dominion's parent company," concluding that, because BP and Statoil were not similarly situated, "there is no reason for the Commission to consider whether Dominion's actions might have constituted discrimination against another such customer for inappropriate reasons." *Id.* ¶ 16.  Finally, the Commission held that because no undue discrimination had occurred, there was "no reason to revise Dominion's tariff to address alleged discrimination." *Id.* ¶ 14.  BP then filed a petition for review to this Court.

## SUMMARY OF ARGUMENT

The Commission's statutory interpretation cannot stand.  It is both contrary to the plain text of the statute and unreasonable in light of the statute's purposes.  15 U.S.C. § 717b(e)(4) prohibits discrimination between "open access" customers and non-open access "existing customers" of mixed LNG terminals.  *Id.*  The Commission's holding that open access and

21

non-open access customers are not similarly situated, and therefore need not be treated equivalently, renders the provision all but meaningless.

The Commission asserted that BP, as an open access customer, has regulatory protections not applicable to Statoil, but these regulatory protections are distinctions that make no difference in this context. Unlike valuable turn-back rights, they do not protect customers against the risk of a downturn in the LNG market. As FERC recognized, BP and Statoil receive essentially the same services and are exposed to the same market risks. The companies are thus similarly situated and the uniquely favorable turn-back offered to Statoil constituted undue discrimination. The Commission's decision should be reversed.

Further, even if there might be relevant differences between BP and Statoil, a remand is necessary because the Commission failed to consider significant factors. For instance, while relying on BP's regulatory protections to distinguish it from Statoil, the Commission failed to assess whether Statoil has equivalent protections under its contract, as the record suggests. FERC also claimed that there was no undue discrimination because BP and Statoil otherwise received equivalent services and BP's

22

services had not changed.  These factors, however, only confirm that the two customers are similarly situated.

In addition, a remand is needed because FERC erred in refusing to consider whether Dominion accorded undue preference to Statoil because of separate dealings between Statoil and Dominion's parent company, as indicated in the record.  Such "sweetheart deal[s]" with favored customers constitute classic undue discrimination, and FERC's refusal to analyze this relevant factor renders its decision arbitrary and capricious.  *Town of Norwood*, 587 F.2d at 1313.

Finally, FERC erred in refusing to require modifications to Dominion's tariff.  This decision was based entirely upon its erroneous holding that no undue discrimination occurred.

## STANDARD OF REVIEW

This Court "review[s] FERC's orders by applying the Administrative Procedure Act's 'arbitrary and capricious' standard," *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 256 (D.C. Cir. 2007) (per curiam), reversing an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *NRG Power Mktg., LLC v. FERC*, 718 F.3d 947, 953 (D.C. Cir. 2013).  An agency decision is arbitrary and

capricious when not "based on a consideration of the relevant factors."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).  The Court defers to the agency's statutory interpretation if it is

"reasonable, consistent with the statutory purpose, and not in conflict with

the statute's plain language."  *Davis v. Latschar*, 202 F.3d 359, 364 (D.C. Cir.

2000).

## STANDING

BP has standing because it is "aggrieved by" FERC's decision

allowing Dominion to discriminate against BP in violation of the NGA.  15

U.S.C. § 717r(b).  This decision injured BP by depriving it of an opportunity

to relinquish services that cost BP approximately $25 million per year.  *See*

97 FERC at 61,195; BP Protest 3; *Moreau v. FERC*, 982 F.2d 556, 565 (D.C.

Cir. 1993) (party has standing to challenge FERC order if "it has sustained

'injury in fact' to an interest 'arguably within the zone of interests to be

protected or regulated' by FERC under the Act" (alteration omitted)).

## ARGUMENT

**I.** **FERC Erred In Holding That Customers Receiving Similar LNG Terminal Services Under Different "Regulatory Regimes" Are Not Similarly Situated.**

**A.** **The EPAct Prohibits Discrimination Between Customers Under Different Regulatory Regimes.**

**1.** **FERC Ignored Clear Statutory Text And Unreasonably Interpreted The Statute.**

Undue discrimination is an unwarranted difference in treatment between two customers who are similarly situated with regard to the term or condition at issue. *See, e.g., NRG Power Mktg.*, 718 F.3d at 958 ("To prevail on an undue discrimination challenge, NRG must demonstrate that it and ConEd are similarly situated for purposes of the approved settlement.").

