**ORAL ARGUMENT NOT YET SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

**Nos. 15-1127 and 15-1205 (consolidated)**

_____

EARTHREPORTS, INC., *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

**BRIEF OF RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

_____

Max Minzner
General Counsel

Robert H. Solomon
Solicitor

Karin L. Larson
Susanna Y. Chu
Attorneys

For Respondent
Federal Energy Regulatory
 Commission
Washington, D.C. 20426

FINAL BRIEF: February 25, 2016

## CIRCUIT RULE 28(a)(1) CERTIFICATE

**A.     Parties:**  All parties and intervenors appearing before this Court are

identified in Petitioners' briefs.

**B.     Rulings Under Review:**

1.     Order Granting Section 3 And Section 7 Authorizations, *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 (Sept. 29, 2014) ("Authorization Order"), R. 1657, JA 616; and

2.     Order Denying Rehearing And Stay, *Dominion Cove Point LNG, LP*, 151 FERC ¶ 61,095 (May 4, 2015) ("Rehearing Order"), R. 1875, JA 834.

**C.     Related Cases:**  These cases have not previously been before this Court or

any other court.  With respect to case no. 15-1127, *EarthReports, Inc. (d/b/a/

Patuxent Riverkeeper), et al. v. FERC*, in which Sierra Club is a petitioner, three

related cases within the meaning of D.C. Cir. R. 28(a)(1)(C) are currently pending

in this Court:  *Sierra Club v. FERC*, D.C. Cir. No. 14-1249, and *Sierra Club, et al.

v. FERC*, D.C. Cir. No. 14-1275, both of which have been fully briefed and argued,

and *Sierra Club v. FERC*, D.C. Cir. No. 15-1133, for which briefing is completed.

In addition, a related administrative proceeding is pending at the Department

of Energy, Office of Fossil Energy:  *Dominion Cove Point LNG, LP*, DOE/FE

Docket No. 11-128-LNG (proceeding on application under section 3(a) of the

Natural Gas Act, 15 U.S.C. § 717b(a), for authorization to export liquefied natural

i

gas using the facilities that are the subject of the Federal Energy Regulatory

Commission's review in the challenged proceeding).

*/s/ Karin L. Larson*
Karin L. Larson

# **TABLE OF CONTENTS**

**PAGE**

STATEMENT OF ISSUES ........................................................................ 1

STATUTORY AND REGULATORY PROVISIONS ........................................... 2

COUNTER-STATEMENT OF JURISDICTION .................................................. 2

INTRODUCTION ................................................................................ 3

STATEMENT OF FACTS ....................................................................... 5

I.      STATUTORY AND REGULATORY BACKGROUND ........................... 5

        A.      Natural Gas Act ................................................................. 5

                1.      Regulation Of LNG Facilities And The Exportation Of LNG 5

                2.      Regulation Of Terminal And Transportation Services............ 8

        B.      National Environmental Policy Act ...................................... 9

II.     THE COVE POINT LIQUEFACTION PROJECT .................................. 12

        A.      The Cove Point LNG Terminal History ................................ 12

        B.      The Challenged Project ................................................... 15

        C.      The Commission's Environmental Review ..................... 17

        D.      The Authorization Order ................................................. 18

        E.      The Rehearing Order....................................................... 20

        F.      Motion For Stay.............................................................. 20

III.    THE DEPARTMENT OF ENERGY'S REVIEW ..................................... 21

## <u>TABLE OF CONTENTS</u>

**PAGE**

SUMMARY OF ARGUMENT ........................................................................ 26

ARGUMENT ................................................................................................. 29

I.  THE COMMISSION'S ENVIRONMENTAL REVIEW FULLY
    COMPLIED WITH THE NATIONAL ENVIRONMENTAL
    POLICY ACT ....................................................................................... 29

    A.  Standard Of Review For NEPA Challenges .................................. 30

    B.  The Commission Properly Found That Any Increase In
        Natural Gas Production Is Not An Indirect Impact,
        Under NEPA, Of The Liquefaction Project .................................. 32

        1.  There Is No Causal Link Between The Commission's
            Approval Of The Liquefaction Project And Any Potential
            Increased Gas Production ...................................................... 33

        2.  There Are No Reasonably Foreseeable Induced Gas
            Production Activities Tied To The Liquefaction Project ...... 42

    C.  The Commission Reasonably Analyzed The Project's
        Greenhouse Gas Emissions ............................................................ 48

    D.  Additional Review Would Be Unnecessarily Duplicative Of
        Department Of Energy Review ...................................................... 55

    E.  The Commission Took A Hard Look At Project Impacts
        On Water Quality, Whales, And Safety .......................................... 57

        1.  FERC Fully Identified Ballast Water Impacts ...................... 58

        2.  FERC Reasonably Relied On Prior Environmental
            Analysis To Identify Impacts On The Right Whale .............. 61

        3.  FERC Fully Identified And Considered Safety Issues .......... 64

iv

# <u>TABLE OF CONTENTS</u>

**PAGE**

F.      *Amici Curiae* Are Precluded From Raising New Issues ................. 67

II.     BP ENERGY'S PETITION IN CASE NO. 15-1205 SHOULD BE
        DISMISSED FOR LACK OF STANDING, AND, IN ANY EVENT,
        THE COMMISSION REASONABLY REJECTED ITS UNDUE
        DISCRIMINATION CLAIM .................................................................... 69

        A.      BP Energy's Alleged Harm Does Not Satisfy Constitutional
                Standing Requirements .................................................... 69

        B.      Standard Of Review Governing BP Energy's Claim ...................... 71

        C.      NGA Section 3(e)(4) Bars BP Energy's Claim .............................. 73

        D.      The Commission Reasonably Determined That BP Energy
                 And Statoil Are Not Similarly Situated ......................................... 76

        E.      FERC Reasonably Determined That Dominion's Tariff
                Adequately Addresses Undue Discrimination ................................. 81

CONCLUSION ................................................................................. 82

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*Ala. Mun. Distribs. Grp. v. FERC*,
   300 F.3d 877 (D.C. Cir. 2002)................................................................. 68

*Anderson v. FERC*,
   333 F. App'x 575 (D.C. Cir. 2009) ........................................................ 71

*Associated Gas Distribs. v. FERC*,
   824 F.2d 981 (D.C. Cir. 1987)........................................................... 76-77

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983)........................................................................... 10, 31

*Barnes v. U.S. Dep't of Transp.*,
   655 F.3d 1124 (9th Cir. 2011) ........................................................... 40, 51

*Beardslee v. Inflection Energy, LLC*,
   761 F.3d 1124 (9th Cir. 2011) ................................................................ 32

*Bear Lake Watch, Inc. v. FERC*,
   324 F.3d 1071 (9th Cir. 2003) ........................................................... 60, 67

*Cal. Dep't of Water Res. v. FERC*,
   306 F.3d 1121 (D.C. Cir. 2002)............................................................... 68

*Cia Mexicana de Gas v. FPC*,
   167 F.2d 804 (5th Cir. 1948) .................................................................... 7

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)........................................................................... 71-72

*Cities of Bethany v. FERC*,
   727 F.2d 1131 (D.C. Cir. 1984)............................................................... 77

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**COURT CASES:**                                                                    **PAGE**

*Cities of Newark v. FERC*,
    763 F.2d 533 (3d Cir. 1985) ............................................................ 71, 73

*City of Arlington v. FCC*,
    133 S. Ct. 1863 (2013)............................................................ 72

*City of Dallas v. Hall*,
    562 F.3d 712 (5th Cir. 2009) ............................................... 34

*City of Fall River v. FERC*,
    507 F.3d 1 (1st Cir. 2007)..................................................... 61

*City of Shoreacres v. Waterworth*,
    420 F.3d 440 (5th Cir. 2005) ........................................... 34, 41

*Coal. for Canyon Pres. v. Bowers*,
    632 F.2d 774 (9th Cir. 1980) ............................................... 40

*Coal. for Responsible Growth & Res. Conservation v. FERC*,
    485 F. App'x 472 (2d Cir. 2012)..................................... 37, 38

*Colo. Envtl. Coal. v. Dombeck*,
    185 F.3d 1162 (10th Cir. 1999) ...................................... 56, 57

*Columbia Riverkeeper v. U.S. Coast Guard*,
    761 F.3d 1084 (9th Cir. 2014) ............................................ 12

*Consol. Edison Co. of N.Y., Inc. v. FERC*,
    315 F.3d 316 (D.C. Cir. 2003)............................................... 7

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004)....................................... 10, 11, 34, 41, 48

*Duncan's Point Lot Owners Ass'n, Inc. v. FERC*,
    522 F.3d 371 (D.C. Cir. 2008)............................................. 48

# TABLE OF AUTHORITIES

**COURT CASES:**                                                      **PAGE**

*EarthReports, Inc. v. FERC*,
   No. 15-1127 (D.C. Cir. June 12, 2015) .................................................. 21

*E. Ky. Power Coop. v. FERC*,
   489 F.3d 1299 (D.C. Cir. 2007) ................................................................. 68

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003) ................................................................................... 68

*Eldred v. Ashcroft*,
   255 F.3d 849 (D.C. Cir. 2001) ................................................................... 68

*Eldred v. Reno*,
   239 F.3d 372 (D.C. Cir. 2001) ................................................................... 68

*Friends of the Ompompanoosuc v. FERC*,
   968 F.2d 1549 (2d Cir. 1992) .................................................................... 30

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992) ..................................................................... 60

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
   609 F.3d 897 (7th Cir. 2010) ............................................................. 43, 45

*High Country Conservation Advocates v. U.S. Forest Serv.*,
   52 F. Supp. 3d 1174, 1190 (D. Colo. 2014) ......................................... 53-54

*Inland Empire Pub. Lands Council v. Schultz*,
   992 F.2d 977 (9th Cir. 1993) ..................................................................... 67

*League of Wilderness Defenders/Blue Mtns. Biodiversity Proj. v. Connaughton*,
   Case No. 3:12-cv-02271-HZ, 2014 WL 6977611 (D. Or. 2014) ............ 54

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................. 69-70

# TABLE OF AUTHORITIES

**COURT CASES:**                                                      **PAGE**

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)...................................................................... 31, 60, 61

*NO Gas Pipeline v. FERC*,
    756 F.3d 764, 767-68 (D.C. Cir. 2014) ................................................. 70

*MetroPCS Cal., LLC v. FCC*,
    644 F.3d 410 (D.C. Cir. 2011)................................................................ 72

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983).................................................................................. 53

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) ............................................................ 44, 45

*Minisink Residents for Envtl. Pres. & Safety v. FERC*,
    762 F.3d 97 (D.C. Cir. 2014)...................................................... 10, 31, 57

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*,
    554 U.S. 527 (2008)......................................................................... 14, 70

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015)...................................... 31, 35, 40, 57, 67

*Nat'l Comm. for the New River, Inc. v. FERC*,
    373 F.3d 1323 (D.C. Cir. 2004)................................................... 30, 31, 67

*Nat. Res. Def. Council, Inc. v. Callaway*,
    524 F.2d 79 (2d Cir. 1975) ...................................................................... 45

*Nat. Res. Def. Council, Inc. v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988)................................................................ 31

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006)........................................................... 30, 31

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*N.J. Dep't of Envtl. Prot. v. NRC*,
    561 F.3d 132 (3d Cir. 2009) ................................................................ 41

*N.C. Utils. Comm'n v. FERC*,
    42 F.3d 659 (D.C. Cir. 1994) ............................................................... 13

*N. Plains Res. Council v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ............................................................. 47

*N. Slope Borough v. Andrus*,
    642 F.2d 589 (D.C. Cir. 1980) ............................................................. 31

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ......................................................... 34, 56

*PNGTS Shippers' Grp. v. FERC*,
    592 F.3d 132 (D.C. Cir. 2010) ............................................................. 71

*Pub. Utils. Comm'n of Cal. v. FERC*,
    900 F.2d 269 (D.C. Cir. 1990) ............................................................. 64

*Resident Council of Allen Parkway Vill. v. HUD*,
    980 F.2d 1043 (5th Cir. 1993) ............................................................. 68

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ...................................................................... 10, 30

*Sacramento Mun. Util. Dist. v. FERC*,
    474 F.3d 797 (D.C. Cir. 2007) ............................................................. 77

*Sierra Club v. Froehlke*,
    486 F.2d 946 (7th Cir. 1973) .......................................................... 47-48

*Sierra Club v. Marsh*,
    976 F.2d 763 (1st Cir. 1992) ............................................................... 42

# TABLE OF AUTHORITIES

**COURT CASES:**                                                                    **PAGE**

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    295 F.3d 1209 (11th Cir. 2002) ............................................................. 56

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    701 F.2d 1011 (2d Cir. 1983) ................................................. 56

*Sylvester v. U.S. Army Corps of Eng'rs*,
    884 F.2d 394 (9th Cir. 1980) .................................................. 34

*Taxpayers of Mich. Against Casinos v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ................................................. 11

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ......................................... 10, 63

*Town of Barnstable v. FAA*,
    740 F.3d 681 (D.C. Cir. 2014) ................................................. 56

*Town of Norwood v. FERC*,
    587 F.2d 1306 (D.C. Cir. 1978) ............................................... 80

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
    599 F.3d 705 (D.C. Cir. 2010) ................................................. 72

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
    435 U.S. 519 (1978) ................................................................ 31

*W. Minn. Mun. Power Agency v. FERC*,
    806 F.3d 588 (D.C. Cir. 2015) ................................................. 72

*W. Va. Pub. Servs. Comm'n v. Dep't of Energy*,
    681 F.2d 847 (D.C. Cir. 1982) ................................................... 7

*\*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ................................... 48, 51, 53

# TABLE OF AUTHORITIES

**COURT CASES:**                                                                          **PAGE**

*WildEarth Guardians v. U.S. Forest Serv.*,
    828 F. Supp. 2d 1223 (D. Colo. 2014) .................................................... 52

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................... 21

**ADMINISTRATIVE CASES:**

*\*Cent. N.Y. Oil & Gas Co.*,
    137 FERC ¶ 61,121 (2011).............................................................. 37, 38

*\*Cent. N.Y. Oil & Gas Co.*,
    138 FERC ¶ 61,104 (2011).............................................................. 37, 38

*Columbia Gas Transmission Corp.*,
    103 FERC ¶ 61,388 at PP 4-6, 12 (2003), *on reh'g*,
    105 FERC ¶ 61,373 (2003)............................................................... 78-79

*Constitution Pipeline Co., LLC*,
    149 FERC ¶ 61,199 (2014).................................................................... 43

*Corpus Christi Liquefaction, LLC*,
    149 FERC ¶ 61,283 (2014).................................................................... 51

*Corpus Christi Liquefaction, LLC*,
    151 FERC ¶ 61,098 (2015)............................................................. 46, 51

*Cove Point LNG Ltd. P'ship*,
    68 FERC ¶ 61,377 (1994).................................................................... 13

*Cove Point LNG Ltd. P'ship*,
    97 FERC ¶ 61,043 (2001).................................................................... 14

*Dominion Cove Point LNG, LP*,
    115 FERC ¶ 61,337 (2006), *on reh'g*,
    118 FERC ¶ 61,007 (2007)......................................................... 9, 14, 74

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**                                            **PAGE**

*Dominion Cove Point LNG, LP,*
    119 FERC ¶ 61,209 (2007)................................................................ 71, 74

*Dominion Cove Point LNG, LP,*
    128 FERC ¶ 61,037, *on reh'g,*
    129 FERC ¶ 61,137 (2009)..................................................................... 14

*Dominion Cove Point LNG, LP,*
    129 FERC ¶ 61,073 (2009)..................................................................... 78

*Dominion Cove Point LNG, LP,*
    134 FERC ¶ 61,219 (2011)................................................................ 75, 78

*\*Dominion Cove Point LNG, LP,*
    148 FERC ¶ 61,244 (2014)........................4, 15-19, 22, 29, 32, 33, 35-37,
                                           41-47, 49, 50, 54, 58-61, 63, 65,
                                             66, 68, 69, 73, 75, 76, 81

*\*Dominion Cove Point LNG, LP,*
    151 FERC ¶ 61,095 (2015)...................... 4, 13, 16, 20, 33, 34, 36, 37, 42,
                                         43, 45, 46, 48-50, 52-54, 59, 60-63,
                                        65, 66, 69, 73, 74, 77, 79, 80, 81

*Freeport LNG Dev., L.P.,*
    149 FERC ¶ 61,119 (2014)..................................................................... 47

*Hackberry LNG Terminal, L.L.C.,*
    101 FERC ¶ 61,294 (2002) *on reh'g,*
    104 FERC ¶ 61,269 (2003)....................................................................... 8

*Sabine Pass Liquefaction Expansion, LLC et al.,*
    151 FERC ¶ 61,012, *reh'g denied,*
    151 FERC ¶ 61,253 (2015)................................................................ 50-51

# TABLE OF AUTHORITIES

**STATUTES:**                                                                     **PAGE**

Administrative Procedure Act

    5 U.S.C § 706(2)(A) ................................................................. 30

Department of Energy Organization Act

    42 U.S.C § 7151(b)................................................................... 5

    42 U.S.C. § 7172(e) ................................................................. 6

Natural Gas Act

    15 U.S.C. § 717a(11) ............................................................... 6

    15 U.S.C. § 717b................................................................ 3, 5, 18

    15 U.S.C. § 717b(a) ......................................................... 6, 21, 23

    15 U.S.C. § 717b(b) ................................................................. 6

    15 U.S.C. § 717b(c) ........................................................ 6, 22, 41

    15 U.S.C. § 717b(e) ................................................................. 6

    15 U.S.C. § 717b(e)(1) ............................................................. 6

    15 U.S.C. § 717b(e)(3) ............................................................. 8

    *15 U.S.C. § 717b(e)(4) ..................................... 2, 8, 9, 19, 28, 72, 73, 76

    15 U.S.C. § 717b-1(a).............................................................. 15

    15 U.S.C. § 717c...................................................................... 8

    15 U.S.C. § 717d...................................................................... 8

xiv

# TABLE OF AUTHORITIES

**STATUTES:**                                                            **PAGE**

15 U.S.C. § 717f ............................................................................. 3, 8, 9

15 U.S.C. § 717f(c)(1)(A) ............................................................. 7

15 U.S.C. § 717f(e) ......................................................................... 7

15 U.S.C. § 717n(b)(1) ................................................................... 12

15 U.S.C. § 717r ............................................................................. 25

National Environmental Policy Act

42 U.S.C. §§ 4321, *et seq.* .......................................................... 10

**REGULATIONS:**

18 C.F.R. § 157.21(b) ..................................................................... 15

40 C.F.R. § 1500.1(c) ..................................................................... 56

40 C.F.R. § 1501.4 .......................................................................... 10

40 C.F.R. § 1501.4(e) ..................................................................... 11

40 C.F.R. § 1501.5(a) ..................................................................... 12

40 C.F.R. § 1501.6 .......................................................................... 12

40 C.F.R. § 1502.20 ........................................................................ 62

40 C.F.R. § 1503.2 .......................................................................... 12

40 C.F.R. § 1503.3 .......................................................................... 12

40 C.F.R. § 1506.3 .................................................................... 12, 24

# TABLE OF AUTHORITIES

**REGULATIONS:**                                                                                           **PAGE**

40 C.F.R. § 1508.8(b) ................................................................... 33

40 C.F.R. § 1508.9 ....................................................................... 11

40 C.F.R. § 1508.9(a) ................................................................... 11

40 C.F.R. § 1508.9(b) ................................................................... 11

40 C.F.R. § 1508.13 ...................................................................... 11

40 C.F.R. § 1508.28(b) ................................................................. 62

49 C.F.R. Part 193 ....................................................................... 65

**OTHER MATERIALS:**

Council on Environmental Quality, *Revised Draft Guidance for Greenhouse Gas Emissions and Climate Change Impacts* (Dec. 2014) ............................ 51

U.S. Department of Energy, *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States* (Aug. 2014) ...................................................... 24

U.S. Department of Energy, *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States*, (May 2014) ......................................................................... 24

*Fact Sheet: Social Cost of Carbon* (Nov. 2013) ............................................. 52

U.S. Energy Information Administration, *Effect of Increased Natural Gas Exports on Domestic Energy Markets, as Requested by the Office of Fossil Energy* (Jan. 2012) ............. 24, 46-47

# <u>TABLE OF AUTHORITIES</u>

**OTHER MATERIALS:**                                           **PAGE**

U.S. Energy Information Administration,
     *Overview of the National Energy Modeling System*................................ 46

# **GLOSSARY**

| | |
|---|---|
| 2012 Export Study | U.S. Energy Information Administration, *Effect of Increased Natural Gas Exports on Domestic Energy Markets, as Requested by the Office of Fossil Energy* (Jan. 2012) |
| Authorization Order | *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 (Sept. 29, 2014), R. 1657, JA 616 |
| BP Energy | BP Energy Company, petitioner in case no. 15-1205 |
| Br. | Brief |
| Commission or FERC | Federal Energy Regulatory Commission |
| Cove Point Pipeline | Dominion's 88-mile natural gas pipeline that interconnects the Terminal with the interstate natural gas pipeline network |
| Department | U.S. Department of Energy |
| Dominion | Dominion Cove Point LNG, LP, owner and operator of the Cove Point Terminal |
| EarthReports | Environmental petitioners in case no. 15-1127: EarthReports, Inc. (d/b/a Patuxent Riverkeeper), Sierra Club, and Chesapeake Climate Action Network |
| EA or Environmental Assessment | Environmental Assessment for the Cove Point Liquefaction Project, Docket No. CP13-113-000 (May 2014), R. 574, JA 263 |
| Environmental Addendum | U.S. Department of Energy, *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States* (Aug. 2014) |
| Expansion Project | The 2006 project that nearly doubled the size of the Cove Point Terminal |

| | |
|---|---|
| Export Customers | The two Liquefaction Project customers: Pacific Summit Energy, LLC and GAIL Global (USA) LNG, LLC |
| Export Order | *Dominion Cove Point LNG, LP*, Final Opinion and Order Granting Long-Term Multi-Contract Authorization to Export Liquefied Natural Gas by Vessel from the Cove Point LNG Terminal in Calvert County, Maryland, to Non-Free Trade Agreement Nations, Order No. 3331-A, DOE/FE Docket No. 11-128-LNG (May 7, 2015), *reh'g pending* |
| Greenhouse Gas Report | *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States*, published by the Department of Energy on June 4, 2014 |
| JA | Joint Appendix |
| Liquefaction Project or Project | Dominion Cove Point LNG, LP's proposal to site, construct, and operate facilities for the liquefaction and export of domestically-produced natural gas at Dominion's existing LNG import terminal in Calvert County, Maryland |
| LNG | Liquefied natural gas |
| NEPA | National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* |
| NGA | Natural Gas Act, 15 U.S.C. §§ 717, *et seq.* |
| P | The internal paragraph number within a FERC order |
| Pier Reinforcement Project | The 2009 project that upgraded the Cove Point Terminal |
| Rehearing Order | *Dominion Cove Point LNG, LP*, 151 FERC ¶ 61,095 (May 4, 2015), R. 1875, JA 834 |

Statoil                                The sole customer of the 2006 Cove Point
                                       Expansion Project:  Statoil Natural Gas

Terminal                               The existing Cove Point LNG import terminal
                                       facility, including LNG storage tanks,
                                       liquefaction and gasification facilities, and
                                       marine facilities for large seagoing vessels
                                       located in Calvert County, Maryland

# In the United States Court of Appeals
# for the District of Columbia Circuit

Nos. 15-1127 and 15-1205 (consolidated)
_____

EARTHREPORTS, INC., *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.
_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION
_____

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION
_____

## STATEMENT OF ISSUES

In 2014, the Federal Energy Regulatory Commission ("Commission" or "FERC") conditionally authorized an application to construct and operate facilities for the transport and liquefaction of natural gas for export as liquefied natural gas ("LNG") at an existing LNG terminal. To make way for the new export service, the terminal owner negotiated an early contract termination with an existing import customer.