Here, FERC did not dispute that Statoil was given a valuable benefit not provided to BP: the opportunity to relinquish terminal services that had diminished in value due to changes in market conditions. Rehearing ¶¶ 9-10. Several FERC decisions have held that a "difference in the terms of capacity turn-back is unduly discriminatory" and a natural gas facility may not "offer[] different terms to [one customer] after the ... open season than it did to all other shippers during the open season." *Natural Gas*

*Pipeline Co. of Am.,* 76 FERC ¶ 61,142, 61, 788 (1996); *see also Tenn. Gas*

*Pipeline Co.,* 97 FERC ¶ 61,225, 62,029-30 (2001) ("a shipper's right to

reduce, or terminate, its contract demand before the expiration of its

contract is a valuable right, since it can enable the shipper to avoid

significant liability for future reservation charges," and this right must "be

granted in a not unduly discriminatory manner."); *Portland Natural Gas*

*Trans. Sys.,* 137 FERC ¶ 61,004, ¶ 2 (2011) (similar); *Columbia Gas Trans.,*

*LLC,* 153 FERC ¶ 61,098, ¶¶ 25-28 (2015) (similar) .

    FERC also agreed that "the terminal service that [BP] receives from

Dominion is fundamentally the same as that provided to Statoil," and "BP

and Statoil may face the same risk that the market for imported natural gas

might change."  Rehearing ¶¶ 13-14.  Nonetheless, FERC held that BP and

Statoil are not similarly situated, because "section 7 and section 3 terminal

services are distinguishable," and "the difference in 'regulatory regime'

between open access and non-open access service is a relevant one."  *Id.*

¶ 13; *see* Order ¶ 47 ("The section 7 and section 3 terminal services are

distinguishable, thus BP and Statoil are not similarly situated.").

Accordingly, FERC held, the different treatment of Statoil and BP could not

constitute undue discrimination simply because of the different regulatory regimes applicable to the two customers.  Rehearing ¶ 13.

This interpretation of the statute is contrary to its text and unreasonable.  As explained above, *Hackberry* allows customers receiving the same services from the same LNG terminal to be differently regulated, but also holds that the agency will not permit "undue discrimination" between such customers.  101 FERC ¶ 61,294, ¶ 22.  The EPAct, which essentially codified *Hackberry*, added a provision prohibiting undue discrimination in precisely this scenario:  "An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in ... undue discrimination against existing customers as to their terms or conditions of service at the facility."  15 U.S.C. § 717b(e)(4).

FERC has recognized this purpose of the provision multiple times.  In approving Statoil as a non-open access customer in 2006, the Commission explained that "section 311(e)(4) of EPAct 2005, discussed above, specifically applies to Cove Point LNG's circumstances as an LNG terminal also offering services on an open-access basis." 115 FERC ¶ 61,337, ¶ 149.  FERC further explained "[t]hat section prohibits ... undue discrimination in terms and conditions of service against[] existing customers," *id*., and

27

requires the agency to "ensure that Cove Point LNG's existing customers will not ... be discriminated against" in favor of Statoil, the non-open access customer, *id*. ¶ 106. Similarly, here, FERC recognized that "EPAct 2005 amended the NGA to prohibit undue preferences and undue discrimination in the context of LNG terminals providing service authorized under both sections 3 and 7 of the NGA, which is the case at Cove Point." Order ¶ 45; *see* Rehearing ¶ 12 (same).

Nonetheless, FERC concluded that "BP and Statoil [a]re not similarly situated for the purposes of relinquishing terminal service because Statoil [is] an expansion customer receiving non-open access service under section 3, while BP [is] a LTD-1 shipper receiving open access terminal service under section 7." Rehearing ¶ 10. This interpretation effectively renders section 3(e)(4) a nullity: if the fact that an existing customer is regulated under section 7, while an expansion customer is regulated under section 3, prevents those customers from being similarly situated, then "undue discrimination against existing customers" in mixed terminals can never exist. 15 U.S.C. § 717b(e)(4). The Act's prohibition on such discrimination would be essentially meaningless.