The questions presented on appeal are:

1.  In case no. 15-1127, whether the Commission's environmental review, which spanned over two years, resulted in a 205-page environmental assessment that considered direct, indirect, and cumulative impacts of the construction and operation of additional liquefaction facilities at an existing, operating LNG terminal, and imposed 79 mandatory environmental conditions, satisfied the procedural requirements of the National Environmental Policy Act ("NEPA").

2.  In case no. 15-1205, assuming jurisdiction, whether the Commission reasonably determined that the terminal owner did not act in an unduly discriminatory manner, as prohibited by the Natural Gas Act, 15 U.S.C. § 717b(e)(4), when it agreed to shorten the term of a non-open access customer's service contract, without offering a corresponding early contract termination option to an open access customer.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the Addendum.

## COUNTER-STATEMENT OF JURISDICTION

The Commission agrees that the Court has jurisdiction to review the environmental groups' petition in case no. 15-1127.  However, in case no. 15-1205, petitioner BP Energy Company fails to demonstrate that it has suffered a concrete and particularized injury sufficient to satisfy minimum constitutional standing requirements.  *See infra* Argument section II.A of the Argument.

2

**INTRODUCTION**

This proceeding involves the Commission's review of a proposed LNG

project and related customer contracts.  Specifically, this case arises from the

application of Dominion Cove Point LNG, LP ("Dominion") to the Commission

under sections 3 and 7 of the Natural Gas Act, 15 U.S.C. §§ 717b, 717f, for

authorization to construct and operate additional natural gas facilities at the

existing Cove Point LNG Terminal in Calvert County, Maryland and on its Cove

Point pipeline.  The Terminal has been used since 1978 to receive imported LNG

from ocean-going carriers, temporarily store LNG in on-site tanks, and vaporize

the LNG for delivery to U.S. markets.  *See* Environmental Assessment for the

Cove Point Liquefaction Project at 2 (May 2014) ("EA" or "Environmental

Assessment"), R. 574, JA 278.  Between 1994 and 2009, the LNG Terminal has

been expanded and/or modified (after FERC's environmental review and

authorization) four times.  *Id.*  In 2013, Dominion sought a fifth modification at the

Cove Point Terminal.

In the challenged proceeding, the Commission, after conducting an

environmental review, authorized Dominion's April 2013 application to construct

and operate one additional liquefaction train (a refrigerant compressor, which

supercools compressed gas to transform it into liquid) and associated facilities to

support the export of LNG – which must separately be authorized by the

Department of Energy – from the existing Terminal (the "Liquefaction Project").[1]

*See Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 at PP 1, 8 (Sept. 29, 2014), JA 618, 621 ("Authorization Order"); *see also Dominion Cove Point LNG, LP*, 151 FERC ¶ 61,095 at P 1 (May 4, 2015), JA 834 ("Rehearing Order").

Once the liquefaction train is added to the existing LNG Terminal, Dominion will provide import and/or export service of up to 5.75 million metric tons of LNG per year to two new customers:  Pacific Summit Energy, LLC and GAIL Global (USA) LNG, LLC (together the "Export Customers").  *See* Authorization Order PP 7-8, JA 620-21.  This service is in addition to the import service Dominion will continue to make available to three existing customers, including BP Energy Company ("BP Energy").

In case no. 15-1127, the environmental petitioners, EarthReports, Inc. (d/b/a Patuxent Riverkeeper), Sierra Club, and Chesapeake Climate Action Network (together "EarthReports"), challenge the Commission's environmental review of Dominion's most recent modification of the Cove Point Terminal.

In case no. 15-1205, petitioner BP Energy, an existing open access import customer of Dominion, challenges the Commission's determination that Dominion

---

[1]  Dominion's application also includes construction of additional natural gas facilities along the Cove Point Pipeline in Virginia, which EarthReports does not challenge.  *See* EA at 1-2, JA 277-78 (describing the proposed pipeline upgrades).

did not act in an unduly discriminatory manner when it agreed to shorten the term of service contracts with Statoil Natural Gas LLC ("Statoil"), the sole customer of an expansion project approved in 2006, without offering a corresponding "turnback" opportunity to BP Energy.

## STATEMENT OF FACTS

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    Natural Gas Act

#### 1.    Regulation Of LNG Facilities And The Exportation Of LNG

Under the Natural Gas Act, regulatory oversight for the export of LNG and the facilities that support the export is divided between the Commission and the Department of Energy.  The Commission authorizes the physical facilities and the Department of Energy, which is generally charged with developing and coordinating national energy policy, oversees the commodity.

Specifically, section 3 of the Act, 15 U.S.C. § 717b, prohibits the exportation of any natural gas from the United States to a foreign country without "first having secured an order of the Commission authorizing" such exportation. In 1977, Congress transferred the regulatory functions of NGA section 3 to the Department of Energy (the "Department").  *See* 42 U.S.C. § 7151(b) (Department of Energy Organization Act).  The Department delegated back to the Commission the limited authority under NGA section 3(e), 15 U.S.C. § 717b(e), to approve the

siting, construction, and operation of import and export facilities.  *See* DOE

Delegation Order No. 00-044.00A (effective May 16, 2006) (renewing delegation

to the Commission authority over the construction and operation of LNG

facilities); *see also* 43 Fed. Reg. 47,796, 47,772 (Oct. 17, 1978) (1978 delegation);

42 U.S.C. § 7172(e) (Commission authority includes any matter assigned by the

Department).  The Department retains, under sections 3(a)-(c) of the NGA,

exclusive authority over the export of natural gas as a commodity, including the

responsibility to determine whether the exportation of natural gas will "not be

inconsistent with the public interest."  15 U.S.C. § 717b(a); *see also id.* § 717b(b)-

(c) (exports to nations with a free trade agreement).

　　　The Commission's NGA section 3(e) authority, as exercised here, is

restricted to licensing the "siting, construction, expansion, or operation" of LNG

terminals.  15 U.S.C. § 717b(e)(1); *see also id.* § 717a(11) (defining "LNG

terminal" as onshore facilities used to receive or process natural gas that is

imported to or exported from the U.S., or transported by ships in interstate

commerce).  In doing so, the Commission considers the technical and

environmental aspects of the physical facilities themselves.  The Commission

"shall" authorize a proposed LNG project unless it finds that construction and

operation of the proposed facilities "will not be consistent with the public interest."

*Id.* § 717b(a).

Separately, NGA section 7 vests the Commission with authority over the construction and operation of interstate natural gas pipeline facilities.  15 U.S.C. § 717f(c)(1)(A).  *See*, *e.g.*, *Consol. Edison Co. of N.Y., Inc. v. FERC*, 315 F.3d 316, 319 (D.C. Cir. 2003) ("Any pipeline seeking to build or to expand its facilities must first apply for a certificate of public convenience and necessity from FERC.").  Under section 7(e), the Commission "shall" issue a certificate authorizing proposed natural gas facilities if their construction and operation "is or will be required by the present or future public convenience and necessity."  15 U.S.C. § 717f(e).

For the authorizations the Commission issues, the section 3 "public interest" standard is applied differently than the section 7 "public convenience and necessity" standard.  *See W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982).  Unlike section 7, section 3 "sets out a general presumption favoring such authorization . . . ."  *W. Va.*, 681 F.2d at 856.  Accordingly, under NGA section 3, the Commission must authorize proposed LNG facilities unless it makes a negative finding that the construction and operation of such facilities is not consistent with the public interest.  *Id.* (citing *Cia Mexicana de Gas v. FPC*, 167 F.2d 804, 806 (5th Cir. 1948)).

## 2.    Regulation Of Terminal And Transportation Services

Traditionally, the transportation and terminal services provided from both LNG terminals and interstate natural gas pipelines were regulated under section 7 of the Natural Gas Act, which traditionally required cost-of-service rates and open access terms of service.  *See* 15 U.S.C. §§ 717c, 717d, 717f.  In 2002, however, finding that the traditional approach may have had the unintended effect of deterring new investment, the Commission announced a "less intrusive" regulatory regime for LNG terminals under section 3 of the NGA.  *See Hackberry LNG Terminal, L.L.C.*, 101 FERC ¶ 61,294 at PP 22-24 (2002), *on reh'g*, 104 FERC ¶ 61,269 (2003).  The Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005), codified FERC's *Hackberry* policy.  *See* 15 U.S.C. §§ 717b(e)(3)(B), 717b(e)(4).

Under NGA section 3, as amended by the Energy Policy Act, applicants for new LNG terminals are not required to offer open access service under a tariff with cost-based rates for terminal service.  15 U.S.C. § 717b(e)(3)(B)(ii)(II) (the Commission "shall not . . . condition an order on . . . any regulation of the rates, charges, terms, or conditions of service of the LNG terminal . . . .").  Thus, LNG terminal owners may provide terminalling services to customers at rates, terms, and conditions mutually agreed to by the terminal owner and its customer (*e.g.*, market-based rates).  *See Hackberry LNG Terminal, L.L.C.*, 101 FERC ¶ 61,294 at

8

P 22; *see also Dominion Cove Point LNG, LP*, 115 FERC ¶ 61,337 at PP 13-15,

101-11 (2006), JA 5-6, 41-44 (approving market rate treatment for Statoil at Cove

Point).  This regulatory change enables terminals such as Cove Point to be "mixed"

LNG terminals, with some customers taking service pursuant to an open access,

cost-of-service regime under NGA section 7, 15 U.S.C. § 717f, while other

customers take service pursuant to market-based, negotiated rates under NGA

section 3, *id.* § 717b.  *See Dominion Cove Point LNG, LP*, 115 FERC ¶ 61,337 at

PP 106-11, JA 42-44 (permitting Dominion to provide service to Statoil at market

rates while providing cost-of-service rates to its existing customers).

 The Natural Gas Act protects existing customers taking service under NGA

section 7, 15 U.S.C. § 717f, against undue discrimination when a terminal offers

service to new customers under NGA section 3, *id.* § 717b, by prohibiting undue

discrimination in certain areas.  Specifically:

> An order issued for an LNG terminal that also offers service to customers on
> an open access basis shall not result in subsidization of expansion capacity
> by existing customers, degradation of service to existing customers, or
> undue discrimination against existing customers as to their terms or
> conditions of service at the facility, as all of those terms are defined by the
> Commission.

15 U.S.C. § 717b(e)(4).

### B. National Environmental Policy Act

 In considering an application for authorization to site, construct, and operate

LNG facilities and natural gas pipelines, the Commission must conduct an

environmental review under the National Environmental Policy Act, 42 U.S.C.

§§ 4321, *et seq.*  "NEPA is a procedural statute; it 'does not mandate particular

results, but simply prescribes the necessary process.'"  *Minisink Residents for*

*Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 111 (D.C. Cir. 2014) (quoting

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)); *see also*

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (same).  NEPA requires

agencies to "undertake analyses of the environmental impact of their proposals and

actions."  *Pub. Citizen*, 541 U.S. at 756-57 (citing *Robertson*, 490 U.S. at 349-50);

*see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503

(D.C. Cir. 2010) (NEPA ensures a "fully informed and well-considered decision,

not necessarily the best decision").  Accordingly, an agency must take a "hard

look" at "the environmental impact of its action[]."  *Minisink*, 762 F.3d at 111; *see*

*also Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)

(same).

     Regulations implementing NEPA require federal agencies to consider the

environmental effects of a proposed action by preparing either an environmental

assessment, if supported by a finding of no significant impact, or a more

comprehensive environmental impact statement.  *See* 40 C.F.R. § 1501.4 (detailing

when to prepare an environmental impact statement versus an environmental

assessment).  An environmental assessment is a concise public document that

"[b]riefly provide[s] sufficient evidence and analysis for determining whether to

prepare an environmental impact statement." *Pub. Citizen*, 541 U.S. at 757-58

(quoting 40 C.F.R. § 1508.9(a)).

   An environmental assessment need not contain long descriptions or detailed

data which the agency may have gathered. Rather, it should contain a brief

discussion of the need for the proposal, alternatives to the proposal, the

environmental impacts of the proposed action and alternatives, and a list of

agencies and persons consulted. 40 C.F.R. § 1508.9(b). If, pursuant to the

environmental assessment, an agency determines that an environmental impact

statement is not required, it issues a "finding of no significant impact," which

briefly presents the reasons why the proposed agency action will not have a

significant impact on the human environment. *See* 40 C.F.R. §§ 1501.4(e),

1508.13. Once the agency issues a finding of no significant impact, it has fulfilled

NEPA's documentation requirements. *See Taxpayers of Mich. Against Casinos v.

Norton*, 433 F.3d 852, 857 (D.C. Cir. 2006) (citing 40 C.F.R. §§ 1501.4(e), 1508.9,

1508.13).

   In 2005, through the Energy Policy Act, Congress designated the

Commission as "the lead agency for the purposes of coordinating all applicable

Federal authorizations and for the purposes of complying with the National

Environmental Policy Act" for LNG-related authorizations required under section

3 of the NGA.  *See* 15 U.S.C. § 717n(b)(1); *see also Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1087-88 (9th Cir. 2014) (discussing FERC's role as lead agency under the Energy Policy Act of 2005).  The lead NEPA agency supervises the preparation of the environmental assessment where more than one federal agency is involved.  40 C.F.R. § 1501.5(a).

Any other Federal agency that has jurisdiction by law or special expertise over an aspect of the action being reviewed may be a "cooperating agency."  40 C.F.R. § 1501.6.  A cooperating agency participates in the NEPA process commencing at the "earliest possible time," including participating in the scoping process to determine the issues that need to be covered in the environmental review.  40 C.F.R. § 1501.6; *see also id.* § 1503.2 (cooperating agencies have duty to comment on environmental review document); *id.* § 1503.3 (cooperating agency required to specify what additional information it needs to fulfill its own environmental review).  A cooperating agency may ultimately adopt the lead agency's environmental document to fulfill its own NEPA responsibilities if independently satisfied that the environmental document adheres to the cooperating agency's comments and recommendations.  *Id.* § 1506.3.

## II.    THE COVE POINT LIQUEFACTION PROJECT

### A.    The Cove Point LNG Terminal History

The Commission originally authorized the construction and operation of the

Cove Point LNG Terminal and Cove Point Pipeline in 1972.  EA at 2, JA 278.  The

LNG Terminal was designed as an import terminal with all the facilities needed to

receive imported LNG from ocean-going carriers, and to store and vaporize LNG

for delivery to U.S. markets.  *Id.*  From 1980 to 1994, the Terminal was largely

unused.

Since 1994, the Terminal has been the subject of five FERC proceedings to

expand and evolve the LNG facility as described below.

**1994:**  FERC, after issuing an environmental assessment, authorized Cove

Point to reactivate the on-shore storage and vaporization facilities and to construct

a liquefaction unit to liquefy domestic natural gas for storage.  EA at 2, JA 278; *see*

*also Cove Point LNG Ltd. P'ship*, 68 FERC ¶ 61,377 (1994).

**2001:**  FERC, after developing an environmental assessment, authorized the

reactivation of the Terminal to resume imports and construction of an additional

LNG storage tank.  EA at 2, JA 278.  BP Energy was one of three customers that

contracted for LNG terminal service and for capacity to deliver the gas via the

Cove Point Pipeline under traditional cost-of-service rates.[2]  *See* Authorizing Order

P 38, JA 630; Rehearing Order P 6, JA 837.  BP contracted to receive these

---

[2] Under traditional cost-of-service ratemaking principles, a pipeline is
permitted to recover its reasonable operating costs together with a reasonable
return on its rate base to ensure that its shareholders are fairly compensated for
their investment.  *See, e.g., N.C. Utils. Comm'n v. FERC*, 42 F.3d 659, 661 (D.C.
Cir. 1994).

services, on a traditional cost-of-service basis, until 2023.  *Cove Point LNG Ltd.*

*P'ship*, 97 FERC ¶ 61,043 at p. 61,195 (2001).

**2006:**  FERC, after conducting an environmental impact statement,

authorized the Cove Point expansion project ("Expansion Project").  Statoil, the

sole expansion customer, entered into a non-open access service agreement with

market-based rates[3] for all of the expanded capacity pursuant to NGA section 3 and

the Commission's *Hackberry* policy.  The expansion nearly doubled the size of the

Terminal, expanded the import capacity of the Cove Point Pipeline, and provided

for new downstream pipeline and storage facilities.  EA at 2, JA 278; *see also*

*Dominion Cove Point LNG, LP*, 115 FERC ¶ 61,337 (2006), JA 1, *on reh'g*, 118

FERC ¶ 61,007 (2007).

**2009:**  FERC, after issuing a 115-page environmental assessment, authorized

Dominion to upgrade, modify, and expand its existing off-shore pier at the

Terminal to accommodate the docking of larger, modern LNG vessels ("Pier

Reinforcement Project").  EA at 2, JA 278; *see also Dominion Cove Point LNG,*

*LP*, 128 FERC ¶ 61,037, *on reh'g*, 129 FERC ¶ 61,137 (2009).

---

[3] Market-based rate contracts are freely negotiated and are premised on the absence of market power and the presence of "fair, arms length negotiations."  *See Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 537, 554 (2008).

**2014 (challenged proceeding):**  FERC, after completing a 205-page environmental assessment, authorized Dominion to construct a liquefaction unit to liquefy domestic natural gas for export and construct upgrades to a compressor stations along the Cove Point Pipeline.  Authorization Order P 1, JA 618.

## B.     The Challenged Project

In 2012, Dominion, using the Commission's "pre-filing" process,[4] initiated its most recent expansion project at Cove Point, the challenged Liquefaction Project.  The Liquefaction Project consists of the siting, construction, and operation of facilities necessary to liquefy domestic natural gas for export at the existing Terminal.  The primary FERC-jurisdictional component of the Liquefaction Project is the addition of one liquefaction train, which is a stand-alone unit containing refrigeration compressors that liquefy natural gas.

The new liquefaction train will be sited within the demarcated 131-acre fenced-in area, which contains all of the Terminal's industrial facilities.  The fenced-in area is located within a 1,017-acre parcel of otherwise undeveloped land owned by Dominion that is held in conservation easements and serves as a buffer.

---

[4]  The Energy Policy Act of 2005 mandated that applicants seeking to construct LNG and related natural gas facilities engage in the Commission's otherwise voluntary NEPA "pre-filing" procedure.  15 U.S.C. § 717b-1(a); *see also* 18 C.F.R. § 157.21(b) (LNG pre-filing regulation).  The pre-filing process requires project sponsors to submit a detailed project description and other information necessary to begin the environmental review of the proposed project.
.

EA at 3, 5, JA 279, 281 (map of LNG Terminal).  The liquefaction facilities will

occupy 59.5 acres within the 131-acre fenced-in area and will tie into the existing

LNG infrastructure (*e.g.*, storage tanks, etc.) at the LNG terminal.  EA at 3,

JA 279.  No additional permanent marine facilities are required for the Project.

*See* Authorization Order P 10, JA 621.  Further, the estimated 85 LNG ships per

year anticipated for the Liquefaction Project is well-within the previously analyzed

and authorized 200 vessels per year.  EA at 27, JA 303.