28

In its order denying rehearing, FERC disagreed that its holding "would effectively render the antidiscriminatory provision of NGA section 3 meaningless," noting that "the terminal service that [BP] receives from Dominion is fundamentally the same as that provided to Statoil—Statoil receives no preference in nominating, scheduling, or the quality of the terminal service provided."  Rehearing ¶ 14.  The Commission further noted that it had approved section 30 of Dominion's GT&C "to prevent undue discrimination ... 'against the existing LTD customers as to their terms and conditions of service in the critical tariff areas.'"  *Id*.

This response simply confirms the deep flaws in FERC's reasoning: FERC recognized that BP and Statoil receive "fundamentally the same" service from Dominion, and that the anti-discrimination provision requires there to be "no undue discrimination" against existing customers like BP "in the critical tariff areas, such as nominating, scheduling, and operating conditions."  *Id*.  But FERC provided no reasoned basis for concluding that BP and Statoil are not similarly situated with regard to the critical right to turn back terminal service, when they are similarly situated with regard to other "critical tariff areas, such as nominating, scheduling and operating conditions."  *Id*.  Its decision therefore cannot stand.

## 2.    FERC Erred In Relying On Irrelevant Regulatory "Protections" Of Open Access Customers.

FERC also claimed that "the difference in 'regulatory regime'

between open access and non-open access service is a relevant one"

because "as an open access customer, BP has protections not afforded

Statoil." *Id.* ¶ 13.  In particular, FERC pointed to two regulatory rights of

open access customers: "a regulatory right to release all or a portion of its

terminal service to another shipper," and "regulatory rights regarding

retention of its capacity upon expiration of its initial service agreement."

*Id.*  Neither right, however, is relevant to turn-back.

The NGA's anti-discrimination provisions would have no force if

facilities could treat their customers unequally by identifying *any*

difference between them, no matter how minor or unrelated; rather, the

difference between customers must be relevant to and justify the particular

difference in treatment.  *See Sacramento Mun. Util. Dist. v. FERC*, 474 F.3d

797, 804 (D.C. Cir. 2007) (a distinction in treatment must be "reasonably

related to the goals of the challenged agreement"); *City of Frankfort v. FERC*,

678 F.2d 699, 707 (7th Cir. 1982) (where "factual differences did not relate to

30

or justify a difference in treatment" then "the disparity in treatment is unduly discriminatory").

Accordingly, the regulatory rights of open access customers do not warrant denying them turn-back opportunities unless the rights are relevant to turn-back and provide a reason for treating BP less favorably. Yet FERC made no attempt to explain the relevance of the cited regulations. These regulations are irrelevant to turn-back because they are designed to address entirely different market conditions: turn-back offers customers the ability to terminate their commitments and avoid significant financial obligations when the market is unfavorable, while both release and extension rights give customers the ability to enhance their positions in a favorable market.

FERC first pointed to the "regulatory right to release all or a portion of [the customer's] terminal service to another shipper." Rehearing ¶ 13. As FERC states, regulations require that open access shippers such as BP be permitted to release their capacity to a replacement shipper. *See* 18 C.F.R. § 284.8(b)(1). That right, however, is fundamentally different from a turn-back right because there must be a replacement shipper willing to contract for the released services. *See Williston Basin Interstate Pipeline Co. v. FERC,*

31

519 F.3d 497, 498 (D.C. Cir. 2008).  The releasing shipper remains fully

responsible for all charges, including any difference between its contract

rates and the rate the replacement shipper is willing to pay.  *See* Energy

Info. Admin., *Natural Gas 1996: Issues and Trends* 42 (Apr. 1996),

http://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/nat

ural_gas_1996_issues_trends/pdf/it96ch2.pdf.  Thus, release is primarily

useful when the market is thriving; in a market downturn, other shippers

are unlikely to pay for a customer's capacity.  By contrast, a turn-back

allows a customer to terminate its commitments, and avoid further charges

for unwanted services—a valuable right when the market is unfavorable.

Likewise, there is no reasonable relation between the right to extend

services and the right to relinquish services; indeed, those rights are

opposites.  Under FERC's regulations, open access customers have the

right to retain capacity, provided they give notice and match the longest

term and highest rate for that service.  *See* 18 C.F.R. § 284.221(d)(2)(ii).