Although Dominion expects the Export Customers will initially export LNG,

to maintain flexibility the Liquefaction Project allows for bi-directional import or

export service.  Authorization Order P 7, JA 620.  Each year, based on the status of

global gas markets, Export Customers may jointly elect whether to import or

export LNG from the Terminal.  *Id.*; *see also* Rehearing Order P 4, JA 835-36.

Dominion also owns the 88-mile-long natural gas pipeline ("Cove Point

Pipeline") that extends west from the Terminal to connections with three major

Mid-Atlantic gas transmission systems:  Transcontinental Gas Pipe Line Co., LLC,

Columbia Gas Transmission, LLC, and Dominion Transmission, Inc.

Authorization Order PP 3, 12 n.23, JA 618, 622.  Along with the Liquefaction

Project, Dominion proposed to modify the Cove Point Pipeline to add additional

compressors at an existing compressor station along with other miscellaneous

modifications and upgrades.  Authorization Order P 1, JA 618.

### C.    The Commission's Environmental Review

The Commission initiated its environmental review of the Project in June 2012 under the "pre-filing" process.  The Commission served as the lead agency for the preparation of the Environmental Assessment for the Project.  EA at 19, JA 295.  The Department of Energy,[5] Department of Transportation, U.S. Coast Guard, and two other agencies served as cooperating agencies for the preparation of the environmental documents necessary to comply with NEPA.  *See* EA at 19-21, JA 295-96 (describing the cooperating agencies' roles with respect to the Liquefaction Project).  The Commission consulted with the cooperating agencies and multiple other federal and state agencies to identify issues to be addressed in the Environmental Assessment.  EA at 19, 33-35, JA 295, 309-11 (table listing consultations with other federal, state, and local agencies).

In agency proceedings extending over two years, and resulting in a detailed 205-page Environmental Assessment, the Commission thoroughly examined the environmental impacts of the Project and considered all comments, including those of EarthReports.  *See* Authorization Order PP 98-105, JA 646-49 (discussing environmental review).  Ultimately, the Commission determined, in accordance

---

[5] The Department can adopt and use FERC's environmental assessment to support its respective export authorization after an independent review of the document, but it must present its own conclusions and recommendations in its own record of decision.  EA at 20, JA 296.

with section 3 of the Natural Gas Act, 15 U.S.C. § 717b, that the Project, upon

Dominion's compliance with numerous environmental conditions and mitigation

measures, is "not inconsistent with the public interest."  *See id.* P 33, JA 628; *see*

*also id*. P 30, JA 627-28 (detailing the Department of Energy's authorization of the

export of LNG from Cove Point in an amount roughly equal to the Project's

liquefaction capacity).

### D.    The Authorization Order

On September 29, 2014, the Commission authorized Dominion to construct

and operate the Liquefaction Project within the existing footprint of the Cove Point

Terminal upon satisfaction of 79 environmental conditions, including obtaining all

applicable authorizations required under federal law.  Authorization Order P 2 &

App. B, JA 618 & 712-28.  The Commission determined that an environmental

assessment was appropriate for the Liquefaction Project because the new facilities

will be "within the footprint of the existing LNG terminal" and because the

environmental issues are "relatively small in number and well-defined."  *Id.* P 275,

JA 705-06.  Thus, the Commission, after a detailed discussion of the Project's

impacts, affirmed the Environmental Assessment's conclusion that the

Liquefaction Project would not have a significant impact on the quality of the

human environment.  *Id.*

18

The Commission also addressed all of EarthReports' comments, including the issues raised in this appeal: indirect impacts from induced natural gas production (*id.* PP 225-37, JA 686-91); global greenhouse gas emissions (*id.* PP 243-48, JA 693-95); ballast water impacts (*id.* PP 126-30, JA 655-57); impacts on North Atlantic right whales (*id.* P 142, JA 660-61); and public safety (*id.* PP 184-217, JA 675-84). Ultimately, the Commission found that EarthReports seeks a "broader, nationwide review of the costs and benefits of LNG export and its impacts," beyond the limited scope of the Commission's review of LNG facilities. *Id.* P 278, JA 706.

The Authorization Order also rejected BP Energy's claim that Dominion acted in an unduly discriminatory manner in shortening the term of Statoil's service contract to make way for the new export facilities without offering a corresponding early contract termination to BP Energy. Authorization Order P 47, JA 632. The Commission found that an early contract termination does not constitute a change in the "terms and conditions of service" subject to NGA section 3's undue discrimination prohibition, 15 U.S.C. § 717b(e)(4). Authorization Order PP 45-46, JA 632. In addition, the Commission found that BP Energy, as a regulated shipper receiving open access terminal services provided under NGA section 7, is not similarly situated to Statoil, an expansion customer receiving proprietary, non-open access service under NGA section 3. *Id.* P 47, JA 632.

19

### E.    The Rehearing Order

BP Energy and EarthReports filed requests for rehearing of the

Authorization Order regarding their respective issues.  Rehearing Order P 1,

JA 834.

On rehearing, the Commission rejected all of EarthReports' challenges

regarding FERC's compliance with NEPA.  *See id.*  As relevant to this appeal, the

Commission affirmed that environmental effects associated with induced natural

gas production are neither causally related to the Liquefaction Project nor

reasonably foreseeable.  *Id.* PP 26-44, JA 843-51.  The Commission also rejected

EarthReports' contentions that FERC was required to engage in a quantitative

assessment of the global greenhouse gas impacts from the export of LNG from

Cove Point.  *Id.* PP 50-59, JA 853-58.  Last, the Commission rejected

EarthReports' rehearing arguments regarding public safety (*id.* PP 66-69, JA 859-

61), ballast water impacts (*id.* PP 70-74, JA 861-63), and vessel traffic impacts on

the North Atlantic right whale (*id.* PP 75-78, JA 863-64).

Regarding BP Energy's challenge, on rehearing, the Commission reaffirmed

the findings set forth in the Authorization Order.  *Id.* PP 12-17, JA 838-40.

### F.    Motion For Stay

On June 1, 2015, EarthReports filed with this Court an emergency motion

for a stay seeking to halt Project construction pending judicial review.  Upon

consideration of the pleadings, this Court denied EarthReports' stay request. *EarthReports, Inc. v. FERC*, No. 15-1127 (D.C. Cir. June 12, 2015) (order denying motion for stay and expedited briefing) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (articulating the four-factor test for a stay, one of which is the stay applicant's likelihood of success on the merits)).  Since issuance of the Court's order denying stay, Dominion has continued Project construction consistent with Commission authorization, with an anticipated in-service date in late 2017.  *See* Dominion Cove Point LNG, LP's Opposition to Petitioners' Emergency Stay Motion at 18, D.C. Cir. No. 15-1127 (June 10, 2015).

## III.    THE DEPARTMENT OF ENERGY'S REVIEW

The Department of Energy is tasked with determining whether the export of LNG is "not inconsistent" with the public interest.  EA at 20, JA 296 (describing the Department's role in the Project's environmental review process); *see also supra* pp. 5-6 (explaining separate role of the Department).  One factor that bears on the Department's public interest determination is the environmental impacts associated with the export of LNG.  EA at 20, JA 296.  Concurrent with the Commission's proceeding, the Department of Energy reviewed and continues to review Dominion's application for authority under section 3(a) of the Natural Gas Act, 15 U.S.C. § 717b(a), to export LNG to nations with which the United States does not have a free-trade agreement.

Specifically, in 2011, Dominion sought the Department's authorization to export LNG to non-free-trade nations from the Cove Point terminal.[6] *See* Authorization Order P 30, JA 627-28 (referencing Department of Energy, Office of Fossil Energy Docket No. 11-128-LNG).  One of the environmental petitioners, Sierra Club, intervened in this export proceeding raising multiple issues, including the Department's failure to analyze the environmental impacts arising from induced natural gas production.[7] *See* Sierra Club's Motion to Intervene, Protest, and Comments at 22-47, 49-51, DOE/FE Docket No. 11-128-LNG (Feb. 6, 2012). Specifically, Sierra Club argued that "[the Department] must consider upstream environmental impacts in its Natural Gas Act determination, so, too, it must analyze and disclose these impacts in the NEPA analysis that will support its final determination."  *Id.* at 50.  Further, Sierra Club asserted that although FERC may be the lead agency for purposes of NEPA, the Department "may not move forward unless either [the Department] or FERC completes an adequate [environmental

---

[6] In 2011, the Department separately approved, under section 3(c) of the Natural Gas Act, 15 U.S.C. § 717b(c), Dominion's application to export 1.0 billion cubic feet per day of natural gas to countries with which the United States has free-trade agreements.  *See* Authorization Order P 30, JA 627-28 (summarizing Dominion's export applications filed with the Department).  *See also* 15 U.S.C. § 717b(c) (providing for expedited processing and mandatory approval of applications for export to free-trade agreement nations).

[7] Environmental petitioner Patuxent Riverkeeper also filed comments opposing Dominion's export application but did not intervene in the Department proceeding.

impact statement] that *does* cover all upstream impacts of [the Department's] decision." *Id.* at 51.

On September 11, 2013, the Department issued a conditional order granting Dominion authorization to export LNG to non-free trade agreement nations contingent on the Department's environmental review of the proposed export of LNG. *See Dominion Cove Point LNG, LP*, Order Conditionally Granting Long-Term Multi-Contract Authorization to Export LNG from the Cove Point LNG Terminal to Non-Free Trade Agreement Nations, DOE/FE Order No. 3331 at 150, 152, DOE/FE Docket No. 11-128-LNG (Sept. 11, 2013). This conditional order made findings on all non-environmental issues considered under NGA section 3(a), 15 U.S.C. § 717b(a). The Department also explained that with respect to its environmental review of Dominion's export application, it was participating "as a cooperating agency in FERC's review of the Liquefaction Project." DOE/FE Order No. 331 at 150. The Department noted that if a "participant in the FERC proceeding actively raises concerns over the scope or substance of environmental review but is unsuccessful in securing that agency's consideration of its stated interests, [the Department] reserves the right to address the stated interests within this proceeding." *Id.* at 150-51.

On May 7, 2015, the Department issued a 113-page final order which completes the Department's environmental review of Dominion's proposed export

23

of LNG and grants Dominion final approval to export LNG to non-free trade countries, subject to Dominion's compliance with the 79 environmental conditions imposed by FERC. *Dominion Cove Point LNG, LP*, Final Opinion and Order Granting Authorization to Export LNG by Vessel to Non-Free Trade Agreement Nations, DOE/FE Order No. 3331-A (May 7, 2015) ("Export Order"). The Export Order considers a "wide range of information," including: (1) FERC's Environmental Assessment;[8] (2) U.S. Energy Information Administration, *Effect of Increased Natural Gas Exports on Domestic Energy Markets, as Requested by the Office of Fossil Energy* ("2012 Export Study");[9] (3) the *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States* ("Environmental Addendum");[10] and (4) the *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States* ("Greenhouse Gas Report").[11] Export Order at 81-82; *see also id.* at 46-81; 85-94

---

[8] The Department independently reviewed and adopted the Commission's Environmental Assessment, as permitted under 40 C.F.R. § 1506.3. *Id.* at 6.

[9] *Available at* http://www.eia.gov/analysis/requests/fe/pdf/fe_lng.pdf.

[10] *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States*, (Aug. 2014), *available at* http://www.energy.gov/sites/prod/files/2014/08/f18/Addendum.pdf.

[11] *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States* (May 2014), *available at* http://energy.gov/sites/prod/files/2014/05/f16/Life%20Cycle%20GHG%20Perspective%20Report.pdf.

(discussing the Environmental Addendum and Greenhouse Gas Report).

With respect to Sierra Club's arguments concerning impacts from induced natural gas production, the Department concluded that "[f]undamental uncertainties constrain our ability to foresee and analyze with any particularity the incremental natural gas production that may be induced by permitting exports of LNG to non-[free trade agreement] countries." *Id.* at 83. Underscoring the uncertainty regarding induced gas production, the Department further noted that receiving export authorization "does not guarantee that a particular facility would be financed and built; nor does it guarantee that, if built, market conditions would continue to favor export once the facility is operational." *Id.* at 83-84. The Department therefore concluded that "NEPA does not require the review to include induced upstream natural gas production." *Id.* at 83. Ultimately, the Department found that authorizing Dominion's export of LNG from Cove Point would not have a significant effect on the human environment. *Id.* at 82.

Petitioner Sierra Club continues to pursue its arguments at the Department in a pending request for rehearing, and will have the right to appeal (separately) the Department's findings. *See Dominion Cove Point LNG, LP*, Request for Rehearing of Sierra Club, DOE Docket No. 11-128-LNG (June 8, 2015); *see also* 15 U.S.C. § 717r(d)(1) (providing for judicial review of orders by the Department issued pursuant to NGA section 3).

## SUMMARY OF ARGUMENT

EarthReports incorrectly presumes that FERC is the sole agency responsible under NEPA for examining the environmental impacts associated with every aspect of every federal authorization associated with an LNG export project. This myopic view ignores the vital role and corresponding obligations of other cooperating federal agencies, including the Department of Energy, Department of Transportation, and U.S. Coast Guard. EarthReports also disregards the environmental review the Department of Energy conducted in Dominion's export authorization proceeding, including the broad studies the Department undertook to analyze (1) impacts associated with natural gas production activities, including hydraulic fracturing throughout the United States, and (2) global greenhouse gas emissions and resulting climate impacts from exporting LNG. The Department's two resulting reports – the Environmental Addendum and the Greenhouse Gas Report – meaningfully inform EarthReports and the public regarding the environmental impacts of natural gas production and downstream consumption of LNG. In light of the two Department reports alone, the relief EarthReports seeks with respect to its primary claims – indirect impacts of induced natural gas production and lifecycle greenhouse gas emissions impacts – would serve no purpose other than to generate unnecessary paperwork.

26

Notwithstanding other agencies' work, the Commission's comprehensive environmental review, culminating with the lengthy environmental assessment of the construction and operation of a single liquefaction unit at the existing, operating Cove Point Terminal, satisfied FERC's statutory responsibilities under the National Environmental Policy Act to take a "hard look" at the environmental consequences of the Liquefaction Project. NEPA does not require the Commission to consider all potential impacts no matter how attenuated or speculative. Future natural gas development production activities, in the Commission's informed judgment, are not a causally-related effect of the construction and operation of this particular liquefaction facility. Moreover, the impacts of any such production activities are not reasonably foreseeable – certainly not from the handful of press releases and news articles EarthReports cites. Thus, the Commission reasonably declined to further discuss indirect, speculative impacts that would not meaningfully inform its environmental review of the Liquefaction Project.

The Commission appropriately considered the Project's greenhouse gas emissions, accounting for such emissions both quantitatively and qualitatively. In its informed judgment, the Commission reasonably concluded that no appropriate methodology was available to determine the significance of their impacts on a regional or global scale.

EarthReports' remaining arguments, enumerating perceived inadequacies in

27

FERC's analysis of the impacts of discharged ballast water, LNG tanker impacts on whales, and the safety risk of the liquefaction facilities, are no more persuasive. The Environmental Assessment reflects the Commission's thoughtful consideration of each of these issues, the level of detail of which is subject to the agency's discretion and the "rule of reason," and appropriately reflects the input of other agencies that have special expertise with respect to each issue. For each of the three issues, potential adverse impacts were identified, all of which the Commission found will be adequately mitigated by the mandatory environmental conditions. Where, as here, all the relevant information was provided and analyzed in the Environmental Assessment (and subsequent orders), the Commission fully satisfied its obligations under the National Environmental Policy Act.

Finally, BP Energy's petition should be dismissed for lack of standing. BP Energy, an existing customer at Cove Point, fails to demonstrate that it has suffered or will suffer any harm as a result of the early termination of another customer's service contracts with Dominion. On the merits, the Commission reasonably held that the alleged differential treatment of the two shippers does not give rise to undue discrimination concerns. First, the Commission reasonably interpreted the statutory phrase "terms and conditions of service," 15 U.S.C. § 717b(e)(4), the interpretation of which Congress explicitly delegated to FERC, to exclude contract termination provisions. Second, the Commission reasonably determined that

28

Statoil – the sole customer of the 2006 Cove Point expansion project and the sole

NGA section 3 non-open access terminal customer – and BP Energy, a NGA

section 7 open access terminal customer, are not "similarly situated."

## ARGUMENT

## I.   THE COMMISSION'S ENVIRONMENTAL REVIEW FULLY COMPLIED WITH THE NATIONAL ENVIRONMENTAL POLICY ACT

EarthReports asserts that the Commission "act[ed] on incomplete

information" (Br. 4) in approving the Liquefaction Project.  Yet the record,

including the comprehensive Environmental Assessment and orders, reflects the

Commission's careful evaluation of Project impacts on all relevant environmental

resources coupled with specific mitigation measures to make an informed finding

of no significant impact.  *See* Authorization Order PP 98-282, JA 646-708.  The

Environmental Assessment addresses the Project's impacts on the full range of

resources including geology, soils, water resources, wetlands, vegetation, fisheries,

wildlife, threatened and endangered species, land use, recreation, visual resources,

cultural resources, air quality, noise, safety, socioeconomics, cumulative impacts,

and alternatives.  *See id.* P 102, JA 648.  Moreover, the Commission carefully

considered and responded to all comments regarding the scope of its environmental

assessment.  *See id.* PP 102, 104, JA 648-49.

For EarthReports to succeed, the Court would need to find that the Commission, after developing a 205-page Environmental Assessment, made an uninformed decision. *See Robertson*, 490 U.S. at 350-51 (NEPA merely prohibits uninformed rather than unwise agency action). In the face of the level of detail in the Environmental Assessment and subsequent orders, EarthReports fails to show that the Commission acted arbitrarily. *See Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1556-57 (2d Cir. 1992) (finding of no significant impact not arbitrary where the Commission considered all aspects of the proposed action, required appropriate mitigation measures, and reasonably explained its decision).

## A.    Standard Of Review For NEPA Challenges

The Court reviews the substance of Commission actions under the Administrative Procedure Act, overturning disputed orders only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard applies to challenges to FERC's compliance with the National Environmental Policy Act. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006). When the Court reviews Commission action taken "under NEPA, the [C]ourt's role is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004)

(denying appeal of FERC pipeline certificate decision) (quoting *Balt. Gas & Elec.*, 462 U.S. at 97-98); *see also, e.g., Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (noting that FERC's NEPA obligations are "essentially procedural") (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).  The Commission's findings of fact, if supported by substantial evidence, are conclusive.  *See Nat'l Comm. for the New River*, 373 F.3d at 1327.

Agency action taken pursuant to NEPA is entitled to a high degree of deference.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377-78 (1989).  This Court evaluates agency compliance with NEPA under a "rule of reason" standard, *Myersville*, 783 F.3d at 1322, and consistently declines to "flyspeck" an agency's environmental analysis, looking for "any deficiency no matter how minor."  *Id.* at 1322-23 (quoting *Nevada*, 457 F.3d at 93; and citing *Minisink*, 762 F.3d at 112).  Thus, "[a]s long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment."  *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980)).

31

### B.    The Commission Properly Found That Any Increase In Natural Gas Production Is Not An Indirect Impact, Under NEPA, Of The Liquefaction Project

Notwithstanding EarthReports' arguments to the contrary (Br. 33-47), consistent with NEPA, the Commission's Environmental Assessment addresses the full range of impacts associated with construction and operation of the new liquefaction facilities.  Because the footprint of the new facilities is entirely within the existing LNG terminal, where much of the land has been previously disturbed by the multiple prior projects, their impacts are small in number and well-defined. *See* Authorization Order PP 3, 275, JA 618-19, 705-06.

Nevertheless, EarthReports persists that the Commission violated NEPA by failing to consider the environmental impacts from upstream activities, specifically natural gas production in the Marcellus shale region.[12]  *See* Br. 2, 4, 10, 17-18, 33-43; *see also Amici* Br. 3-13 (same).[13]  The Commission, however, reasonably concluded that increases, if any, in domestic natural gas production are not indirect impacts, as defined by the regulations implementing NEPA and contemplated by

---

[12] Marcellus shale is a black shale geological formation containing natural gas reserves which are developed using horizontal drilling and hydraulic fracturing techniques.  The Marcellus shale formation extends deep underground from Ohio and West Virginia, northeast through Pennsylvania and southern New York. *Beardslee v. Inflection Energy, LLC*, 761 F.3d 221, 224 (2d Cir. 2014).

[13] Except as noted *infra* in section I.F, the arguments presented by the brief of *Amici Curiae* in support of the environmental petitioners largely repeat those made by EarthReports.

court precedent, of the Commission's approval of the Project, because the potential

environmental effects "are not sufficiently causally related to this project to

warrant consideration," nor "reasonably foreseeable or quantifiable."

Authorization Order P 226, JA 687; *see also* Rehearing Order PP 26-44, JA 843-

51.

> **1.    There Is No Causal Link Between The Commission's Approval Of The Liquefaction Project And Any Potential Increased Gas Production**

Here, unlike Sierra Club's position in other related LNG export cases

pending before this Court (nos. 14-1249, 14-1275, and 15-1133), environmental

petitioners do not argue that FERC, as the lead agency tasked with drafting the

Environmental Assessment, must enlarge the scope of its environmental review to

include the impacts associated with production of natural gas induced by the export

of LNG.  Rather, EarthReports argues that it is the operation of the liquefaction

facilities themselves that will spur increased natural gas production.  *See e.g.*, Br.

2, 29, 38; *but cf. Amici* Br. 3 (arguing FERC ignored "indirect effects of the export

of natural gas").  But the impacts of conjectural increases in natural gas production

are outside the scope of NEPA review because they are not "caused by" the

construction or operation of the Project.