Again, this right is useful in a thriving market, when a customer wishes to

continue its current services.  In a market downturn, however, the right to

extend services that a customer no longer wants is unhelpful, while the

right to turn back services is valuable.  *See supra* at 15-16; Rehearing ¶ 13

32

(noting "that market conditions might render these rights more or less valuable to BP at any given point in time").

Thus, FERC identified no differences between BP and Statoil that justify the clear and significant disparity in their treatment with respect to turn-back rights. To the contrary, FERC agreed that BP and Statoil receive "fundamentally the same" terminal services, and "may face the same risk that the market for imported natural gas might change." Rehearing ¶¶ 13-14. FERC's holding that no undue discrimination occurred is thus arbitrary, capricious and contrary to law. It should be reversed, and the agency directed to require DCP to hold a reverse open season.

**B.     FERC Failed To Analyze Adequately Whether Statoil And BP Are Similarly Situated.**

**1.     BP's "Regulatory Protections" Do Not Prevent It From Being Similarly Situated To Statoil, Because Statoil May Have Similar Contractual Protections.**

Even if BP's regulatory rights were relevant, FERC's decision must be remanded because the agency failed to undertake an adequate analysis of whether "factual differences [between BP and Statoil] relate to or justify a difference in treatment." *City of Frankfort*, 678 F.2d at 707. Indeed, FERC failed to undertake *any* analysis as to whether Statoil has similar rights under the terms of its contract with Dominion, despite evidence suggesting

33

that it does.[2]  FERC's conclusion that BP has "protections not afforded Statoil" thus lacks any reasonable basis.  Rehearing ¶ 13.

In 2006, Cove Point represented to the Commission that "Section 3 Firm Service customers will also be entitled to assign their entitlements to other parties," suggesting that Statoil may have a contractual right similar to BP's regulatory release right.  115 FERC ¶ 61,337, ¶ 16.  Indeed, Statoil may be better situated than BP in this regard.  BP's regulatory release right is governed by cumbersome rules, notably requiring a notice period and providing complex capacity allocation mechanisms.  18 C.F.R. § 284.8(c)-(e).  These provisions do not apply to Statoil, whose contractual right to release and assign its capacity may involve less burdensome mechanisms.  *See* GT&C § 30 (exempting Statoil from tariff provisions governing release and assignment).  But the Commission did not inquire into Statoil's contractual rights, and accordingly had no basis for concluding that BP has "protections not afforded Statoil."  *See* Rehearing ¶ 13.

---

[2] While the statute provides that FERC, prior to 2015, could not "condition an order on ... a requirement to file with the Commission schedules or contracts," 15 U.S.C. § 717b(e)(3)(B)(ii)(III), FERC could require facilities to supply sufficient information to ensure the contract is not unduly discriminatory, as FERC did in 2006 when approving the addition of Statoil as an expansion customer.  115 FERC ¶ 61,337, ¶ 18.

Likewise, BP and Statoil may have similar rights to retain capacity. Statoil represented in its filings that "the terms of this private contract [between Statoil and Dominion] gave the parties certain rights and obligations related to … contract extension."  Statoil Answer at 3 (June 14, 2013).  Yet FERC undertook no examination of Statoil's situation in this regard.  *See* Rehearing ¶ 13.

FERC's failure to inquire into and compare Statoil and BP's release and retention rights before concluding that they are dissimilar is arbitrary and capricious, necessitating a remand.  *State Farm*, 463 U.S. at 43.

### 2. FERC's Remaining Reasons Also Fail To Demonstrate That Statoil Received No Undue Preference.

The Commission's remaining reasons for finding no undue discrimination are equally flawed.  First, FERC stated it was "not concerned with the fact that in addition to relinquishing section 3 terminal service Statoil also turned back section 7 service on the Cove Point Pipeline because Dominion held an open season providing all shippers an opportunity to turnback this service."  Rehearing ¶ 15.  This open season cannot excuse Dominion's failure to provide BP the same opportunity as Statoil to turn back its *terminal service*.