For NEPA purposes, an indirect impact is an action "caused by the proposed

action."  Rehearing Order P 23, JA 842 (citing 40 C.F.R. § 1508.8(b) (defining

"indirect effects")).  As the Commission explained, for an agency to include

consideration of an impact in its NEPA analysis as an indirect effect, approval of

the proposed project and the related secondary effect must be causally related, i.e.,

the agency action and the effect must be "two links of a single chain."  Rehearing

Order P 23, JA 843 (quoting *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394,

400 (9th Cir. 1980)).  But a simple "'but for' causal relationship is insufficient to

make an agency responsible for a particular effect under NEPA . . . ."  *Pub.*

*Citizen*, 541 U.S. at 767; *accord City of Shoreacres v. Waterworth*, 420 F.3d 440,

452 (5th Cir. 2005) (explaining that a "proximate cause" standard applies); *see also*

*City of Dallas v. Hall*, 562 F.3d 712, 719 (5th Cir. 2009) (same); *Ohio Valley*

*Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 196 (4th Cir. 2009) (same).

    Rather, the test to determine whether impacts must be included in an NEPA

analysis is whether the federal action was the "legally relevant cause" of the effect.

*See Pub. Citizen,* 541 U.S. at 769.  In *Public Citizen*, the Supreme Court upheld the

agency's decision not to consider in its environmental analysis for new safety

regulations governing Mexican motor carriers – a precursor to re-opening the

United States to Mexican truck traffic – the potential environmental impacts of an

increased number of Mexican trucks on U.S. roads.  *See id.* at 767-69.  The Court

agreed with the agency's finding that there was no reasonably close causal

relationship between the increased number of trucks and the proposed safety

regulations.  *Id.* (noting that requiring the agency to consider broader effects would not provide "useful" information that would assist with informed decision-making).

Far from asserting that the "Project will have no effect on production" (Br. 36; *see also id.* at 33, 35), the Commission reasonably explained that any causal connection between the Commission's action and the purported impacts is not sufficiently "close" to warrant further analysis in the NEPA document, as there is no record evidence that any increase in natural gas production is directly attributable to the Liquefaction Project.  *See* Authorization Order P 226, JA 687 (citing EA at 163, JA 439); *see also id.* PP 228-29, JA 687-88 (Terminal can receive gas from three interstate gas pipeline systems; multiple existing and proposed options are available to transport Marcellus shale gas to market).

EarthReports seeks review of impacts (induced gas development of fracked gas from the Marcellus shale gas play) that are not "caused by" the siting, construction, and operation of the Project.  *See id.* PP 228-29, JA 687-88 (finding no connection between the Project and any specific, quantifiable induced production); *cf. Myersville*, 783 F.3d at 1326-27 (upholding FERC determination that, although a Dominion-owned pipeline project's excess capacity may be used to move gas to the Cove Point terminal for export, the projects are "unrelated" for purposes of NEPA).  As the Commission noted, the Cove Point Terminal has

35

access to abundant and diverse domestic supply sources through its interconnection with three expansive interstate natural gas transmission systems.  EA at 18, JA 294 (three "interconnects [will] allow feed gas for the Project to be sourced from a wide variety of regions in the U.S.").  Because Marcellus shale production is not required for the Project and production is likely to increase in that area regardless of whether the Project exports gas, Marcellus shale production activities and their associated impacts are not sufficiently causally related to warrant further consideration as indirect effects of the Liquefaction Project.  Rehearing Order P 29, JA 845; *see also id.* P 27, JA 844 (natural gas development will likely continue with or without the Liquefaction Project); Authorization Order P 228, JA 687-88 (Marcellus shale production is not an "essential predicate" for the Liquefaction Project).

Moreover, Dominion has no control over the source of gas supplies. Authorization Order P 18, JA 624 (Dominion's customers are "responsible for procuring their own supplies and transporting the supplies *to or from* the Cove Point Terminal") (emphasis added).  EarthReports makes much of the fact that press releases and news articles indicate that Dominion's terminal customers have entered into supply contracts with two gas producers – Cabot Oil & Gas Corporation and Antero Resources Corporation – that produce natural gas in the Marcellus shale region.  Br. 18-20, 37-38; *see also Amici* Br. 5 n.4, 6 n.6.

36

However, the Commission has continuously found the impacts of production to be

beyond the scope of its review, even when a particular producer is an identified

shipper/customer of a proposed pipeline project.  Authorization Order P 233,

JA 690 (citing three FERC orders certificating pipelines as examples); *see also* EA

at 25 (production activity regulated by state and local authorities, not by FERC).

Here, as the Commission explained, the tie between Dominion's customers' gas

producer/supplier and the Liquefaction Project is more attenuated than in cases

where the producer is also the transportation customer of the proposed pipeline

project under FERC's review.  Authorization Order P 233, JA 301.

Indeed, the Second Circuit upheld the Commission's determination that it

need not consider the environmental impacts of Marcellus shale region production

when authorizing a pipeline project that would connect an interstate gas pipeline to

a specific Marcellus shale gas production region.  *See Cent. N.Y. Oil & Gas Co.*,

137 FERC ¶ 61,121 at P 37 (2011) (finding no causal connection between pipeline

and shale gas production "because the Commission plays no role in, nor retains

any control over," well development), *on reh'g*, 138 FERC ¶ 61,104 (2012), *aff'd*,

*Coal. for Responsible Growth & Res. Conservation v. FERC*, 485 F. App'x 472,

474 (2d Cir. 2012); *see also* Rehearing Order P 26, JA 843 (citing *Cent. N.Y. Oil &*

*Gas Co.*).  In *Central New York*, the Commission authorized construction and

operation of a 39-mile long pipeline traversing Northeast Pennsylvania, which was

intended, in part, to "provide access to interstate markets for natural gas produced from the Marcellus [s]hale in northeast Pennsylvania . . . ." *Cent. N.Y. Oil & Gas Co., LLC*, 138 FERC ¶ 61,104 at P 5.  Environmental groups, before the Commission and the Second Circuit, argued that the pipeline would "serve[] as a 'catalyst' for Marcellus shale development in the Bradford, Lycoming and Sullivan Counties crossed by the pipeline, and would 'facilitate the development of Marcellus [s]hale.'"  *Cent. N.Y. Oil & Gas Co., LLC*, 137 FERC ¶ 61,121 at P 81.

In that case, the Commission examined the purpose of the pipeline project, and found that Marcellus shale development activities are not "an essential predicate" for the project because "it is not merely a gathering system for delivery" of Marcellus shale gas.  *Id*. at P 91.  Further, the Commission noted that the new pipeline would create a "bi-directional hub line, . . . enabl[ing] gas to flow between three major interstate pipeline systems in response to market demands . . . ."  *Id.* Thus, the Commission concluded, and the Second Circuit agreed, that, under NEPA, Marcellus shale development activities are not sufficiently causally-related to the Project to warrant in-depth consideration of the gas production impacts. *Cent. N.Y. Oil & Gas Co.*, 138 FERC ¶ 61,104 at P 84; *Coal. for Responsible Growth*, 485 F. App'x at 474 ("FERC reasonably concluded that the impacts of that [shale gas] development are not sufficiently causally-related to the project to warrant a more in-depth [NEPA] analysis").

38

Similarly, here, the Commission found that "Marcellus shale production is not an essential predicate for the Cove Point Liquefaction Project, which can receive natural gas through interconnects with three interstate natural gas pipeline systems." Authorization Order P 228, JA 688. The Cove Point Terminal location will "provide access to abundant and diverse domestic supply sources through the Cove Point Pipeline," whose interconnection with three interstate gas transmission systems will "allow feed gas for the Project to be sourced from a wide variety of regions in the U.S. depending on market forces and circumstances at any given time." EA at 18, JA 294 (stating the Project's purpose and need). Also, like the *Central New York* pipeline project, the Liquefaction Project will make the Terminal a bi-directional import/export terminal adaptable to global market demand and conditions. Authorization Order P 7, JA 620 (existing customers may continue to import gas and the new Export Customers may elect to import or export depending on world-wide gas markets). Moreover, the Commission noted that natural gas development, including development of the Marcellus shale region, "will continue and indeed is continuing, with or without the Cove Point Liquefaction Project, because multiple existing and proposed transportation alternatives for production from the region are available." *Id.* P 229, JA 688.

EarthReports fails to acknowledge, much less distinguish, the *Coalition for Responsible Growth* case. Further, the cases it does cite (Br. 36), *Coalition for*

*Canyon Preservation v. Bowers*, 632 F.2d 774 (9th Cir. 1980), and *Barnes v. U.S.*

*Department of Transportation*, 655 F.3d 1124 (9th Cir. 2011), are distinguishable.

In *Coalition for Canyon Preservation*, the court found an agency's discussion of

the *direct* impacts of the highway construction project was insufficient.  632 F.2d

at 782.  That court's holding regarding direct impacts has no bearing on whether

indirect impacts from non-project activities – EarthReports' argument here – are

sufficient causally related to the federally-authorized project to require inclusion in

the NEPA analysis.

   *Barnes* is also distinguishable.  In that case, the court faulted the agency for

simply concluding, without any explanation, that a new runway would not increase

demand to use that airport, particularly where that court of appeals had consistently

noted that a "new runway has a unique potential to spur demand."  *Barnes*, 655

F.3d at 1138.  Here, the Commission reasonably concluded that future natural gas

development activities are not sufficiently causally-related to downstream natural

gas and LNG transportation projects to warrant further consideration of the

potential impacts stemming from such gas production.  *Cf. generally Myersville*,

783 F.3d at 1323 (affording deference to agency's determination of what is

reasonable to include in an environmental assessment).

   Moreover, courts have called into question whether "an environmental effect

may be considered as proximately caused by the action of a particular federal

regulator if that effect is directly caused by the action of another government entity over which the regulator has no control." *City of Shoreacres*, 420 F.3d at 452 (discussing *Public Citizen*); *see also N.J. Dep't of Envtl. Prot. v. NRC*, 561 F.3d 132, 139 (3d Cir. 2009) (NEPA does not require consideration of foreseeable effects that are not potentially subject to the control of the federal agency doing the evaluation). Here, only the Department, not the Commission, can authorize exports of LNG. EA 18-19, JA 294-95; *see supra* pp. 5-6 (explaining the Department's role). Further, Congress has decreed that an application to export natural gas to free trade nations must be granted by the Department without "modification or delay." 15 U.S.C. § 717b(c); *see also* EA 20, JA 296 (describing the Department's jurisdiction). FERC also lacks authority over natural gas production, which is regulated by the States. EA at 25, JA 301 (FERC's "authority under the NGA and NEPA review requirements relate[s] only to natural gas facilities that are involved in interstate commerce."); *see also* Authorization Order P 26, n.32, JA 626. Accordingly, like the federal action at issue in *Public Citizen*, authorizing the construction and operation of liquefaction facilities at the Cove Point Terminal is not the legally relevant cause of any future incremental increases in natural gas production.

41

## 2. There Are No Reasonably Foreseeable Induced Gas Production Activities Tied To The Liquefaction Project

Even if the Commission's approval of the Liquefaction Project were presumed to cause an increase in natural gas production, the scope of the impacts from any such production is not reasonably foreseeable.  Rehearing Order P 37, JA 848.  "An impact is reasonably foreseeable if it is 'sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.'"  *Id.* P 25, JA 843 (citing *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).  With respect to the Liquefaction Project, the source of the gas to be exported is speculative.  Authorization Order P 231, JA 688-89 (explaining that the three gas pipeline systems that interconnect with the Cove Point Pipeline cross multiple shale gas, as well as conventional gas, plays).  Without knowing where the wells and gathering line locations will occur, the potential associated environmental impacts are not "reasonably foreseeable" within the meaning of the NEPA regulations.  *Id.*

The Commission did not "ignore" (Br. 40) the information regarding the supply agreement between one of Dominion's export customers and Cabot Oil & Gas.  Rather, the Commission concluded that, even accepting EarthReports' assumption that Cabot Oil & Gas will produce gas in the Marcellus shale region to supply its contract with the export customer, the record still "lacks sufficient specificity for a meaningful analysis of potential impacts."  Authorization Order

42

P 233, JA 690; *see also id.* P 231, JA 688-89 (finding analysis EarthReports seeks

would require FERC "to engage in speculative analysis that would not provide

meaningful information") (citing *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d

897 (7th Cir. 2010) (agency need not discuss projects too speculative for

meaningful discussion)).  In addition, the Project's viability is not dependent upon

either the Export Customers' supply contracts or an assumption that Dominion's

customers will receive gas from any particular supplier or production area.

Rehearing Order P 44, JA 851 (Project approval not tied to assumptions

concerning potential gas supply).

      EarthReports contrasts the Commission's environmental review here with its

later environmental impact statement for an unrelated pipeline project.  *See* Br. 39,

n.73 (citing October 24, 2014 Final EIS for the Constitution Pipeline Project).  But

the Commission has not abandoned or altered its search for reasonably foreseeable

impacts.  In the Constitution Pipeline case, far from evaluating all impacts of

increased gas production in the detailed manner preferred by EarthReports (*see*

Br. 38-39), the Commission estimated the acreage that "might hypothetically be

impacted" assuming all of the gas transported by the new pipeline is supplied by

gas produced in the county where the pipeline begins.  *Constitution Pipeline Co.*

*LLC*, 149 FERC ¶ 61,199 at P 107 (2014).  Still, the Commission cautioned that

the estimated acreage is "speculative and unlikely, given the complexities of the

43

interstate natural gas system." *Id.* And, ultimately, the Commission held that because the "exact location, scale, and timing of future [gas production] facilities are unknown and unknowable, the available information does not assist us in making a meaningful analysis of potential impacts." *Id.* This conclusion is consistent with the Commission's prior determination in the Cove Point proceeding – that impacts from additional shale gas development supported by LNG export projects are not reasonably foreseeable. *See* Authorization Order P 231, JA 688-89.

EarthReports' reliance (Br. 41-43) upon *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003), is misplaced. In that case, the agency acknowledged that a particular outcome (construction of new coal burning plants resulting from the availability of cheaper coal after the new rail lines were built) was reasonably foreseeable, but then failed to consider its impact. *See id.* at 549-50 (holding that "when the *nature* of the effect is reasonably foreseeable but its *extent* is not . . . agency may not simply ignore the effect").

Here, the Commission properly found, based on the record before it, that neither the nature *nor* the extent of the effect is reasonably foreseeable. As discussed above, the Commission could not determine that the Project would induce incremental production of natural gas and, even if additional gas is induced, the amount, timing, and location of such development activity is speculative.

44

Authorization Order P 233, JA 690.  *See generally Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 90 (2d Cir. 1975) (holding that an agency need not "consider other projects so far removed in time or distance from its own that the interrelationship, if any, between them is unknown or speculative").

Also, in contrast to *Mid-States*, where the effect – increased coal consumption – was made possible by the new rail service to reach coal mines, here the Commission could not determine whether the Liquefaction Project would increase demand for natural gas produced from the Marcellus shale region.  *See* Rehearing Order PP 27, 37, JA 844, 848 (distinguishing *Mid States*).  Thus, unlike the agency in that case, the Commission did not "simply ignore" (345 F.3d at 549) the impacts of future gas development; rather, it explained the absence of causation and determined that insufficient information was available to allow for meaningful analysis.  Authorization Order PP 230-31, JA 688-89.  *See generally Habitat Educ. Ctr.*, 609 F.3d at 902 (distinguishing *Mid-States*).

EarthReports also suggests that "models" are available to estimate increased gas production.  Br. 40 (presumably referencing the National Energy Modeling System, which is the only model cited in EarthReports' brief (*see* Br. 18)); *see also Amici* Br. 6 (citing models).  But the Commission reasonably found otherwise.  *See* Rehearing Order P 37, JA 848 (noting that the parties have cited no "modeling software that forecasts when, where, and how gas development attributable to the

45

Liquefaction Project will occur).  The Commission found the National Energy Modeling System to be unhelpful because it "predict[s] potential impacts based on a snapshot of market conditions," which is "not meaningful for our analysis." Authorization Order P 235, JA 691.  Further, the Commission has consistently rejected using the National Energy Modeling System in other LNG export facility cases as a viable tool for determining environmental impacts, noting that, though useful in projecting market responses to energy programs and policies, the model is "not intended for predicting or analyzing the environmental impacts of specific infrastructure projects."  *Corpus Christi Liquefaction, LLC*, 151 FERC ¶ 61,098 at P 15 & n.30 (2015) (citing the Energy Information Administration's "Overview" of its model, at http://www.eia.gov/oiaf/aeo/overview/index.html).  The Commission explained here that "engaging in speculative analysis of survey estimates and projections would not provide meaningful information to inform our decision."  Rehearing Order P 44, JA 851.

The Commission also found the Energy Information Administration's 2012 Export Study to be unhelpful.  *See* Authorization Order P 234, JA 690 (discussing the U.S. Energy Information Administration's 2012 Export Study).[14]  The Commission noted that the 2012 Export Study itself "includes the caveat that projections involving energy markets are highly uncertain and 'subject to many

---

[14] *Available at* http://www.eia.gov/analysis/requests/fe/pdf/fe_lng.pdf.

events that cannot be foreseen.'" *Id.* P 235, JA 691 (citing 2012 Export Study at

3). Accordingly, the Commission reasonably concluded that the study's general

economic projections about future gas production activities would not

meaningfully contribute to the Commission's consideration of the environmental

impacts of its decision to authorize construction and operation of this specific LNG

facility. Authorization Order P 235, JA 691; *see also Freeport LNG Dev., L.P.*,

149 FERC ¶ 61,119 at P 20 (2014) (authorizing the addition of liquefaction

facilities at an existing LNG terminal) (explaining that studies by NERA

Consulting, Deloitte, and the Energy Information Administration "provide general

economic analyses concluding that increased LNG exports may increase domestic

natural gas production, but they do not provide specificity that would assist in

informing the Commission's decision[s]" as to specific LNG projects). Though

NEPA requires "reasonable forecasting," it does not require the Commission "to

do the impractical, if not enough information is available to permit meaningful

consideration." *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067,

1078 (9th Cir. 2011), *cited in* Authorization Order P 230, JA 688.

    The boundless analysis sought by EarthReports would require "significant

speculation" that would not meaningfully inform FERC's consideration of the

impacts from construction and operation of the Liquefaction Project.

Authorization Order P 231, JA 689; *see also Sierra Club v. Froehlke*, 486 F.2d

47

946, 951 (7th Cir. 1973) (NEPA does not require that "each problem be documented from every angle"); *Pub. Citizen*, 541 U.S. at 767-69 (noting that requiring the agency to consider broader effects would not provide "useful" information that would assist with informed decision-making).

There is nothing arbitrary about the Commission's reasoned conclusion that a discussion of potential impacts from future gas production activities (the extent of which are unknown) would not meaningfully contribute to the Commission's consideration of the Liquefaction Project. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013) (because the NEPA process "involves an almost endless series of judgment calls . . . [t]he line-drawing decisions . . . are vested in the agencies, not the courts") (quoting *Duncan's Point Lot Owners Ass'n, Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008)).

## C. The Commission Reasonably Analyzed The Project's Greenhouse Gas Emissions

The Commission took a hard look at the Project's potential impacts on climate change. The Commission calculated and quantified the greenhouse gas emissions associated with the construction and operation of the Project. *See* EA at 98-99, 107, 112, Table 2.7.1-6, JA 374-75, 383, 388 (Liquefaction Facilities Potential Emissions Summary); *see also* EA at 169-71, JA 445-47 (analysis of cumulative impacts of climate change in the Project area); Rehearing Order P 50, JA 853 (same). The Environmental Assessment also identifies several climate

48

change-related environmental effects in the northeast region resulting from overall greenhouse gas emissions.  EA at 170, JA 446.  The Commission, however, could not determine whether the Project's incremental contribution would result in physical effects on the environment because "there is no standard methodology" for such a determination.  Authorization Order PP 243, 246, JA 693-95; EA at 171, JA 447.  Nor could FERC assess "whether or not the Project's contribution to cumulative impacts on climate change would be significant."  EA at 171, JA 447.

EarthReports argues that the Commission was required to go further: specifically, that the Commission should have quantified the greenhouse gas emissions from the upstream production and transportation and downstream combustion of exported natural gas.  Br. 43-44.  The Commission reiterated that upstream production is speculative and not reasonably foreseeable.  Authorization Order P 246, JA 694-95; Rehearing Order P 57, JA 856-57.  For the same reasons, FERC also determined that natural gas consumption, like natural gas production, will continue to occur regardless of whether FERC approves the Liquefaction Project.  Thus, the Commission found potential downstream emissions outside the scope of a meaningful NEPA analysis.  Authorization Order P 246, JA 694-95; Rehearing Order P 58, JA 857; *see also* EA at 173-74, JA 449-50 (speculating that if the Liquefaction Project is not built, export customers would likely seek

alternatives to meet the contracted service, whether service from other LNG facilities or alternative forms of energy).

The Commission also reviewed the Department of Energy's 2014 Greenhouse Gas Report and 2014 Environmental Addendum (both of which were published after the EA issued). The Commission observed that the Greenhouse Gas Report concluded that "LNG exports will not increase the life cycle [greenhouse gas] emissions." Rehearing Order at P 58, JA 857; *see also* Export Order at 63-64, 90-94 (explaining that LNG exports to other countries likely will displace dirtier fuels for electric generation decreasing global greenhouse gas emissions). But the Commission also noted that this Report "references limitations and uncertainty in the modeling data." Rehearing Order P 58, JA 857. The Commission ultimately found the Department's two reports "too general" to help inform its consideration of the specific environmental impacts arising from the construction and operation of the Liquefaction Project. Authorization Order P 246, JA 694-95; *see also* Rehearing Order PP 57-58, JA 856-57 (noting that the Department acknowledged that both studies go "beyond NEPA requirements" and do not "meaningfully analyze specific upstream impacts").