"As DCP was well aware at the time it conducted these open seasons, relinquishing Cove Point Pipeline capacity without a corresponding relinquishment of storage and regasification capacity in the terminal would have rendered BP Energy's existing storage and regasification entitlements at the LNG terminal virtually useless."  BP Protest 8-9.  BP's capacity at the Cove Point Terminal and the Cove Point Pipeline function as a seamless whole; when BP offloads imported gas, it must be able to ship it to interconnections on the U.S. pipeline grid.  Thus, the import terminal service has no value unless DCP "ensure[s] that the customer can … have the LNG vaporized and re-delivered."  97 FERC at 61,203.  Unsurprisingly, none of Dominion's customers (including Statoil) accepted the offer to turn back pipeline services alone.  Order ¶ 40.

In denying rehearing, FERC did not disagree that the offer to turn back pipeline service alone was essentially worthless, instead stating "[w]hether or not it was in BP's business interest to relinquish section 7 service on the Cove Point Pipeline does not alter our observation that Dominion's open season provided all shippers the chance to turn back section 7 service."  Rehearing ¶ 15.  But because Dominion's offer to Statoil to turn back both pipeline and terminal services was far more valuable, its

empty offer to BP to turn back only pipeline services cannot support its finding that Dominion's treatment of BP was not unduly discriminatory.

In addition, the Commission found that BP was not unduly discriminated against because "Dominion has not proposed to change the terms and conditions of service for BP." *See* Order ¶ 46. But undue discrimination is a matter of the *relative* treatment of customers; exempting one customer from onerous terms while continuing to enforce them against another customer is clearly a type of undue discrimination. *See Town of Norwood*, 587 F.2d 1306 (finding potential undue discrimination where petitioner's rate was unchanged while another customer was given a preferable rate). Indeed, the EPAct separately prohibits *both* "degradation of service to existing customers" *and* "undue discrimination against existing customers," demonstrating that an existing customer may be unduly discriminated against although its service is unaltered. 15 U.S.C. § 717b(e)(4).

Because FERC drew an "arbitrary distinction" between Statoil and BP, this Court should "remand this issue to the Commission for further consideration." *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1175 (D.C. Cir. 1996) (per curiam).

37

### C.    FERC Erred In Failing To Analyze Whether Dominion's Turnback Offer To Statoil Was A "Sweetheart Deal."

The Commission also erred by refusing to analyze whether "Dominion provided Statoil with inappropriate preferential treatment in consideration for commercial benefits to Dominion's parent company." Rehearing ¶ 16.  The Commission reasoned that "[a]s Statoil is Dominion's only current non-open access section 3 customer, there is no reason for the Commission to consider whether Dominion's actions might have constituted discrimination against another such customer for inappropriate reasons." *Id.*  But this analysis fails, because it is based on the agency's incorrect conclusion that customers under different regulatory regimes cannot be similarly situated.  *See supra* at 25-29.  Further, even if the difference in regulatory regimes could justify different treatment under other circumstances, unequal treatment motivated by the desire to benefit an unregulated affiliate is undue discrimination.

This Court has previously held that giving a '"sweetheart' deal" to one customer constitutes undue discrimination in an analogous situation under the Federal Power Act.  *Norwood*, 587 F.2d at 1313.  In *Norwood*, a utility had "a group of customers some of whom are guaranteed rather low

38

rates by fixed-price contracts while others who are similarly situated save for the absence of such contracts are charged more." *Id.* at 1311-12. This Court rejected FERC's decision that the different treatment was allowable due to the differences in the contracts, holding that "the Commission approach comes altogether too close to reading Section 205(b) out of the Federal Power Act." *Id.* at 1312.

*Norwood* held that where there is "no reason to question what occurred at the contract formation stage," such differences in contracts might not be unduly discriminatory. *Id.* However, if the "agreement was a 'sweetheart' deal negotiated at a time when the two companies were involved in merger discussions," it would constitute undue discrimination. *Id*. at 1313. *Norwood* concluded that "if such discrimination can be demonstrated, Section 205(b) requires that every effort be made to eliminate it." *Id*. Because the Commission "did not really explore" this allegation, *id*., the Court remanded.