Further, contrary to EarthReports' claim (Br. 45), FERC's consideration of greenhouse gas emissions is consistent with FERC's prior practice and that of other agencies. The Commission has repeatedly declined to engage in the

50

speculative analysis sought by EarthReports in other LNG infrastructure proceedings. *See Sabine Pass Liquefaction Expansion, LLC*, 151 FERC ¶ 61,012, PP 100-101, *reh'g denied*, 151 FERC ¶ 61,253 at PP 20-23 (2015) (declining to speculate on climate impacts related to gas production); *Corpus Christi Liquefaction, LLC, et al.*, 149 FERC ¶ 61,283 (2014), *reh'g denied*, 151 FERC ¶ 61,098, PP 49-52 (2015) (considering climate impacts from LNG liquefaction project emissions only in the project's region); *see also Jordan Cove Energy Project, L.P.*, Final Environmental Impact Statement at 4-930 – 4-935, Docket Nos. CP13-483-000 and CP13-492-000 (Sept. 30, 2015) (implementing a climate change and greenhouse gas emissions analysis consistent with the updated CEQ draft guidelines issued in December 2014,[15] but still concluding that downstream emissions impacts (transport and combustion) are "too speculative to permit any meaningful consideration"). Various courts have upheld agency decisions not to analyze specific climate change impacts under NEPA. *See, e.g.*, *WildEarth Guardians*, 738 F.3d at 309 (holding that "BLM was not required to identify specific effects on the climate in order to prepare an adequate EIS"; not useful for the NEPA analysis to attempt to link climate changes, or the environmental

---

[15] "Revised Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Reviews," issued on December 18, 2014, available on CEQ's website at http://www.whitehouse.gov/sites/default/files/docs/nepa_revised_draft_ghg_guidance_searchable.pdf.

impacts thereof, to a particular project); *Barnes*, 655 F.3d at 1139-40 (upholding

Department of Transportation's conclusion that it would be impossible to analyze

climate change impacts "specific to the locale"); *Wildearth Guardians v. U.S.*

*Forest Serv.*, 828 F. Supp. 2d 1223, 1240 (D. Colo. 2014) (upholding the Forest

Service's conclusion that it could not "describe with particularity how the project

would contribute to overall climate change").

　　　Moreover, EarthReports argues that FERC should have used the "social cost

of carbon" tool to assess the impacts from global greenhouse gas emissions.

Br. 46.  The social cost of carbon refers to a calculation developed by the

Environmental Protection Agency to provide monetized value, on a global level, of

addressing climate change impacts.  *See* Rehearing Order P 54, JA 854-55; *see*

*generally Fact Sheet: Social Cost of Carbon* (Nov. 2013), *available at*

http://www.epa.gov/climatechange/Downloads/EPAactivities/scc-fact-sheet.pdf.

The tool's intended purpose is to estimate the climate benefits of rulemaking and

policy alternatives using cost/benefit analyses.  Thus, the Commission found that it

"would not be appropriate or informative" for assessing the impacts of a specific

infrastructure project or for informing the Commission's NEPA evaluation.

Rehearing Order P 54, JA 854-55.  First, because there is (by the Environmental

Protection Agency's own account) no consensus as to the appropriate discount rate

for an analysis decades into the future, calculations can vary significantly.  *See id.*

(citing *Fact Sheet*, *supra*).  Second, "the tool does not measure the actual incremental impacts of a project on the environment[.]"  Rehearing Order P 54, JA 854-55.  Third, even if impacts were monetized using the calculator, "there are no established criteria" for what values would be considered significant for NEPA purposes.  *Id.*  Given that the social cost of carbon model was recognized by its developer as providing estimates that will suffer from "uncertainty, speculation, and lack of information,"[16] the Commission reasonably decided that this model would "not aid or further inform [FERC's] decision on the project."  Rehearing Order P 55, JA 856; *cf. Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776 (1983) (the scope of the agency's inquiries must remain "manageable" if NEPA's goal of "ensuring a fully informed and well considered decision" is to be accomplished); *WildEarth Guardians*, 738 F.3d at 312 (upholding agency decision not to use specific model where agency explained the limitations of the model).

EarthReports disputes the Commission's judgment, pointing to a district court decision requiring the Forest Service to use the social cost of carbon in its NEPA analysis.  Br. 46 (citing *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1190 (D. Colo. 2014)).  There, the agency had

---

[16] Interagency Working Grp. on Social Cost of Carbon, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* at 2 (Feb. 2010), *available at* http://www.epa.gov/oms/climate/regulations/scc-tsd.pdf.

used the social cost of carbon calculation in its draft environmental impact statement, then omitted it from the final statement without explaining why the tool was not appropriate for the analysis. *Id.* at 1190-91; *but see id.* at 1190 (acknowledging that the tool is "provisional" and designed for cost-benefit analyses in rulemakings). Here, by contrast, the Commission explained its reasoning. *See* Rehearing Order PP 54-55, JA 854-56; *see also* Authorization Order P 246 n.214, JA 694-95 (distinguishing *High Country*). Moreover, in *High Country*, "though NEPA does not require a cost-benefit analysis" (52 F. Supp. 3d at 1191), the Forest Service had explicitly relied on the quantified economic benefits of its action even as it disclaimed any quantification of costs. *See id.* at 1191-92. Here, however, the Commission "did not attempt to quantify anticipated benefits of project approval while excluding potential costs from a cost-benefit analysis." Authorization Order P 246 n.214, JA 695; *see also* Rehearing Order P 55, JA 855 (citing non-economic factors supporting FERC's authorization of the Project). Another court upheld a similar NEPA analysis by the Forest Service, finding that the agency explained its rationale for declining to use the social cost of carbon tool and "qualitative[ly] discuss[ed]" climate change impacts. *League of Wilderness Defenders/Blue Mtns. Biodiversity Proj. v. Connaughton*, Case No. 3:12-cv-02271-HZ, 2014 WL 6977611 at *26-*27 (D. Or. Dec. 9, 2014) (distinguishing *High Country*), *appeal pending* (9th Cir. no. 15-35427).

54

The Commission thus analyzed greenhouse gas emissions and climate impacts in a manner consistent both with court precedent and regulatory guidance, and provided a reasoned explanation for its decision not to use other measures or conduct a broader, speculative analysis. Nothing more is required.

### D.     Additional Review Would Be Unnecessarily Duplicative Of Department Of Energy Review

EarthReports' demand for FERC to undertake additional environmental review, of both the indirect impacts of increased gas production and the lifecycle greenhouse gas emissions associated with the production, transport, and consumption of any exported gas, ignores the two environmental reports published by the Department of Energy in 2014. In two public proceedings, which provided for notice and comment, the Department issued two reports that evaluated environmental impacts associated with the LNG production and export chain: the Environmental Addendum and the Greenhouse Gas Report. *See supra* pp. 21-25 (discussing reports and proceedings). Although the Department developed these generalized, predictive reports in response to challenges raised by Sierra Club and other commenters in the LNG export authorization proceedings pending at the Department of Energy, the Department agreed with FERC that these types of reports and analysis are beyond what is required by NEPA. *See* Export Order at 8, 46-47, 55-56, 81.

Even if the Court disagrees with both FERC and the Department and finds that NEPA does require the environmental assessment to incorporate a discussion of indirect impacts from upstream (gas development) and downstream (gas combustion) activities, requiring FERC to supplement its Environmental Assessment would serve no meaningful purpose. To require the Commission, at this juncture, to independently produce the same reports the Department already produced, would be unnecessarily duplicative of the Department's efforts. "NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action." 40 C.F.R. § 1500.1(c). As several circuit courts have noted, common sense and executive policy suggest that, with respect to NEPA requirements, duplication should be avoided. *See Town of Barnstable v. FAA*, 740 F.3d 681, 691 (D.C. Cir. 2014) (holding NEPA's "rule of reason" does not require FAA to duplicate Interior Department's NEPA analysis when it would serve no purpose); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215 (11th Cir. 2002) ("Agencies are not required to duplicate the work done by another federal agency which also has jurisdiction over a project."); *Ohio Valley Envtl. Coal.*, 556 F.3d at 196 ("NEPA plainly is not intended to require duplication of work."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1039 (2d Cir. 1983) (declining to order federal permitting agency to develop its own EIS to remedy violation because it would be a wasteful duplication of effort).

56

"Congress did not enact the National Environmental Policy Act to generate paperwork or impose rigid documentary specifications." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999). In *Dombeck*, the court held that the agency's failure to formally disclose in the environmental impact statement that its lynx population data was incomplete was not actionable under NEPA because the participants in the environmental review process were well aware of the available lynx population data; thus, requiring a formal statement in the EIS would serve no useful purpose. *See* 185 F.3d at 1172-73. Similarly, here, the Court should reject EarthReports' demand that the Commission generate more paperwork to further justify an action – the Liquefaction Project – that both it and the Department independently analyzed and approved in full compliance with NEPA.

E.    **The Commission Took A Hard Look At Project Impacts On Water Quality, Whales, And Safety**

EarthReports' remaining arguments, concerning ballast water, the North Atlantic right whales, and safety, all fall within the "flyspecking" camp. *See Myersville*, 783 F.3d at 1322-23 (rejecting petitioners' assertion that FERC underestimated the amount of land impacted by an alternative as "flyspecking"); *see also Minisink*, 762 F.3d at 112 (finding petitioners' NEPA claims (*e.g.*, failure to undertake cost-benefit analysis or examine project's impact on property values) as "flyspecking").

57

### 1.    FERC Fully Identified Ballast Water Impacts

EarthReports' claim that the Commission "arbitrarily minimized" (Br. 47) potential impacts from ballast water[17] ignores the extensive discussion in the Environmental Assessment.  *See* EA at 53-55, JA 329-31.  The Environmental Assessment details potential adverse impacts from the discharge of ballast water, namely, the unintentional introduction of non-indigenous aquatic organisms.  *Id.* at 53, JA 329.  The Environmental Assessment further discusses the potential variation of salinity, dissolved oxygen, water temperature, and pH levels between the ballast water and the Chesapeake Bay.  *Id.* at 54, JA 330.

As the Commission noted, LNG ships discharging ballast water must comply with multiple U.S. laws, regulations and policies – not just the Coast Guard's regulations.  EA at 53, JA 329 (listing seven different laws, regulations and policies governing ballast water discharge).  The Commission acknowledged that there are risks of invasive species introduction and water quality impacts even with these federal controls.  *See* Authorization Order P 128, JA 656 (citing EA at 53-54, JA 329-30).  Nevertheless, the Commission reasonably concluded that the currently-required measures for all ships entering U.S. waters, including offshore ballast water exchange, provide best management practices that minimize risks

---

[17] Ballast water is water that is collected and carried by ships to provide balance and stability during transport.  EA at 53, JA 329.

from invasive species and contamination from non-U.S. ports. *Id.* P 128, JA 656;

*see also* Rehearing Order P 74, JA 862-63 (no basis to presume that established

regulations are not satisfactory to maintain water quality).

EarthReports' claim that new Coast Guard regulations governing ballast

water management will not be in effect when the Project goes into service (Br. 47,

48-49) is contradicted by the record. The new rules take effect in 2016, prior to the

Project's proposed June 2017 in-service date. EA at 3, 54, JA 279, 330;

Authorization Order P 127, JA 656 (citing the Maryland Department of the

Environment, Science Services Administration's Comments on the FERC EA at 1,

Docket No. CP13-113-000 (June 16, 2014), R. 1508, JA 589).

The Commission acknowledged the comments submitted by Dr. Mario

Tamburri, a professor at the University of Maryland's Center for Environmental

Science. *See* Authorization Order P 126, JA 655. But Dr. Tamburri's comments

stand in contrast to the Maryland Department of the Environment's conclusions.

That agency, which is tasked with protecting the state's environmental resources,

concluded that because the Liquefaction Project does not "entail increased

shipping traffic over and above prior approvals, there is no anticipated increased

risk of ballast water introductions." *Id.* P 127, JA 656.

The fact that parties and experts have raised questions about possible effects

does not indicate that the agency has failed to take a hard look. Rather, when

59

parties and experts express conflicting views, the reviewing agency has discretion to choose to rely on the reasonable opinion of one or some of the disputing parties or experts. *See Marsh*, 490 U.S. at 378. Moreover, one party's demonstration that "some scientists dispute the [agency's] analysis and conclusions . . . is not a sufficient basis for [the court] to conclude that the [agency's] action was arbitrary and capricious." *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1077 (9th Cir. 2003) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992)). Based on the existence of extensive federal regulations designed to mitigate impacts from discharging ballast water, the Commission reasonably concurred with the Maryland Department of the Environment's findings and reasonably concluded that ballast water discharges will not have any noticeable, long-term impact on the Chesapeake Bay or aquatic resources beyond those that have already occurred. Authorization Order P 129, JA 656; EA at 54-55, JA 330-31; *see also* Rehearing Order P 72, JA 862 (same).

Despite EarthReports' questions regarding the adequacy of ballast water regulations, there can be no claim that the Commission failed to identify and disclose the potential impacts on water quality associated with ballast water. *See* Rehearing Order PP 73-74, JA 862-63. The EA's level of discussion is sufficient. *See Marsh*, 490 U.S. at 376-77 (holding that agencies retain substantial discretion as to the extent of the inquiry and level of explanation necessary for an impacts

analysis); *cf. City of Fall River v. FERC*, 507 F.3d 1 (1st Cir. 2007) (FERC's

conditional approval of LNG import terminal became ineffective after the Coast

Guard later denied necessary approval of LNG vessel transportation plan).

> **2.      FERC Reasonably Relied On Prior Environmental Analysis To Identify Impacts On The Right Whale**

EarthReports' claim that FERC "refused to analyze" (Br. 50) the Project's

impact on the North Atlantic right whale is belied by the record.  *See* EA at 71-72,

89, JA 347-48, 365; Authorization Order PP 141-142, JA 660-61; Rehearing Order

PP 75-78, JA 863-64.  This issue was extensively analyzed for the two most recent

past Cove Point projects:  the 2006 Cove Point Expansion Project and the 2009

Pier Reinforcement Project.  Rehearing Order P 76, JA 863; *see also Dominion*

*Cove Point LNG*, *LP*, Cove Point Expansion Project Final Environmental Impact

Statement at 4-70 – 4-73, Docket No. CP05-130-000 (April 2006) (finding

probability of the right whale encountering LNG ships in the open ocean

"inherently low;" nevertheless imposing Vessel Strike Avoidance mitigation

measures to reduce threat of ship collisions with right whales); *Dominion Cove*

*Point LNG, LP*, Cove Point Pier Reinforcement Project Environmental Assessment

at 53-63, Docket No. CP09-60-000 (May 2009) (determining that it is "rare or

unlikely" that the right whale would be found along the vessel transit route;

requiring Dominion's continued compliance with the 2007 Vessel Strike

Avoidance Measures Plan).  In the 2014 Environmental Assessment, the

Commission explained that the Liquefaction Project will not cause larger ships or more frequent ship visits than were previously studied in the Commission's environmental analysis for the Expansion and Pier Reinforcement Projects. EA at 27, 89, JA 303, 365.

Thus, because neither the volume nor size of LNG vessels will change, the Commission reasonably relied upon – or "tiered" – the 2006 and 2009 NEPA reviews to bolster its current review of LNG ship impacts on the right whale. Rehearing Order P 77, JA 864; *see also* 40 C.F.R. § 1502.20 (NEPA regulation encouraging agencies to tier their environmental reviews to eliminate repetitive discussion of the same issues). The Council on Environmental Quality's regulations that implement NEPA provide that, where a broad environmental statement has already been prepared, then the subsequent environmental assessment "need only summarize the issues discussed in the broader statement" and "concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20; *see also id.* § 1508.28(b) (tiering allows agency to exclude from consideration issues already decided). Thus, the Commission reasonably incorporated the right whale impacts analysis from its prior evaluation of earlier Cove Point projects to support its conclusion that the Liquefaction Project "did not trigger a significant change that would necessitate an alteration in [FERC's] previous determination" that there would be no significant effect on the right

whale.  Rehearing Order P 77, JA 864; *see, e.g., Theodore Roosevelt Conservation*, 616 F.3d at 511-12 (under tiering regulations, agency not required to reevaluate in an environmental assessment an analysis included in a prior environmental impact statement).

Further, EarthReports provides no support for its allegation that the mitigation measures designed to help protect the right whales are "insufficient" and "voluntary."  Br. 51.  The mitigation measures are mandatory.  *See* Authorization Order P 142, JA 661 (requiring Dominion to continue to comply with existing mitigation measures to protect whales, namely the Vessel Strike Avoidance Measures and Injured and Dead Protected Species Reporting Plan); *see also id.* at App. B, Environmental Condition 1, JA 712 (mandating Dominion's compliance with mitigation measures).  Moreover, the Commission independently reviewed the Vessel Strike Avoidance Measures and the regulations setting vessel speed restrictions and determined that these measures and regulations continue to be appropriate to protect right whales.  Rehearing Order P 76, JA 863.

With respect to alleged future threats to the right whale (Br. 51), the Commission noted that it is "unaware of future development that would increase ship traffic."  Rehearing Order P 78, JA 864.  Nonetheless, if future threats arise, the National Oceanic and Atmospheric Administration, the agency with direct authority to protect endangered marine species, "will direct appropriate measures

63

to protect the species." *Id.* NEPA does not require examination of future, speculative threats in any greater detail. *See Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 282-83 (D.C. Cir. 1990) (finding NEPA does not require agencies to consider environmental effects of actions that are not reasonably foreseeable, especially in light of the agency's discussion of how it would mitigate any effects that may occur in the future).

### 3. FERC Fully Identified And Considered Safety Issues

EarthReports asserts that the Project presents a heightened safety risk because it is sited on an "unusually small" area (Br. 52) – a baseless claim that relies on a misleading comparison to the Freeport LNG and Cameron LNG liquefaction projects. *See* Br. 13 n.26. Both the Freeport and Cameron liquefaction projects entail construction of facilities more than twice the size of Dominion's Liquefaction Project.[18]

---

[18] The Freeport LNG Liquefaction Project includes three liquefaction trains *each* with a capacity rating of 4.4 million metric tons per annum of LNG and associated facilities. *See Final Environmental Impact Statement for the Freeport LNG Liquefaction Project and Phase II Modification Project* at 1-1, Docket Nos. CP12-509-000, *et al.* (June 2014); *Freeport LNG Dev., L.P.*, 148 FERC ¶ 61,076 at P 17 (2014) (project description). The Cameron LNG liquefaction project includes construction of three liquefaction trains *each* with a capacity rating of 4.985 million metric tons per annum of LNG, LNG storage tanks, and other facilities. *See Final Environmental Impact Statement for the Cameron LNG Liquefaction Project* at ES-2, Docket Nos. CP13-25-000, *et al.* (April 2014). By comparison, Dominion will construct one liquefaction train with a capacity rating of 5.75 million metric tons per annum of LNG. Authorization Order P 8, JA 621.

Moreover, the existing LNG Terminal "maintains extensive fire protection facilities," which will be expanded for the Liquefaction Project to include vapor and fire detection sensors and fire mitigation measures such as water spray equipment.  EA at 9, JA 285.  The Project also includes multiple protection layers which generally are independent of one another, such that each layer performs its function of preventing or mitigating an incident even if another protection layer fails.  Rehearing Order P 68, JA 860; *see also* EA at 131-42, JA 407-18 (discussing Project's safety design).  In addition, Dominion certified that the Liquefaction Project would be designed, installed, inspected, tested, constructed, operated, and maintained in accordance with federal safety standards.  *See* EA at 25, JA 301 (citing 49 C.F.R. Part 193) (Federal Safety Standards for LNG Facilities).  No more is required.

EarthReports complains that the Commission's review considers Dominion's compliance with the Department of Transportation's safety regulations (Br. 52), but the Department of Transportation's Pipeline and Hazardous Materials Safety Administration – not FERC – has the authority to establish and enforce safety standards for onshore LNG facilities.  Authorization Order P 106 & n.93, JA 649; *see also* EA at 20-21, JA 296-97 (describing Department of Transportation's role).  Regardless, the Commission independently reviewed and comprehensively studied the engineering design, including specifications, control

65

systems, emergency shutdown systems, hazard detection, hazard control, structural

fire protection, and other safety and reliability material in addition to the siting

requirements, for all proposed equipment that comprise the Liquefaction Project.

Rehearing Order P 67, JA 860; EA at 123-59, JA 399-435.  The Commission

addressed EarthReports' concerns regarding:  project siting (Authorization Order

P 191, JA 677-78); trucking and storage of hazardous chemicals (*id.* PP 197, 200-

204, JA 679-82); proximity to residents (*id.* P 205, JA 682); and evacuation routes

(*id.* P 206, JA 682).