Other cases have reached similar conclusions. For instance, *Cities of Bethany v. FERC*, 727 F.2d 1131 (D.C. Cir. 1984), held that "[r]ate disparities resulting from a private rate arrangement are lawful only when the agreement was reached through fair conduct and good faith by the parties"

39

not when the agreement "was a 'sweetheart' deal," where different customers were given "unequal opportunities to negotiate."  *Id.* at 1139-40; *see also United Mun. Distribs. Grp. v. FERC*, 732 F.2d 202, 212-13 (D.C. Cir. 1984) (holding that "the same reasoning applies" under the NGA).

Here, BP presented evidence that the turn-back offer to Statoil was a sweetheart deal to advance separate projects between Statoil and Dominion's parent, and FERC erred in refusing to investigate or analyze the issue.  When asked in an earnings call why DCP had granted Statoil what "seems like a pretty substantial concession with nothing else in hand," the CEO of DCP's parent responded by identifying plans "to work with our partner at the Cove Point expansion [Statoil] in development of infrastructure out of the Marcellus region in other ways."  *See supra* at 16-18.  In 2013, Dominion and Statoil agreed to a "further modification of the terms of the Cove Point Expansion service agreements" to allow an even "earlier termination of the contracts," with no other apparent reason for singling out Statoil for such preferential treatment.  DCP Answer 10-11. Based on this evidence, FERC should have investigated "DCP's underlying motivations" for the turn-back offer.  Protest 4 n.7.

Instead, the Commission made no findings as to whether Dominion's turn-back offer to Statoil was a sweetheart deal.  Rehearing ¶ 16.  This refusal to consider a highly relevant factor renders FERC's decision arbitrary and capricious.  *State Farm*, 463 U.S. at 43.

## II.   FERC Erred In Holding That Dominion's Tariff Is Adequate To Prevent Undue Discrimination.

Finally, FERC's rejection of BP's request that it require revisions to Dominion's tariff is arbitrary and capricious because it rested entirely on the Commission's erroneous finding that the turn-back offer to Statoil was not unduly discriminatory.  Order ¶ 76 ("[W]e found that Dominion did not act in an unduly discriminatory manner in allowing Statoil to turn-back its terminal capacity.  Thus, we will reject BP's request to require Dominion to file a new GT&C section 30."); *see* Rehearing ¶ 14 (same).

As described above, FERC misread 15 U.S.C. § 717b(e)(4) and undertook a legally inadequate analysis of the relative facts concerning BP and Statoil's contracts.  *See supra* at 25-40.  Accordingly, the Commission had no adequate basis to conclude that it was unnecessary to revise DCP's tariff to prevent undue discrimination.  A remand is required on this issue.  *United Distrib.*, 88 F.3d at 1175.

## CONCLUSION

For the foregoing reasons, this Court should reverse FERC's decision that there was no undue discrimination against BP, or remand to FERC to conduct a new analysis, under the correct legal framework and considering all relevant factors.

November 6, 2015                         Respectfully submitted,

                                         /s/ Erika L. Maley
                                         _____

Betsy R. Carr                            Virginia Seitz
BP Energy Company                        Erika L. Maley
201 Helios Way                           John T. Hebden
Houston, TX 77079                        Sidley Austin LLP
713.323.6353                             1501 K Street NW
Betsy.Carr@bp.com                        Washington, DC 20005
                                         202.736.8961
                                         emaley@sidley.com
                                         *Counsel for Petitioner BP Energy Company*

42

## CERTIFICATE OF COMPLIANCE

In accordance with Circuit Rule 32(a) and Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies that the accompanying brief has been prepared using 14-point Book Antiqua typeface, and is double-spaced (except for headings and footnotes).

The undersigned further certifies that the brief is proportionally spaced and contains 7,997 words exclusive of the certificate required by Circuit Rule 28(a)(1), table of contents, table of authorities, signature lines, and certificates of service and compliance.  The words of Opening Brief of Petitioner do not exceed 8,000 words, pursuant to this Court's Order of October 13, 2015.  The undersigned used Microsoft Word 2007 to compute the count.

/s/ Erika L. Maley
Erika L. Maley

43

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November, 2015, I electronically filed the foregoing Opening Brief of Petitioner with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Erika L. Maley
Erika L. Maley