EarthReports seeks a quantitative risk assessment (Br. 52).  But the

Commission reasonably declined because "the methods provided for conducting a

quantitative risk assessment can be manipulated to achieve widely divergent

results" and there are "no established criteria on which to judge the resulting

numerical estimates of risk."  Rehearing Order P 69, JA 860-61; *see also*

Authorization Order PP 218-24, JA 685-86 (addressing EarthReports' demand for

consequence modeling).  Instead, the Commission assessed "whether the proposed

facilities would be able to operate safely and securely" and "potential public safety

impacts" based on the Commission's technical review of the facility engineering

design and siting analysis.  Rehearing Order P 69, JA 860.  And based on that

assessment, together with numerous conditions to ensure the safety of the Project

(EA at 135-41, JA 411-17), the Commission concluded that the Project's

66

safeguards and facility design "minimize[] the potential for incidents that could impact the safety of the off-site public." Rehearing Order P 68, JA 860. The Commission's judgment is based upon its expertise and is entitled to deference from this Court. *See*, *e.g.*, *Myersville*, 783 F.3d at 1308 (FERC's evaluation of scientific data is afforded "an extreme degree of deference"); *Nat'l Comm. for the New River*, 373 F.3d at 1327 (same).

That FERC did not analyze safety risks, impacts on right whales, and ballast water impacts in precisely the manner or level of detail that EarthReports would have preferred does not constitute a violation of NEPA or otherwise require judicial intervention. *See Bear Lake Watch*, 324 F.3d at 1077 (court defers to agency expertise unless agency has "completely failed to address some factor, consideration of which was essential to a truly informed decision") (quoting *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993)).

### F.    *Amici Curiae* Are Precluded From Raising New Issues

*Amici curiae*, in addition to supporting petitioner EarthReports' arguments regarding indirect impacts, assert new arguments that are absent from EarthReports' appeal. *See Amici* Br. 2 (admitting that Parts II and III of their brief raise issues "not made by Petitioners"). The *Amici* thus seek to contravene the rule that an amicus participant cannot expand the scope of an appeal to implicate issues that have not been presented by the parties to the appeal. *Eldred v. Ashcroft*, 255

F.3d 849, 854 (D.C. Cir. 2001) (Sentelle, J., dissenting from denial of rehearing en banc) ("There is no dispute that an *amicus curiae* may not raise new *issues* in an appeal.") (emphasis in original); *Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001), *aff'd sub nom. Eldred v. Ashcroft*, 537 U.S. 186 (2003) (citing 16A Wright, Miller & Cooper, Federal Practice and Procedure § 3975.1 & n.3 (3d ed. 1999), and *Resident Council of Allen Parkway Vill. v. HUD*, 980 F.2d 1043, 1049 (5th Cir. 1993)). *Cf. East Ky. Power Coop., Inc. v. FERC*, 489 F.3d 1299, 1305 (D.C. Cir. 2007) ("'[A]bsent extraordinary circumstances, intervenors 'may join only on a matter that has been brought before the court' by a petitioner.'") (quoting *Cal. Dep't of Water Res. v. FERC*, 306 F.3d 1121, 1126 (D.C. Cir. 2002)); *Ala. Mun. Distribs. Grp. v. FERC*, 300 F.3d 877, 879 (D.C. Cir. 2002) (same).

In any event, the Commission addressed *Amici's* two issues in the Environmental Assessment and Orders. With regard to cumulative impacts of sedimentation arising from gas development activities, the Commission reasonably declined to include in its cumulative impacts analysis gas development activities that were not reasonably foreseeable and outside the project area. *See* EA at 163, JA 439 (addressing comments asking for cumulative impacts analysis to include natural gas development); Authorization Order PP 238-42, JA 692-93 (addressing why gas development activities were not included in the cumulative impacts

analysis and noting mitigation measures to minimize erosion and sedimentation);

Rehearing Order PP 32-44, JA 846-51 (same).

*Amici's* second issue – failure to consider the unique context of the

Chesapeake Bay – was also addressed.  *See* Authorization Order PP 274-78,

JA 705-06 (explaining why context of the Project does not warrant developing a

full environmental impact statement); Rehearing Order PP 80-81, JA 865

(considering the context and intensity of Project); EA at 22-24, JA 298-300 (Table

1.6-1 "Issues Identified in the Scoping Process") (identifying impacts on the

Chesapeake Bay as addressed throughout the EA); *see also id.* at 51, JA 327

(identifying the Chesapeake Bay as a sensitive waterbody).

## II.   BP ENERGY'S PETITION IN CASE NO. 15-1205 SHOULD BE DISMISSED FOR LACK OF STANDING, AND, IN ANY EVENT, THE COMMISSION REASONABLY REJECTED ITS UNDUE DISCRIMINATION CLAIM

### A.   BP Energy's Alleged Harm Does Not Satisfy Constitutional Standing Requirements

BP Energy's claim that the challenged orders "depriv[e] it of an opportunity

to relinquish services that cost BP [Energy] approximately $25 million per year"

(Br. 24) does not satisfy Article III standing requirements.  The "irreducible

constitutional minimum" for standing requires the petitioner to have suffered (1) an

"injury in fact – an invasion of a legally protected interest which is (a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) that

has a "causal connection" with the challenged agency action, and (3) that likely "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotations omitted); *see also, e.g., NO Gas Pipeline v. FERC*, 756 F.3d 764, 767-68 (D.C. Cir. 2014) (applying *Lujan* standard).

BP Energy contracted for terminal and pipeline services at Cove Point, and pays for such services under an ongoing contract with Dominion. *See* Br. 13, 24. BP Energy's claimed economic injury – the payment of approximately $25 million per year in contract fees – thus merely reflects the bargain that it struck with Dominion, and does not arise as a result of the Commission's actions in the challenged orders. As the Supreme Court has recognized, in the context of energy statutes administered by FERC, contracts play a vital role in promoting settled expectations between sophisticated parties, and "contract stability ultimately benefits consumers." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 551 (2008).

Apart from its desire to escape its own contractual obligations, BP Energy does not attempt to argue that it will suffer any competitive harm or other adverse impact as a result of Statoil's early contract termination. As the Commission has explained in approving a tariff provision permitting early termination of service contracts at Cove Point, "none of the [protesting customers] have explained how

70

they might be adversely affected by the early termination of another shipper's

agreement, nor have they identified any possible issue or adverse effects resulting

from early termination that would not also result if the contracts were permitted to

expire as scheduled." *Dominion Cove Point LNG, LP*, 119 FERC ¶ 61,209 at P 15

(2007).  *See also Cities of Newark v. FERC*, 763 F.2d 533, 548 (3d Cir. 1985)

(upholding Commission requirement that petitioners must adduce evidence of

"actual competitive harm" in order to obtain relief for alleged undue

discrimination).

Accordingly, BP Energy fails to meet both the injury and causation

requirements under the *Lujan* standard.  *See Anderson v. FERC*, 333 F. App'x 575,

576 (D.C. Cir. 2009) (petitioner lacked standing to challenge Commission's

approval of a new rate schedule for expanded LNG terminal, where petitioner's

contract rates under existing rate schedule remained unchanged); *PNGTS Shippers'*

*Grp. v. FERC*, 592 F.3d 132, 136-37 (D.C. Cir. 2010) (petitioners not aggrieved

where there is no evidence that they have suffered, or will unavoidably suffer, an

economic injury as a result of FERC's order).

## B.    Standard Of Review Governing BP Energy's Claim

If the Court proceeds to the merits of BP Energy's claims, the Commission's

reasonable interpretation and application of NGA section 3(e)(4) is subject to a

highly deferential standard of review.  *See Chevron, USA, Inc. v. Nat. Res. Def.*

71

*Council, Inc.*, 467 U.S. 837, 842-43 (1984); *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) ("Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency."); *see also MetroPCS Cal., LLC v. FCC*, 644 F.3d 410, 412 (D.C. Cir. 2011) (under *Chevron*, the Court "giv[es] effect to clear statutory text and defer[s] to an agency's reasonable interpretation of any ambiguity").

NGA section 3(e)(4) prohibits "undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission." 15 U.S.C. § 717b(e)(4). The Court must give effect to the plain text of the statute. *See, e.g., W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 592-93 (D.C. Cir. 2015). To the extent there is any ambiguity, the Court must uphold FERC's reasonable interpretation because Congress has expressly delegated authority to the agency to define the "terms or conditions of service" subject to the anti-discrimination provision. *See U.S. Postal Serv. v. Postal Regulatory Comm'n*, 599 F.3d 705, 710 (D.C. Cir. 2010) (court must defer to and uphold agency's reasonable interpretation of statute, where "that provision was clearly delegated to the [agency] to implement and thereby to interpret"). Deference is especially appropriate where, as here, the agency is construing whether any discrimination is "undue" and worthy of redress. *See*

*Cities of Newark*, 763 F.2d at 547 ("[T]he notion of undue discrimination itself gives rise to flexibility in interpretation by the Commission.").

### C.    NGA Section 3(e)(4) Bars BP Energy's Claim

Section 3(e)(4) of the Natural Gas Act prohibits "undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission."  15 U.S.C. § 717b(e)(4).  BP Energy argues that the statutory text is "clear" (Br. 1, 25), but does not explain how a contract termination provision is a "term[] or condition[] of service at the facility."  *Id.*

Pursuant to Congress' express delegation, the Commission has defined "terms or conditions of service at the facility" to mean operational terms or conditions of service in "critical tariff areas, such as nominations, scheduling and operating conditions."  Rehearing Order P 14, JA 840; Authorization Order P 46, JA 632 (tariff provision setting forth operational requirements will "continue to ensure no discriminatory treatment of service").  As the Commission explained, "Dominion has not proposed to change the terms and conditions of service for BP [Energy] in this proceeding."  Authorization Order P 46, JA 632.  Moreover, BP Energy "acknowledges [that] the terminal service that it receives from Dominion is fundamentally the same as that provided to Statoil – Statoil receives no preference

73

in nominating, scheduling, or the quality of the terminal service provided."
Rehearing Order P 14, JA 839.

The Commission's interpretation of NGA section 3(e)(4) herein is consistent
with its prior determinations.  In approving the 2006 Cove Point Expansion
Project, the Commission found that Statoil's non-open access contract for the
terminal's expansion capacity "will result in no degradation of service to Cove
Point LNG's existing customers or undue discrimination against existing
customers as to their terms or conditions of service."  *Dominion Cove Point LNG,
LP*, 115 FERC ¶ 61,337 at P 108, JA 43.  In particular, the Commission
determined that the Statoil contract would not give rise to "undue discrimination
against the existing . . . customers as to their terms and conditions of service in the
critical tariff areas, such as nominations, scheduling and operating conditions."  *Id.*
P 150, JA 60.

In 2007, the Commission approved a new tariff provision specifically
permitting Dominion to negotiate early contract terminations with customers.
*Dominion Cove Point LNG, LP*, 119 FERC ¶ 61,209 (2007).  At the time, the
Commission rejected arguments by some shippers that such early contract
terminations "may adversely affect other customers."  *Id.* P 15.  As the
Commission observed, with the exception of rates and costs (not at issue here),
"none of the protesters have explained how they might be adversely affected by the

74

early termination of another shipper's agreement, nor have they identified any possible issues or adverse effects resulting from early termination that would not also result if the contracts were permitted to expire as scheduled." *Id.*

In 2011, citing the tariff provision permitting Dominion and a shipper to mutually agree to an early contract termination, the Commission approved Dominion and Statoil's first agreement to shorten the term of Statoil's pipeline service contract from 2029 to 2020. *Dominion Cove Point LNG, LP*, 134 FERC ¶ 61,219 at P 2 (2011). Dominion and Statoil also agreed to a corresponding early termination of the Statoil terminal services agreement at that time. Answer of Dominion Cove Point LNG, LP to Comments, Protests, and Requests at 9, Docket No. CP13-113 (May 20, 2013), R. 240, JA 141. No shipper protested the 2011 Statoil early contract termination on the basis that it was unduly discriminatory.

The Authorization Order also authorizes the inclusion of certain contract extension and termination rights in the new Export Customers' service agreements. *See* Authorization Order PP 87, 93, JA 643, 645. The Commission reasoned that such contract extension and termination provisions "do not present a risk of undue discrimination, do not affect the operational conditions of providing service, and do not result in any customer receiving a different quality of service." *Id.* P 93, JA 645. No party has challenged these provisions.

75

The Commission thus has consistently and reasonably interpreted NGA section 3(e)(4), 15 U.S.C. § 717b(e)(4), to protect existing customers against the prospect of degraded quality of service when new customers take service at the facility.[19]  NGA section 3(e)(4) does not extend to prohibit Dominion from negotiating an early contract termination in these circumstances.

### D.    The Commission Reasonably Determined That BP Energy And Statoil Are Not Similarly Situated

BP Energy's claim (Br. 30-37) that it is "similarly situated" to Statoil is meritless.  Even assuming – incorrectly – that NGA section 3(e)(4) must extend to early contract terminations, Dominion still would not be required to offer an early contract termination to BP Energy, or any other open access terminal customer, merely because it offered an early contract termination to a non-open access customer.

As the Commission explained, "it is well-established that not all discrimination is undue, and only similarly situated customers need to be treated similarly."  Authorization Order P 47, JA 632 (citing *Associated Gas Distribs. v.*

---

[19] For example, in the Authorization Order, the Commission considered whether simultaneous operation of the existing regasification and proposed liquefaction capabilities would jeopardize the operations of existing terminal customers.  *See* Authorization Order PP 79-86, JA 641-43.  Likewise, in approving the 2006 Expansion Project, the Commission required Dominion to report on the docking and coordination of LNG tankers because "it is important that parties not be unduly discriminated against when attempting to unload LNG."  *Dominion Cove Point LNG, LP*, 115 FERC ¶ 61,337 at P 151, JA 60.

*FERC*, 824 F.2d 981, 1009 (D.C. Cir. 1987) (upholding Commission order

establishing system of flexible rates for pipelines, including the ability to provide

discounts, over the protests of parties raising undue discrimination concerns) and

*Cities of Bethany v. FERC*, 727 F.2d 1131, 1139-40 (D.C. Cir. 1984) (upholding

Commission's finding that rate disparity between two different classes of utility

customers did not constitute undue discrimination, where one set of customers had

entered into settlement agreement with utility that established lower rates)).  *See*

*also Sacramento Mun. Util. Dist. v. FERC*, 474 F.3d 797, 802-804 (D.C. Cir. 2007)

(upholding Commission's finding that, upon the expiration of certain customer

contracts, utility's negotiation of successor agreement with one customer, while

refusing to offer successor agreement to petitioner, was not unduly discriminatory

because customers were not similarly situated).

Consistent with the above cases, BP Energy's undue discrimination claim

fails because Statoil is not similarly situated to BP Energy.  Statoil is the sole

customer of the 2006 Expansion Project, and the sole non-open access customer at

the Cove Point terminal taking service under NGA section 3 at negotiated, market-

based rates.  *See* Rehearing Order P 16, JA 840.  As the Commission explained,

with regard to the different regulatory treatment of Statoil under NGA section 3

and BP Energy under NGA section 7, "section 7 and section 3 terminal services are

distinguishable," and "the difference in 'regulatory regime' between [section 7]

open access and [section 3] non-open access service is a relevant one." *Id.* P 13,

JA 839.  Accordingly, Statoil's agreement with Dominion to shorten the length of

its contracts does not form the basis for an undue discrimination claim by BP

Energy.

Contrary to BP Energy's contention that the Commission drew an "arbitrary

distinction" between BP Energy and Statoil (Br. 37), the Commission has

previously recognized that Statoil may be treated differently as a result of its status

as the sole expansion customer and "foundation shipper" at Cove Point.  *See, e.g.*,

*Dominion Cove Point LNG, LP*, 129 FERC ¶ 61,073 at P 11 (2009) (approving

non-conforming provisions in Statoil's pipeline contract as not unduly

discriminatory because they relate to "unique circumstances" arising from Statoil's

status as a foundation shipper).  *See also Dominion Cove Point LNG, LP*, 134

FERC ¶ 61,219 at P 11 (2011) (finding that early termination of Statoil's section 7

pipeline services contract "do[es] not present a risk of undue discrimination and

do[es] not affect the quality of service received by Statoil or [any other] . . .

shipper[]").

Moreover, as the Commission indicated, different classes of shippers may

face different risks, justifying different treatment.  *Id.*  For example, in *Columbia

Gas Transmission Corp.*, the Commission permitted a gas pipeline to allow certain

shippers to reduce their contract demand quantities, in light of a specific regulatory

risk faced by such shippers.  103 FERC ¶ 61,388 at PP 4-6, 12 (2003), *on reh'g*,

105 FERC 61,373 (2003).  The Commission determined that the provision of such

rights to just one group of shippers did not unduly discriminate against others:

"Columbia Gas can reasonably limit such reductions to regulated entities whose

need for capacity may be affected by the actions of a regulatory agency.  Since

industrial end-users are not so regulated, they are not subject to the same degree of

regulatory risk and are not similarly situated."  *Id.* P 12.

As the Commission explained here, NGA section 3 customers, such as

Statoil, lack certain protections enjoyed by customers, such as BP Energy, taking

service pursuant to the traditional cost-of-service regime.  *See* Rehearing Order

P 13, JA 839 (describing some of the additional protections BP Energy enjoys by

comparison with Statoil, including the regulatory right to release all or a portion of

its terminal service to another shipper and regulatory rights regarding retention of

its capacity upon expiration of its initial service agreement).  Moreover, "[t]he fact

that market conditions might render these rights more or less valuable to BP

[Energy] at any given point in time does not negate the fact that they exist."  *Id.*

BP Energy's suggestion that the Commission failed to consider whether

Statoil has equivalent protections under its contract is meritless.  *See* Br. 22.  In

light of the very different regulatory regimes under which Statoil and BP Energy

take service, the specific terms of the Statoil proprietary contract are irrelevant to

the Commission's determination that Statoil and BP Energy are not similarly

situated customers.  *See* Rehearing Order P 13, JA 839.

Finally, the Commission reasonably rejected BP Energy's allegation that the

Statoil early contract termination represented a "sweetheart deal."  *See* Br. 38-41.

BP Energy bases its allegation on comments made by Dominion's Chief Executive

Officer during an earnings call regarding the *2011* Statoil early contract

termination, not the early contract termination that is the subject of this case.  In

the 2011 comments, Dominion's Chief Executive Officer indicated, "We're going

to work with our partner at the Cove Point expansion in development of

infrastructure out of the Marcellus region in other ways, *in addition to . . . potential*

*liquefaction facilities*."[20]  He then proceeded to discuss various issues relating to

the development of liquefaction facilities at Cove Point.

Contrary to the facts in *Town of Norwood v. FERC*, cited by BP Energy (Br.

38-39), there is no allegation that Statoil and Dominion were engaged in merger

discussions at the time of the negotiations regarding the early contract termination,

and no "allegations which go to the fairness and good faith of the parties at the

contract formation stage."  587 F.2d 1306, 1313 (D.C. Cir. 1978).  Indeed, there is

---

[20] Bloomberg, *Dominion Resources' CEO Discusses Q4 2010 Results –*
*Earnings Call Transcript* (Jan. 28, 2011), *available at*
http://seekingalpha.com/article/249434-dominion-resources-ceo-discusses-q4-210-
earnings-call-transcript?part=qanda (emphasis added).

no evidence indicating that the early contract termination was anything but an arm's-length transaction. *See* Dominion Answer at 9 n.19, JA 141 (discussing earnings call comments and denying receiving "any commercial value associated with any other infrastructure projects as consideration for the early termination of the [Statoil] contracts"); *id.* at 11, JA 143 (indicating that Statoil paid Dominion an exit fee for the early contract termination).

In light of Statoil's status as "Dominion's only current non-open access section 3 customer," Rehearing Order P 16, JA 840, and in the absence of any actual evidence of improper dealings, the Commission reasonably rejected BP Energy's "sweetheart deal" allegations. The Commission acted well within its discretion and should be affirmed.

### E. FERC Reasonably Determined That Dominion's Tariff Adequately Addresses Undue Discrimination

Because the Commission reasonably determined that the Statoil early contract termination does not support BP Energy's undue discrimination claim, the Commission also reasonably found that tariff provisions addressing operational terms and conditions of service were sufficient to prevent undue discrimination. Authorization Order PP 46, 76-78, JA 632, 640-41; Rehearing Order P 14, JA 839-40. To the extent any differences in quality of service arise once the Liquefaction Project commences operation, BP Energy or any other affected shipper may file a complaint with the Commission. *See* Authorization Order P 86, JA 642-43.

## CONCLUSION

For the foregoing reasons, EarthReports' petition for review should be

denied and BP Energy's petition should be dismissed.  If the Court proceeds to the

merits of BP Energy's petition, it too should be denied.

Respectfully submitted,

Max Minzner
General Counsel

Robert H. Solomon
Solicitor

*/s/ Karin L. Larson*
Karin L. Larson
Susanna Y. Chu
Attorneys

Federal Energy Regulatory
   Commission
Washington, D.C. 20426
Tel:  (202) 502-8236
Fax:  (202) 273-0901

FINAL BRIEF:  February 25, 2016

*EarthReports, Inc., et al. v. FERC*                    **Docket No. CP13-113-000**
**D.C. Cir. Nos. 15-1127 and 15-1205**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), Circuit Rule 32(a), and this Court's

October 13, 2015 format and scheduling order, I certify that this brief contains

18,267 words, excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii).

I further certify that this brief complies with the typeface requirements of

Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.

32(a)(6) because this brief has been prepared in Times New Roman 14-point font

using Microsoft Word 2010.

*/s/ Karin L. Larson*
Karin L. Larson
Attorney

Federal Energy Regulatory
  Commission
888 First Street, N.E.
Washington, D.C. 20426
Phone:  202-502-8236
Fax:     202-273-0901
E-mail:  karin.larson@ferc.gov

February 25, 2016

# ADDENDUM
# STATUTES AND REGULATIONS

# TABLE OF CONTENTS

**STATUTES:**

Department of Energy Organization Act

    42 U.S.C § 7151(b).................................................................... A-1

Natural Gas Act

    Section 2, 15 U.S.C. § 717a(11)............................................ A-4

    Section 3, 15 U.S.C. § 717b .................................................. A-4

    Section 3A, 15 U.S.C. § 717b-1 ........................................... A-6

    Section 4, 15 U.S.C. § 717c.................................................. A-7

    Section 5, 15 U.S.C. § 717d ................................................. A-8

    Section 7, 15 U.S.C. § 717f ................................................. A-9

    Section 15, 15 U.S.C. § 717n ............................................. A-11

    Section 19, 15 U.S.C. § 717r ............................................. A-13

**REGULATIONS:**

    40 C.F.R. § 1500.1................................................................ A-15

    40 C.F.R. § 1501.4................................................................ A-16

    40 C.F.R. § 1501.5................................................................ A-17

    40 C.F.R. § 1501.6................................................................ A-17

    40 C.F.R. § 1502.20.............................................................. A-19

    40 C.F.R. § 1503.2................................................................ A-20

# TABLE OF CONTENTS

**REGULATIONS:**

40 C.F.R. § 1503.3.............................................................................. A-20

40 C.F.R. § 1506.3.............................................................................. A-22

40 C.F.R. § 1508.8.............................................................................. A-24

40 C.F.R. § 1508.9.............................................................................. A-24

40 C.F.R. § 1508.13............................................................................ A-24


## § 7144e. Office of Indian Energy Policy and Programs

### (a) Establishment

There is established within the Department an Office of Indian Energy Policy and Programs (referred to in this section as the ''Office''). The Office shall be headed by a Director, who shall be appointed by the Secretary and compensated at a rate equal to that of level IV of the Executive Schedule under section 5315 of title 5.

### (b) Duties of Director

The Director, in accordance with Federal policies promoting Indian self-determination and the purposes of this chapter, shall provide, direct, foster, coordinate, and implement energy planning, education, management, conservation, and delivery programs of the Department that—

(1) promote Indian tribal energy development, efficiency, and use;

(2) reduce or stabilize energy costs;

(3) enhance and strengthen Indian tribal energy and economic infrastructure relating to natural resource development and electrification; and

(4) bring electrical power and service to Indian land and the homes of tribal members located on Indian lands or acquired, constructed, or improved (in whole or in part) with Federal funds.

(Pub. L. 95–91, title II, §217, as added Pub. L. 109–58, title V, §502(a), Aug. 8, 2005, 119 Stat. 763.)

##### REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original ''this Act'', meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

#### SUBCHAPTER III—TRANSFERS OF FUNCTIONS

## § 7151. General transfers

(a) Except as otherwise provided in this chapter, there are transferred to, and vested in, the Secretary all of the functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration, the Administrator of the Energy Research and Development Administration or the Energy Research and Development Administration; and the functions vested by law in the officers and components of either such Administration.

(b) Except as provided in subchapter IV of this chapter, there are transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence.

(Pub. L. 95–91, title III, §301, Aug. 4, 1977, 91 Stat. 577.)

##### REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original ''this Act'', meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

##### EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to the Secretary of Energy, see Parts 1, 2, and 7 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of this title.

##### EX. ORD. NO. 12038. TRANSFER OF CERTAIN FUNCTIONS TO SECRETARY OF ENERGY

Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, as amended by Ex. Ord. No. 12156, Sept. 10, 1979, 44 F.R. 53073, provided:

By virtue of the authority vested in me as President of the United States of America, in order to reflect the responsibilities of the Secretary of Energy for the performance of certain functions previously vested in other officers of the United States by direction of the President and subsequently transferred to the Secretary of Energy pursuant to the Department of Energy Organization Act (91 Stat. 565; 42 U.S.C. 7101 et seq.) it is hereby ordered as follows:

SECTION 1. *Functions of the Federal Energy Administration.* In accordance with the transfer of all functions vested by law in the Federal Energy Administration, or the Administrator thereof, to the Secretary of Energy pursuant to Section 301(a) of the Department of Energy Organization Act [subsec. (a) of this section], hereinafter referred to as the Act, the Executive Orders and Proclamations referred to in this Section, which conferred authority or responsibility upon the Administrator of the Federal Energy Administration, are amended as follows:

(a) Executive Order No. 11647, as amended [formerly set out as a note under 31 U.S.C. 501], relating to Federal Regional Councils, is further amended by deleting ''The Federal Energy Administration'' in Section 1(a)(10) and substituting ''The Department of Energy'', and by deleting ''The Deputy Administrator of the Federal Energy Administration'' in Section 3(a)(10) and substituting ''The Deputy Secretary of Energy''.

(b) Executive Order No. 11790 of June 25, 1974 [set out as a note under 15 U.S.C. 761], relating to the Federal Energy Administration Act of 1974, is amended by deleting ''Administrator of the Federal Energy Administration'' and ''Administrator'' wherever they appear in Sections 1 through 6 and substituting ''Secretary of Energy'' and ''Secretary'', respectively, and by deleting Section 7 through 10.

(c) Executive Order No. 11912, as amended [set out as a note under 42 U.S.C. 6201], relating to energy policy and conservation, and Proclamation No. 3279, as amended [set out as a note under 19 U.S.C. 1862], relating to imports of petroleum and petroleum products, are further amended by deleting ''Administrator of the Federal Energy Administration'', ''Federal Energy Administration'', and ''Administrator'' (when used in reference to the Federal Energy Administration) wherever those terms appear and by substituting ''Secretary of Energy'', ''Department of Energy'', and ''Secretary'', respectively, and by deleting ''the Administrator of Energy Research and Development'' in Section 10(a)(1) of Executive Order No. 11912, as amended.

SEC. 2. *Functions of the Federal Power Commission.* In accordance with the transfer of functions vested in the Federal Power Commission to the Secretary of Energy pursuant to Section 301(b) of the Act [subsec. (b) of this section], the Executive Orders referred to in this Section, which conferred authority or responsibility upon the Federal Power Commission, or Chairman thereof, are amended or modified as follows:

(a) Executive Order No. 10485 of September 3, 1953, [set out as a note under 15 U.S.C. 717b], relating to certain facilities at the borders of the United States is amended by deleting Section 2 thereof, and by deleting

"Federal Power Commission" and "Commission" wherever those terms appear in Sections 1, 3 and 4 of such Order and substituting for each "Secretary of Energy".

(b) Executive Order No. 11969 of February 2, 1977 [formerly set out as a note under 15 U.S.C. 717], relating to the administration of the Emergency Natural Gas Act of 1977 [formerly set out as a note under 15 U.S.C. 717], is hereby amended by deleting the second sentence in Section 1, by deleting "the Secretary of the Interior, the Administrator of the Federal Energy Administration, other members of the Federal Power Commission and in Section 2, and by deleting "Chairman of the Federal Power Commission" and "Chairman" wherever those terms appear and substituting therefor "Secretary of Energy" and "Secretary", respectively.

(c) Paragraph (2) of Section 3 of Executive Order No. 11331, as amended [formerly set out as a note under 42 U.S.C. 1962b], relating to the Pacific Northwest River Basins Commission, is hereby amended by deleting "from each of the following Federal departments and agencies" and substituting therefor "to be appointed by the head of each of the following Executive agencies", by deleting "Federal Power Commission" and substituting therefor "Department of Energy", and by deleting "such member to be appointed by the head of each department or independent agency he represents,".

SEC. 3. *Functions of the Secretary of the Interior*. In accordance with the transfer of certain functions vested in the Secretary of the Interior to the Secretary of Energy pursuant to Section 302 of the Act [42 U.S.C. 7152], the Executive Orders referred to in this Section, which conferred authority or responsibility on the Secretary of the Interior, are amended or modified as follows:

(a) Sections 1 and 4 of Executive Order No. 8526 of August 27, 1940, relating to functions of the Bonneville Power Administration, are hereby amended by substituting "Secretary of Energy" for "Secretary of the Interior", by adding "of the Interior" after "Secretary" in Sections 2 and 3, and by adding "and the Secretary of Energy," after "the Secretary of the Interior" wherever the latter term appears in Section 5.

(b) Executive Order No. 11177 of September 16, 1964, relating to the Columbia River Treaty, is amended by deleting "Secretary of the Interior" and "Department of the Interior" wherever those terms appear and substituting therefor "Secretary of Energy" and "Department of Energy", respectively.

SEC. 4. *Functions of the Atomic Energy Commission and the Energy Research and Development Administration*.

(a) In accordance with the transfer of all functions vested by law in the Administrator of Energy Research and Development to the Secretary of Energy pursuant to Section 301(a) of the Act [subsec. (a) of this section] the Executive Orders referred to in this Section are amended or modified as follows:

(1) All current Executive Orders which refer to functions of the Atomic Energy Commission, including Executive Order No. 10127, as amended; Executive Order No. 10865, as amended [set out as a note under 50 U.S.C. 3161]; Executive Order No. 10899 of December 9, 1960 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11057 of December 18, 1962 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11477 of August 7, 1969 [set out as a note under 42 U.S.C. 2187]; Executive Order No. 11752 of December 17, 1973 [formerly set out as a note under 42 U.S.C. 4331]; and Executive Order No. 11761 of January 17, 1974 [formerly set out as a note under 20 U.S.C. 1221]; are modified to provide that all such functions shall be exercised by (1) the Secretary of Energy to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Administrator of Energy Research and Development pursuant to the Energy Organization Act of 1974 (Public Law 93–438; 88 Stat. 1233) [42 U.S.C. 5801 et seq.], and (2) the Nuclear Regulatory Commission to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Commission by the Energy Reorganization Act of 1974 [42 U.S.C. 5801 et seq.].

(2) [Former] Executive Order No. 11652, as amended, relating to the classification of national security matters, is further amended by substituting "Department of Energy" for "Energy Research and Development Administration" in Sections 2(A), 7(A) and 8 and by deleting "Federal Power Commission" in Section 2(B)(3).

(3) Executive Order No. 11902 of February 2, 1976 [formerly set out as a note under 42 U.S.C. 5841], relating to export licensing policy for nuclear materials and equipment, is amended by substituting "the Secretary of Energy" for "the Administrator of the United States Energy Research and Development Administration, hereinafter referred to as the Administrator" in Section 1(b) and for the "Administrator" in Sections 2 and 3.

(4) [Former] Executive Order No. 11905, as amended, relating to foreign intelligence activities, is further amended by deleting "Energy Research and Development Administration", "Administrator or the Energy Research and Development Administration", and "ERDA" wherever those terms appear and substituting "Department of Energy", "Secretary of Energy", and "DOE" respectively.

(5) Section 3(2) of each of the following Executive Orders is amended by substituting "Department of Energy" for "Energy Research and Development Administration":

(i) Executive Order No. 11345, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Great Lakes River Basin Commission.

(ii) Executive Order No. 11371, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the New England River Basin Commission.

(iii) Executive Order No. 11578, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Ohio River Basin Commission.

(iv) Executive Order No. 11658, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Missouri River Basin Commission.

(v) Executive Order No. 11659, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Mississippi River Basin Commission.

SEC. 5. *Special Provisions Relating to Emergency Preparedness and Mobilization Functions*.

(a) Executive Order No. 10480, as amended [formerly set out as a note under 50 U.S.C. App. 2153], is further amended by adding thereto the following new Sections:

"Sec. 609. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Atomic Energy Commission, and (b) with respect to petroleum, gas, solid fuels and electric power, upon the Secretary of the Interior.

"Sec. 610. Whenever the Administrator of General Services believes that the functions of an Executive agency have been modified pursuant to law in such manner as to require the amendment of any Executive order which relates to the assignment of emergency preparedness functions or the administration of mobilization programs, he shall promptly submit any proposals for the amendment of such Executive orders to the Director of the Office of Management and Budget in accordance with the provisions of Executive Order No. 11030, as amended [set out as a note under 44 U.S.C. 1505].

(b) Executive Order No. 11490, as amended [formerly set out as a note under 50 U.S.C. App. 2251], is further amended by adding thereto the following new section:

"Sec. 3016. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Federal Power Commission, (b) the Energy Research and Development Administration, and (c) with respect to electric power, petroleum, gas and solid fuels, upon the Department of the Interior.".

SEC. 6. This Order shall be effective as of October 1, 1977, the effective date of the Department of Energy Organization Act [this chapter] pursuant to the provisions of section 901 [42 U.S.C. 7341] thereof and Executive Order No. 12009 of September 13, 1977 [formerly set

out as a note under 42 U.S.C. 7341], and all actions taken by the Secretary of Energy on or after October 1, 1977, which are consistent with the foregoing provisions are entitled to full force and effect.

JIMMY CARTER.

## § 7151a. Jurisdiction over matters transferred from Energy Research and Development Administration

Notwithstanding any other provision of law, jurisdiction over matters transferred to the Department of Energy from the Energy Research and Development Administration which on the effective date of such transfer were required by law, regulation, or administrative order to be made on the record after an opportunity for an agency hearing may be assigned to the Federal Energy Regulatory Commission or retained by the Secretary at his discretion.

(Pub. L. 95–238, title I, § 104(a), Feb. 25, 1978, 92 Stat. 53.)

### CODIFICATION

Section was enacted as part of the Department of Energy Act of 1978—Civilian Applications, and not as part of the Department of Energy Organization Act which comprises this chapter.

## § 7152. Transfers from Department of the Interior

### (a) Functions relating to electric power

(1) There are transferred to, and vested in, the Secretary all functions of the Secretary of the Interior under section 825s of title 16, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to—

(A) the Southeastern Power Administration;

(B) the Southwestern Power Administration;

(C) the Bonneville Power Administration including but not limited to the authority contained in the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.];

(D) the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities; and

(E) the transmission and disposition of the electric power and energy generated at Falcon Dam and Amistad Dam, international storage reservoir projects on the Rio Grande, pursuant to the Act of June 18, 1954, as amended by the Act of December 23, 1963.

(2) The Southeastern Power Administration, the Southwestern Power Administration, and the Bonneville Power Administration,[1] shall be preserved as separate and distinct organizational entities within the Department. Each such entity shall be headed by an Administrator appointed by the Secretary. The functions transferred to the Secretary in paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) shall be exercised by the Secretary, acting by and through such Administrators. Each such Administrator shall maintain his principal office at a place located

in the region served by his respective Federal power marketing entity.

(3) The functions transferred in paragraphs (1)(E) and (1)(F)[2] of this subsection shall be exercised by the Secretary, acting by and through a separate and distinct Administration within the Department which shall be headed by an Administrator appointed by the Secretary. The Administrator shall establish and shall maintain such regional offices as necessary to facilitate the performance of such functions. Neither the transfer of functions effected by paragraph (1)(E) of this subsection nor any changes in cost allocation or project evaluation standards shall be deemed to authorize the reallocation of joint costs of multipurpose facilities theretofore allocated unless and to the extent that such change is hereafter approved by Congress.

### (b), (c) Repealed. Pub. L. 97–100, title II, § 201, Dec. 23, 1981, 95 Stat. 1407

### (d) Functions of Bureau of Mines

There are transferred to, and vested in, the Secretary those functions of the Secretary of the Interior, the Department of the Interior, and officers and components of that Department under the Act of May 15, 1910, and other authorities, exercised by the Bureau of Mines, but limited to—

(1) fuel supply and demand analysis and data gathering;

(2) research and development relating to increased efficiency of production technology of solid fuel minerals, other than research relating to mine health and safety and research relating to the environmental and leasing consequences of solid fuel mining (which shall remain in the Department of the Interior); and

(3) coal preparation and analysis.

(Pub. L. 95–91, title III, § 302, Aug. 4, 1977, 91 Stat. 578; Pub. L. 97–100, title II, § 201, Dec. 23, 1981, 95 Stat. 1407; Pub. L. 104–58, title I, § 104(h), Nov. 28, 1995, 109 Stat. 560.)

### REFERENCES IN TEXT

The Bonneville Project Act of 1937, referred to in subsec. (a)(1)(C), is act Aug. 20, 1937, ch. 720, 50 Stat. 731, as amended, which is classified generally to chapter 12B (§ 832 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 832 of Title 16 and Tables.

The Federal Columbia River Transmission System Act, referred to in subsec. (a)(1)(C), is Pub. L. 93–454, Oct. 18, 1974, 88 Stat. 1376, as amended, which is classified generally to chapter 12G (§ 838 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 838 of Title 16 and Tables.

Act of June 18, 1954, as amended by the Act of December 23, 1963, referred to in subsec. (a)(1)(E), is act June 18, 1954, ch. 310, 68 Stat. 255, which was not classified to the Code.

Paragraphs (1)(E) and (1)(F) of this subsection, referred to in subsec. (a)(3), were redesignated as pars. (1)(D) and (1)(E) of this subsection, respectively, by Pub. L. 104–58, title I, § 104(h)(1)(B), Nov. 28, 1995, 109 Stat. 560.

Act of May 15, 1910, referred to in subsec. (d), as amended, probably means act May 16, 1910, ch. 240, 36 Stat. 369, which is classified to sections 1, 3, and 5 to 7 of Title 30, Mineral Lands and Mining. For complete classification of this Act to the Code, see Tables.

---

[1] So in original. The comma probably should not appear.

[2] See References in Text note below.

ment, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

## § 717a. Definitions

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.

(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

(3) "Municipality" means a city, county, or other political subdivision or agency of a State.

(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

(7) "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

(8) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

(9) "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

(10) "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or

(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

(June 21, 1938, ch. 556, §2, 52 Stat. 821; Pub. L. 102–486, title IV, §404(a)(2), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, §311(b), Aug. 8, 2005, 119 Stat. 685.)

AMENDMENTS

2005—Par. (11). Pub. L. 109–58 added par. (11).
1992—Par. (10). Pub. L. 102–486 added par. (10).

TERMINATION OF FEDERAL POWER COMMISSION;
TRANSFER OF FUNCTIONS

Federal Power Commission terminated and functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a)(1), 7291, and 7293 of Title 42, The Public Health and Welfare.

## § 717b. Exportation or importation of natural gas; LNG terminals

### (a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

### (b) Free trade agreements

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas—

(1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

(2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

### (c) Expedited application and approval process

For purposes of subsection (a) of this section, the importation of the natural gas referred to in subsection (b) of this section, or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or ex-

portation shall be granted without modification or delay.

**(d) Construction with other laws**

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under—

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

**(e) LNG terminals**

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall—

(A) set the matter for hearing;

(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b–1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3)(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find[1] necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not—

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on—

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or

undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

**(f) Military installations**

(1) In this subsection, the term "military installation"—

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult[2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

(June 21, 1938, ch. 556, § 3, 52 Stat. 822; Pub. L. 102–486, title II, § 201, Oct. 24, 1992, 106 Stat. 2866; Pub. L. 109–58, title III, § 311(c), Aug. 8, 2005, 119 Stat. 685.)

REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), is title III of Pub. L. 89–454 as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§ 1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

The Clean Air Act, referred to in subsec. (d)(2), is act July 14, 1955, ch. 360, 69 Stat. 322, as amended, which is classified generally to chapter 85 (§ 7401 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of Title 42 and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (d)(3), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§ 1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

AMENDMENTS

2005—Pub. L. 109–58, § 311(c)(1), inserted "; LNG terminals" after "natural gas" in section catchline.

Subsecs. (d) to (f). Pub. L. 109–58, § 311(c)(2), added subsecs. (d) to (f).

1992—Pub. L. 102–486 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commis-

---

[1] So in original. Probably should be "finds".

[2] So in original. Probably should be "coordinates and consults".

sioners, or other official in Federal Energy Regulatory Commission related to compliance with authorizations for importation of natural gas from Alberta as pre-deliveries of Alaskan gas issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to the Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

DELEGATION OF FUNCTIONS

Functions of President respecting certain facilities constructed and maintained on United States borders delegated to Secretary of State, see Ex. Ord. No. 11423, Aug. 16, 1968, 33 F.R. 11741, set out as a note under section 301 of Title 3, The President.

EX. ORD. NO. 10485. PERFORMANCE OF FUNCTIONS RESPECTING ELECTRIC POWER AND NATURAL GAS FACILITIES LOCATED ON UNITED STATES BORDERS

Ex. Ord. No. 10485. Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, provided:

SECTION 1. (a) The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

(1) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

(2) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

(3) Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Secretary of Energy shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

(b) In any case wherein the Secretary of Energy, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Secretary of Energy shall submit to the President for approval or disapproval the application for a permit with the respective views of the Secretary of Energy, the Secretary of State and the Secretary of Defense.

SEC. 2. [Deleted.]

SEC. 3. The Secretary of Energy is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

SEC. 4. All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Secretary of Energy.

SEC. 5. Executive Order No. 8202 of July 13, 1939, is hereby revoked.

## § 717b–1. State and local safety considerations

### (a) Promulgation of regulations

The Commission shall promulgate regulations on the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) pre-filing process within 60 days after August 8, 2005. An applicant shall comply with pre-filing process required under the National Environmental Policy Act of 1969 prior to filing an application with the Commission. The regulations shall require that the pre-filing process commence at least 6 months prior to the filing of an application for authorization to construct an LNG terminal and encourage applicants to cooperate with State and local officials.

### (b) State consultation

The Governor of a State in which an LNG terminal is proposed to be located shall designate the appropriate State agency for the purposes of consulting with the Commission regarding an application under section 717b of this title. The Commission shall consult with such State agency regarding State and local safety considerations prior to issuing an order pursuant to section 717b of this title. For the purposes of this section, State and local safety considerations include—

(1) the kind and use of the facility;

(2) the existing and projected population and demographic characteristics of the location;

(3) the existing and proposed land use near the location;

(4) the natural and physical aspects of the location;

(5) the emergency response capabilities near the facility location; and

(6) the need to encourage remote siting.

### (c) Advisory report

The State agency may furnish an advisory report on State and local safety considerations to the Commission with respect to an application no later than 30 days after the application was filed with the Commission. Before issuing an order authorizing an applicant to site, construct, expand, or operate an LNG terminal, the Commission shall review and respond specifically to the issues raised by the State agency described in subsection (b) of this section in the advisory report. This subsection shall apply to any application filed after August 8, 2005. A State agency has 30 days after August 8, 2005 to file an advisory report related to any applications pending at the Commission as of August 8, 2005.

### (d) Inspections

The State commission of the State in which an LNG terminal is located may, after the terminal is operational, conduct safety inspections in conformance with Federal regulations and guidelines with respect to the LNG terminal upon written notice to the Commission. The State commission may notify the Commission of any alleged safety violations. The Commission shall transmit information regarding such allegations to the appropriate Federal agency, which shall take appropriate action and notify the State commission.

**(e) Emergency Response Plan**

(1) In any order authorizing an LNG terminal the Commission shall require the LNG terminal operator to develop an Emergency Response Plan. The Emergency Response Plan shall be prepared in consultation with the United States Coast Guard and State and local agencies and be approved by the Commission prior to any final approval to begin construction. The Plan shall include a cost-sharing plan.

(2) A cost-sharing plan developed under paragraph (1) shall include a description of any direct cost reimbursements that the applicant agrees to provide to any State and local agencies with responsibility for security and safety—

(A) at the LNG terminal; and

(B) in proximity to vessels that serve the facility.

(June 21, 1938, ch. 556, §3A, as added Pub. L. 109–58, title III, §311(d), Aug. 8, 2005, 119 Stat. 687.)

REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in subsec. (a), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

## § 717c. Rates and charges

**(a) Just and reasonable rates and charges**

All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

**(b) Undue preferences and unreasonable rates and charges prohibited**

No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Filing of rates and charges with Commission; public inspection of schedules**

Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Changes in rates and charges; notice to Commission**

Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Authority of Commission to hold hearings concerning new schedule of rates**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending

before it and decide the same as speedily as possible.

**(f) Storage services**

(1) In exercising its authority under this chapter or the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.), the Commission may authorize a natural gas company (or any person that will be a natural gas company on completion of any proposed construction) to provide storage and storage-related services at market-based rates for new storage capacity related to a specific facility placed in service after August 8, 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that—

(A) market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

(B) customers are adequately protected.

(2) The Commission shall ensure that reasonable terms and conditions are in place to protect consumers.

(3) If the Commission authorizes a natural gas company to charge market-based rates under this subsection, the Commission shall review periodically whether the market-based rate is just, reasonable, and not unduly discriminatory or preferential.

(June 21, 1938, ch. 556, §4, 52 Stat. 822; Pub. L. 87–454, May 21, 1962, 76 Stat. 72; Pub. L. 109–58, title III, §312, Aug. 8, 2005, 119 Stat. 688.)

REFERENCES IN TEXT

The Natural Gas Policy Act of 1978, referred to in subsec. (f)(1), is Pub. L. 95–621, Nov. 9, 1978, 92 Stat. 3350, as amended, which is classified generally to chapter 60 (§3301 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 3301 of this title and Tables.

AMENDMENTS

2005—Subsec. (f). Pub. L. 109–58 added subsec. (f).
1962—Subsec. (e). Pub. L. 87–454 inserted "or gas distributing company" after "State commission", and struck out proviso which denied authority to the Commission to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only.

ADVANCE RECOVERY OF EXPENSES INCURRED BY NATURAL GAS COMPANIES FOR NATURAL GAS RESEARCH, DEVELOPMENT, AND DEMONSTRATION PROJECTS

Pub. L. 102–104, title III, Aug. 17, 1991, 105 Stat. 531, authorized Federal Energy Regulatory Commission, pursuant to this section, to allow recovery, in advance, of expenses by natural-gas companies for research, development and demonstration activities by Gas Research Institute for projects on use of natural gas in motor vehicles and on use of natural gas to control emissions from combustion of other fuels, subject to Commission finding that benefits, including environmental benefits, to both existing and future ratepayers resulting from such activities exceed all direct costs to both existing and future ratepayers, prior to repeal by Pub. L. 102–486, title IV, §408(c), Oct. 24, 1992, 106 Stat. 2882.

**§717c–1. Prohibition on market manipulation**

It shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of this title) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. Nothing in this section shall be construed to create a private right of action.

(June 21, 1938, ch. 556, §4A, as added Pub. L. 109–58, title III, §315, Aug. 8, 2005, 119 Stat. 691.)

**§717d. Fixing rates and charges; determination of cost of production or transportation**

**(a) Decreases in rates**

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however*, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

**(b) Costs of production and transportation**

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

(June 21, 1938, ch. 556, §5, 52 Stat. 823.)

**§717e. Ascertainment of cost of property**

**(a) Cost of property**

The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for ratemaking purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

**(b) Inventory of property; statements of costs**

Every natural-gas company upon request shall file with the Commission an inventory of all or

any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 21, 1938, ch. 556, § 6, 52 Stat. 824.)

### § 717f. Construction, extension, or abandonment of facilities

#### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

#### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

#### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however*, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring

further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however*, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

#### (d) Application for certificate of public convenience and necessity

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

#### (e) Granting of certificate of public convenience and necessity

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

#### (f) Determination of service area; jurisdiction of transportation to ultimate consumers

(1) The Commission, after a hearing had upon its own motion or upon application, may deter-

mine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, § 7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, § 608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, § 2, Oct. 6, 1988, 102 Stat. 2302.)

AMENDMENTS

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).

1978—Subsec. (c). Pub. L. 95–617, § 608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).

Subsec. (e). Pub. L. 95–617, § 608(b)(2), substituted "subsection (c)(1)" for "subsection (c)".

1947—Subsec. (h). Act July 25, 1947, added subsec. (h).

1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–474, § 3, Oct. 6, 1988, 102 Stat. 2302, provided that: "The provisions of this Act [amending this sec-

tion and enacting provisions set out as a note under section 717w of this title] shall become effective one hundred and twenty days after the date of enactment [Oct. 6, 1988].''

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with certificates of public convenience and necessity issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(f), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

### § 717g. Accounts; records; memoranda

**(a) Rules and regulations for keeping and preserving accounts, records, etc.**

Every natural-gas company shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this chapter: *Provided, however*, That nothing in this chapter shall relieve any such natural-gas company from keeping any accounts, memoranda, or records which such natural-gas company may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by such natural-gas companies, and may classify such natural-gas companies and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays or receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof.

**(b) Access to and inspection of accounts and records**

The Commission shall at all times have access to and the right to inspect and examine all accounts, records, and memoranda of natural-gas companies; and it shall be the duty of such natural-gas companies to furnish to the Commission, within such reasonable time as the Commission may order, any information with respect thereto which the Commission may by order require, including copies of maps, contracts, reports of engineers, and other data, records, and papers, and to grant to all agents of the Commission free ac-

issue. The Commission may also order testimony to be taken by deposition in any proceeding or investigation pending before it at any stage of such proceeding or investigation. Such depositions may be taken before any person authorized to administer oaths not being of counsel or attorney to either of the parties, nor interested in the proceeding or investigation. Reasonable notice must first be given in writing by the party or his attorney proposing to take such deposition to the opposite party or his attorney of record, as either may be nearest, which notice shall state the name of the witness and the time and place of the taking of his deposition. Any person may be compelled to appear and depose, and to produce documentary evidence, in the same manner as witnesses may be compelled to appear and testify and produce documentary evidence before the Commission, as hereinbefore provided. Such testimony shall be reduced to writing by the person taking deposition, or under his direction, and shall, after it has been reduced to writing, be subscribed by the deponent.

**(f) Deposition of witnesses in a foreign country**

If a witness whose testimony may be desired to be taken by deposition be in a foreign country, the deposition may be taken before an officer or person designated by the Commission, or agreed upon by the parties by stipulation in writing to be filed with the Commission. All depositions must be promptly filed with the Commission.

**(g) Witness fees**

Witnesses whose depositions are taken as authorized in this chapter, and the person or officer taking the same, shall be entitled to the same fees as are paid for like services in the courts of the United States.

(June 21, 1938, ch. 556, §14, 52 Stat. 828; Pub. L. 91–452, title II, §218, Oct. 15, 1970, 84 Stat. 929.)

AMENDMENTS

1970—Subsec. (h). Pub. L. 91–452 struck out subsec. (h) which related to the immunity from prosecution of any individual compelled to testify or produce evidence, documentary or otherwise, after claiming his privilege against self-incrimination.

EFFECTIVE DATE OF 1970 AMENDMENT

Amendment by Pub. L. 91–452 effective on sixtieth day following Oct. 15, 1970, and not to affect any immunity to which any individual is entitled under this section by reason of any testimony given before sixtieth day following Oct. 15, 1970, see section 260 of Pub. L. 91–452, set out as an Effective Date; Savings Provision note under section 6001 of Title 18, Crimes and Criminal Procedure.

STUDY AND REPORT ON NATURAL GAS PIPELINE AND STORAGE FACILITIES IN NEW ENGLAND

Pub. L. 107–355, §26, Dec. 17, 2002, 116 Stat. 3012, provided that:

''(a) STUDY.—The Federal Energy Regulatory Commission, in consultation with the Department of Energy, shall conduct a study on the natural gas pipeline transmission network in New England and natural gas storage facilities associated with that network.

''(b) CONSIDERATION.—In carrying out the study, the Commission shall consider the ability of natural gas pipeline and storage facilities in New England to meet current and projected demand by gas-fired power generation plants and other consumers.

''(c) REPORT.—Not later than 1 year after the date of enactment of this Act [Dec. 17, 2002], the Federal Energy Regulatory Commission shall prepare and submit to the Committee on Energy and Natural Resources of the Senate and the Committee on Energy and Commerce of the House of Representatives a report containing the results of the study conducted under subsection (a), including recommendations for addressing potential natural gas transmission and storage capacity problems in New England.''

## § 717n. Process coordination; hearings; rules of procedure

**(a) Definition**

In this section, the term ''Federal authorization''—

(1) means any authorization required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title; and

(2) includes any permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title.

**(b) Designation as lead agency**

**(1) In general**

The Commission shall act as the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

**(2) Other agencies**

Each Federal and State agency considering an aspect of an application for Federal authorization shall cooperate with the Commission and comply with the deadlines established by the Commission.

**(c) Schedule**

**(1) Commission authority to set schedule**

The Commission shall establish a schedule for all Federal authorizations. In establishing the schedule, the Commission shall—

(A) ensure expeditious completion of all such proceedings; and

(B) comply with applicable schedules established by Federal law.

**(2) Failure to meet schedule**

If a Federal or State administrative agency does not complete a proceeding for an approval that is required for a Federal authorization in accordance with the schedule established by the Commission, the applicant may pursue remedies under section 717r(d) of this title.

**(d) Consolidated record**

The Commission shall, with the cooperation of Federal and State administrative agencies and officials, maintain a complete consolidated record of all decisions made or actions taken by the Commission or by a Federal administrative agency or officer (or State administrative agency or officer acting under delegated Federal authority) with respect to any Federal authorization. Such record shall be the record for—

(1) appeals or reviews under the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), provided that the record may be supplemented as expressly provided pursuant to section 319 of that Act [16 U.S.C. 1465]; or

(2) judicial review under section 717r(d) of this title of decisions made or actions taken of Federal and State administrative agencies and officials, provided that, if the Court determines that the record does not contain sufficient information, the Court may remand the proceeding to the Commission for further development of the consolidated record.

**(e) Hearings; parties**

Hearings under this chapter may be held before the Commission, any member or members thereof, or any representative of the Commission designated by it, and appropriate records thereof shall be kept. In any proceeding before it, the Commission in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.

**(f) Procedure**

All hearings, investigations, and proceedings under this chapter shall be governed by rules of practice and procedure to be adopted by the Commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter.

(June 21, 1938, ch. 556, §15, 52 Stat. 829; Pub. L. 109–58, title III, §313(a), Aug. 8, 2005, 119 Stat. 688.)

REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in subsec. (b)(1), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

AMENDMENTS

2005—Pub. L. 109–58 substituted "Process coordination; hearings; rules of procedure" for "Hearings; rules of procedure" in section catchline, added subsecs. (a) to (d), and redesignated former subsecs. (a) and (b) as (e) and (f), respectively.

**§717o. Administrative powers of Commission; rules, regulations, and orders**

The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.

(June 21, 1938, ch. 556, §16, 52 Stat. 830.)

**§717p. Joint boards**

**(a) Reference of matters to joint boards; composition and power**

The Commission may refer any matter arising in the administration of this chapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The Board shall be appointed by the Commission from persons nominated by the State commission of each State affected, or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

**(b) Conference with State commissions regarding rate structure, costs, etc.**

The Commission may confer with any State commission regarding rate structures, costs, accounts, charges, practices, classifications, and regulations of natural-gas companies; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this

chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

**(c) Information and reports available to State commissions**

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of natural-gas companies. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may, upon request from a State commission, make available to such State commission as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 21, 1938, ch. 556, § 17, 52 Stat. 830.)

## § 717q. Appointment of officers and employees

The Commission is authorized to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter; and the Commission may, subject to civil-service laws, appoint such other officers and employees as are necessary for carrying out such functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5.

(June 21, 1938, ch. 556, § 18, 52 Stat. 831; Oct. 28, 1949, ch. 782, title XI, § 1106(a), 63 Stat. 972.)

CODIFICATION

Provisions that authorized the Commission to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter "without regard to the provisions of other laws applicable to the employment and compensation of officers and employees of the United States" are omitted as obsolete and superseded.

As to the compensation of such personnel, sections 1202 and 1204 of the Classification Act of 1949, 63 Stat. 972, 973, repealed the Classification Act of 1923 and all other laws or parts of laws inconsistent with the 1949 Act. The Classification Act of 1949 was repealed by Pub. L. 89–554, Sept. 6, 1966, § 8(a), 80 Stat. 632, and reenacted as chapter 51 and subchapter III of chapter 53 of Title 5, Government Organization and Employees. Section 5102 of Title 5 contains the applicability provisions of the 1949 Act, and section 5103 of Title 5 authorizes the Office of Personnel Management to determine the applicability to specific positions and employees.

Such appointments are now subject to the civil service laws unless specifically excepted by those laws or by laws enacted subsequent to Executive Order 8743, Apr. 23, 1941, issued by the President pursuant to the Act of Nov. 26, 1940, ch. 919, title I, § 1, 54 Stat. 1211, which covered most excepted positions into the classified (competitive) civil service. The Order is set out as a note under section 3301 of Title 5.

"Chapter 51 and subchapter III of chapter 53 of title 5" substituted in text for "the Classification Act of 1949, as amended" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5.

AMENDMENTS

1949—Act Oct. 28, 1949, substituted "Classification Act of 1949" for "Classification Act of 1923".

REPEALS

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, § 8, 80 Stat. 632, 655.

## § 717r. Rehearing and review

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commis-

sion, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as ''permit'') required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, § 19, 52 Stat. 831; June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§ 1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

CODIFICATION

In subsec. (b), ''section 1254 of title 28'' substituted for ''sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]'' on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).
1958—Subsec. (a). Pub. L. 85–791, § 19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.
Subsec. (b). Pub. L. 85–791, § 19(b), in second sentence, substituted ''transmitted by the clerk of the court to'' for ''served upon'', substituted ''file with the court'' for ''certify and file with the court a transcript of'', and inserted ''as provided in section 2112 of title 28'', and, in third sentence, substituted ''petition'' for ''transcript'', and ''jurisdiction, which upon the filing of the record with it shall be exclusive'' for ''exclusive jurisdiction''.

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted ''court of appeals'' for ''circuit court of appeals'' wherever appearing.

## § 717s. Enforcement of chapter

**(a) Action in district court for injunction**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder,

# PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55990, Nov. 28, 1978, unless otherwise noted.

## § 1500.1  Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains ''action-forcing'' provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## § 1500.2  Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

## § 1500.3  Mandate.

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act)

995

**§ 1501.2  Apply NEPA early in the process.**

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to ''utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment,'' as specified by § 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

**§ 1501.3  When to prepare an environmental assessment.**

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

**§ 1501.4  Whether to prepare an environmental impact statement.**

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

998

A-16

**Council on Environmental Quality**                                §1501.6

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to §1507.3, or

(ii) The nature of the proposed action is one without precedent.

### §1501.5 Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency

designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### §1501.6 Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

(2) Participate in the scoping process (described below in § 1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b)(3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

### § 1501.7 Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

(2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (§ 1502.7).

(2) Set time limits (§ 1501.8).

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1502.17  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### § 1502.18  Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

### § 1502.19  Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

### § 1502.20  Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

### § 1502.21  Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

§ 1502.25                                                    40 CFR Ch. V (7–1–13 Edition)

§ 1502.25 Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

## PART 1503—COMMENTING

Sec.
1503.1   Inviting comments.
1503.2   Duty to comment.
1503.3   Specificity of comments.
1503.4   Response to comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

§ 1503.1   Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A–95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10.

§ 1503.2   Duty to comment.

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in § 1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

§ 1503.3   Specificity of comments.

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

### § 1503.4  Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs

(a)(4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§ 1502.19). The entire document with a new cover sheet shall be filed as the final statement (§ 1506.9).

## PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1  Purpose.
1504.2  Criteria for referral.
1504.3  Procedure for referrals and response.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

### § 1504.1  Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews

**Council on Environmental Quality**

§ 1506.3

agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

**§ 1506.2  Elimination of duplication with State and local procedures.**

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

**§ 1506.3  Adoption.**

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of

1013

a judicial action which is not final, the agency shall so specify.

§ 1506.4  Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

§ 1506.5  Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

§ 1506.6  Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A–95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

§ 1508.6                                              40 CFR Ch. V (7–1–13 Edition)

**§ 1508.6  Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

**§ 1508.7  Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**§ 1508.8  Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**§ 1508.9  Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**§ 1508.10  Environmental document.**

*Environmental document* includes the documents specified in §1508.9 (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent).

**§ 1508.11  Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

**§ 1508.12  Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**§ 1508.13  Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§1501.7(a)(5)). If the assessment is included, the finding need not

**Council on Environmental Quality**                                  **§ 1508.19**

repeat any of the discussion in the assessment but may incorporate it by reference.

### § 1508.14  Human environment.

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

### § 1508.15  Jurisdiction by law.

*Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

### § 1508.16  Lead agency.

*Lead agency* means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

### § 1508.17  Legislation.

*Legislation* includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

### § 1508.18  Major Federal action.

*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

### § 1508.19  Matter.

*Matter* includes for purposes of part 1504:

1021

*EarthReports Inc., et al. v. FERC*                    Docket No. CP13-113
**D.C. Cir. Nos. 15-1127 and 15-1205 (consolidated)**

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P.25(d), and the Court's Administrative

Order Regarding Electronic Case Filing, I hereby certify that I have, this 25th day

of February 2016, served the foregoing upon the counsel listed in the Service

Preference Report via email through the Court's CM/EMF system or U.S. mail as

indicated below:

Hope Madeline Babcock                    Email
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Ave. NW
Suite 312
Washington, DC 20001

Betsy Ryan Carr                          U.S. Mail
Dynegy, Inc
1000 Louisiana
Suite 5800
Houston, TX 77002

Sarah Jean Fox                           Email
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Ave. NW
Suite 312
Washington, DC 20001

Kirstin Elaine Gibbs                     Email
Bracewell & Giuliani LLP
2000 K Street, NW; Suite 500
Washington, DC 20006

Deborah Goldberg                         Email
Earthjustice
48 Wall Street
19th Floor
New York, NY 10005


Anne Elizabeth Havemann                   Email
Chesapeake Climate Action Network
6930 Carroll Ave.
Suite 720
Takoma Park, MD 20912


John Taylor Hebden                        Email
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005


Christopher Matthew Heywood                Email
Statoil North America, Inc.
120 Long Ridge Road
Suite 3EO1
Stamford, CT 06902


Stacey Renee Linden                       Email
American Petroleum Institute
Suite 900
1220 L Street, NW
Washington, DC 20005


John Longstreth                           Email
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

Daniel Harold Lutz                                   Email
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Avenue, NW
Suite 312
Washington, DC 20001

Erika Maley                                          Email
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

Sean Marotta                                         Email
Hogan Lovells US LLP
Columbia Square
555 13th Street, NW
Washington, DC 20004

Moneen Susan Nasmith                                 Email
Earthjustice
48 Wall Street
19th Floor
New York, NY 10005

Joel Patrick Nevins                                  Email
Hogan Lovells US LLP
Columbia Square
555 13th Street, NW
Washington, DC 20004

Benjamin Norris IV                                   Email
American Petroleum Institute
Suite 900
1220 L Street, NW
Washington, DC 20005

Virginia Anne Seitz                                 Email
2901 Kanawha
Washington, DC 20015


Catherine Emily Stetson                             Email
Hogan Lovells US LLP
Columbia Square
555 13th Street, NW
Washington, DC 20004


William Augustus Williams III                       Email
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005


David Leonard Wochner                               Email
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006


                                    */s/ Karin L. Larson*
                                    Karin L. Larson
                                    Attorney


Federal Energy Regulatory
   Commission
Washington, DC  20426
Tel:  (202) 502-8236
Fax:  (202) 273-0901
Email:  karin.larson@ferc.gov