**ORAL ARGUMENT SCHEDULED FOR APRIL 19, 2016**

Nos. 15-1127 and 15-1205

IN THE

# United States Court of Appeals for the District of Columbia Circuit

EARTHREPORTS, INC., *et al.*,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

DOMINION COVE POINT LNG, LP, AMERICAN PETROLEUM INSTITUTE, and STATOIL NATURAL GAS, LLC,

Intervenors.

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**BRIEF FOR INTERVENORS**
**DOMINION COVE POINT LNG, LP AND STATOIL NATURAL GAS, LLC**

KIRSTIN E. GIBBS
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5026
kirstin.gibbs@morganlewis.com

J. PATRICK NEVINS
CATHERINE E. STETSON
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Statoil Natural Gas, LLC*

*Counsel for Dominion Cove Point LNG, LP*

February 26, 2016

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     PARTIES

1.     The parties to the proceeding are listed in the EarthReports Petitioners' opening brief.

2.     Dominion Cove Point LNG, LP is a Delaware limited partnership that owns the Cove Point, Maryland liquefied natural gas terminal and the 88-mile Cove Point pipeline.  Dominion Cove Point LNG, LP is an indirect subsidiary of Dominion Resources, Inc., a publicly traded company.  The partners of Dominion Cove Point LNG, LP are Cove Point GP Holding Company, LLC; Dominion Cove Point, Inc.; and Dominion Gas Projects Company, LLC.

Statoil Natural Gas, LLC is a Delaware limited liability company headquartered in Stamford, Connecticut, and is engaged in marketing and trading natural gas in the United States.  Statoil is a wholly owned subsidiary of Statoil US Holdings Inc. and Statoil Norsk LNG AS.  Statoil US Holdings Inc., a Delaware corporation, is ultimately wholly owned by Statoil ASA, a corporation registered under the laws of the Kingdom of Norway, through Statoil Investment Americas AS, a Norwegian corporation, Statoil International Holding AS, a Norwegian corporation, and Statoil Petroleum AS, a Norwegian corporation. Statoil Norsk LNG AS, a Norwegian company, is wholly owned by Statoil ASA. Shares of

Statoil ASA are traded on the Oslo stock exchange, and Statoil ASA American Depository Receipts are traded on the New York Stock Exchange.

### B.   RULINGS UNDER REVIEW

The rulings under review are listed in the EarthReports Petitioners' opening brief.

### C.   RELATED CASES

Other than those listed in the EarthReports Petitioners' opening brief, there are no related cases of which undersigned counsel is aware currently pending in this Court or in any other court involving substantially the same parties and the same or similar issues.

/s/ Catherine E. Stetson
Catherine E. Stetson

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ............................................................................ i

TABLE OF AUTHORITIES ................................................................. v

GLOSSARY ......................................................................................... x

STATEMENT OF FACTS ..................................................................... 1

      A.    EarthReports's NEPA Challenge ..................................... 3

      B.    BP's Protest ....................................................................... 5

STATUTES AND REGULATIONS ....................................................... 8

SUMMARY OF ARGUMENT ............................................................... 8

ARGUMENT ........................................................................................ 11

I.    THE COMMISSION'S NEPA ANALYSIS WAS NOT
ARBITRARY OR CAPRICIOUS ............................................ 11

      A.    EarthReports's Claimed Gas Production And
Overseas Consumption Impacts Are Not Caused By
The Cove Point Liquefaction Project ............................ 11

      B.    EarthReports's Asserted Gas Production And
Overseas Consumption Impacts Are Not Reasonably
Foreseeable ...................................................................... 18

      C.    The Commission Sufficiently Addressed
EarthReports's Other Concerns ..................................... 25

II.    THE COMMISSION REASONABLY CONCLUDED
THAT DOMINION DID NOT UNDULY DISCRIMINATE
AGAINST BP ........................................................................... 29

      A.    Section 3(e)(4) Allows Economic Discrimination
Between Section 3(e) And Section 7 Customers At
Mixed Terminals .............................................................. 29

iii

## TABLE OF CONTENTS—Continued

Page

B.    Even If Section 3(e)(4) Applies To All Terms And
Conditions Of Service, The Commission Sufficiently
Explained Why Statoil And BP Are Not Similarly
Situated ............................................................................................ 36

CONCLUSION ..................................................................................................... 41

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008)........................................................................31

*Ark. Wildlife Fed. v. U.S. Army Corps of Eng'rs*,
  431 F.3d 1096 (8th Cir. 2005) .......................................................22

*Associated Gas Distribs. v. FERC*,
  824 F.2d 981 (D.C. Cir. 1987)..........................................................6

*Beardslee v. Inflection Energy, LLC*,
  761 F.3d 221 (2d Cir. 2014) ...........................................................20

*Cal. Indep. Sys. Operator Corp. v. FERC*,
  372 F.3d 395 (D.C. Cir. 2004).......................................................32

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991).......................................................27

*City of Oxford v. FAA*,
  428 F.3d 1346 (11th Cir. 2005) .....................................................23

*Complex Consol. Edison Co. of N.Y., Inc. v. FERC*,
  165 F.3d 992 (D.C. Cir. 1999) (per curiam)..................................38

*Defs. of Wildlife v. Andrus*,
  627 F.2d 1238 (D.C. Cir. 1980)......................................................21

* *Department of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004)..............................................8, 9, 12, 13, 15, 17

*ExxonMobil Gas Mktg. Co. v. FERC*,
  297 F.3d 1071 (D.C. Cir. 2002).....................................................36

---

\* Authorities upon which we chiefly rely are marked with an asterisk.

## TABLE OF AUTHORITIES—Continued

Page

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
609 F.3d 897 (7th Cir. 2010) ............................................................23

*High Country Conservations Advocates v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174, 1190 (D. Colo. 2014) ................................25, 26

*James Madison Ltd. v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996).........................................................28

\* *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
746 F.3d 698 (6th Cir. 2014) ..............................................14, 15, 17

*King v. Burwell*,
135 S. Ct. 2480 (2015).....................................................................33

*League of Wilderness Defs. v. Connaughton*,
No. 3:12-cv-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014)....................25

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989).........................................................................27

*Mayo Found. v. Surface Transp. Bd.*,
472 F.3d 545 (8th Cir. 2006) ...........................................................22

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983)...................................................................12, 18

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
345 F.3d 520 (8th Cir. 2003) ......................................................22, 23

*Mitchell v. Fed. Bureau of Prisons*,
587 F.3d 415 (D.C. Cir. 2009).........................................................33

*N.J. Dep't of Envtl. Prot. v. U.S. Nuclear Reg. Comm'n*,
561 F.3d 132 (3d Cir. 2009) ............................................................14

*Northwest Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
489 U.S. 493 (1989).....................................................................3, 13

## TABLE OF AUTHORITIES—Continued

<u>Page</u>

\* *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ...................................................14, 15

*Power Co. of Am., L.P. v. FERC*,
245 F.3d 839 (D.C. Cir. 2001)................................................22

*Qi-Zhuo v. Meissner*,
70 F.3d 136 (D.C. Cir. 1995)................................................30

*Russello v. United States*,
464 U.S. 16 (1983)................................................31

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,
481 F.2d 1079 (D.C. Cir. 1973)................................................18

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002)................................................28

*Sierra Club v. U.S. Army Corps of Eng'rs*,
803 F.3d 31 (D.C. Cir. 2015)................................................15

*Society Hill Towers Owners' Ass'n v. Rendell*,
210 F.3d 168 (3d Cir. 2000) ................................................23

*Suffolk County v. Secretary of Interior*,
562 F.2d 1368 (2d Cir. 1977) ................................................18

*TC Ravenswood, LLC v. FERC*,
741 F.3d 112 (D.C. Cir. 2013)................................................26

*Town of Barnstable, Mass. v. FAA*,
740 F.3d 681 (D.C. Cir. 2014)................................................13, 17

*Town of Marshfield v. FAA*,
552 F.3d 1 (1st Cir. 2008)................................................23

*Transmission Agency of N. Cal. v. FERC*,
628 F.3d 538 (D.C. Cir. 2010)................................................40

## TABLE OF AUTHORITIES—Continued

Page

*Wabash Valley Power Ass'n, Inc. v. FERC*,
    268 F.3d 1105 (D.C. Cir. 2001).................................................20, 24, 38

*Washington Water Power Co. v. FERC*,
    201 F.3d 497 (D.C. Cir. 2000)................................................................37

*Wild Earth Guardians v. U.S. Forest Serv.*,
    __ F. Supp. 3d __, 2015 WL 4886082 (D. Wyo. 2015) ......................25

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
    331 F.3d 1011 (D.C. Cir. 2003).............................................................36

*Williston Basin Interstate Pipeline Co. v. FERC*,
    519 F.3d 497 (D.C. Cir. 2008)...............................................................37

**ADMINISTRATIVE PROCEEDINGS**:

*ConocoPhillips Alaska Natural Gas Corp. & Marathon Oil Co.*,
    127 FERC ¶ 61,154 (2009) ......................................................................6

*Corpus Christi Liquefaction, LLC*,
    151 FERC ¶ 61,098 (2015) ....................................................................23

* *Dominion Cove Point LNG, LP*,
    115 FERC ¶ 61,337 (2006).................................................................7, 34

*Hackberry LNG Terminal, LLC*,
    101 FERC ¶ 61,294 (2002)................................................................6, 33

**STATUTES**:

15 U.S.C. § 717(b) ..................................................................................3, 13

15 U.S.C. § 717b(a) .....................................................................................3

15 U.S.C. § 717b(e)(1)............................................................................4, 13

15 U.S.C. § 717b(e)(3)(B)(ii)(II) ...........................................................6, 32

## TABLE OF AUTHORITIES—Continued

Page

\* 15 U.S.C. § 717b(e)(4)....................................................................... 7, 10, 29-37

15 U.S.C. § 717c(a) ..................................................................................6

15 U.S.C. § 717c(b) ...............................................................................31

15 U.S.C. § 717d(a) ............................................................................6, 31

15 U.S.C. § 717r ....................................................................................17

National Energy Policy Act of 2005,
Pub. L. No. 109-58, § 311, 119 Stat. 594, 686 (2005) .........................................6

**REGULATIONS AND ADMINISTRATIVE MATERIALS:**

18 C.F.R. § 284.8(b)(1)...........................................................................37

40 C.F.R. § 1500.1(c)..............................................................................16

40 C.F.R. § 1508.8 .................................................................................11

40 C.F.R. § 1508.8(b) .............................................................................18

49 Fed. Reg. 6684 (Feb. 22, 1984) .......................................................3, 13

**OTHER AUTHORITIES:**

Energy Information Administration, *Annual Energy Outlook 2015*
(Apr. 2015).........................................................................................2

Leonard E. Read, *I, Pencil* (1958) ...........................................................16

# GLOSSARY

| | |
|---|---|
| BP | BP Energy Company |
| Dominion | Dominion Cove Point LNG, LP |
| FERC or the Commission | Federal Energy Regulatory Commission |
| LNG | Liquefied natural gas |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| Statoil | Statoil Natural Gas, LLC |

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

---

Nos. 15-1127 and 15-1205

---

EARTHREPORTS, INC., *et al.*,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

DOMINION COVE POINT LNG, LP, AMERICAN PETROLEUM INSTITUTE,
and STATOIL NATURAL GAS, LLC,

Intervenors.

---

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

---

**BRIEF FOR INTERVENORS
DOMINION COVE POINT LNG, LP AND STATOIL NATURAL GAS, LLC**

---

**STATEMENT OF FACTS**

Dominion Cove Point LNG, LP owns the Cove Point LNG Terminal (Cove

Point Terminal) in Calvert County, Maryland.  JA618 [Authorization Order P 3].

The Commission first authorized the Terminal in 1972 to import liquefied natural

gas (LNG), and authorized expansion of the Terminal's storage and import

capacity in 2001 and 2006.  JA618-620 [*Id.* PP 3-6].

Over time, market forces shifted.  The United States went from anticipating

a need to *import* LNG to meet the country's energy needs to projecting the ability

to *export* LNG to the rest of the world.  *See* Energy Information Administration,

*Annual Energy Outlook 2015*, at 21 (Apr. 2015).[1]  As part of that shift, Dominion

in April 2013 requested authorization to site, construct, and operate facilities that

would make the Terminal "bi-directional"—that is, capable of both LNG import

and export.  JA618, 620 [Authorization Order PP 1,7].  These improvements are

known as the Cove Point Liquefaction Project.

The Project drew two sets of objections relevant to this case.  In the first,

environmental groups led by EarthReports protested that the Commission's

National Environmental Policy Act (NEPA) analysis was insufficient.  *See* JA650-

707 [*Id.* PP 108-280].  In the second, BP Energy, an import customer, argued that

Dominion unfairly discriminated against it by allowing Statoil Natural Gas, a

different import customer, to relinquish or "turn back" its capacity at the Terminal

---

[1] *Available at* http://goo.gl/ZZJSVu.

without affording BP a similar opportunity.  *See* JA630-633, 639-641 [*Id.* PP 38-48, 73-78].  We address the background of each challenge separately below.[2]

### A.    EarthReports's NEPA Challenge.

**Statutory Background.**  The process of exporting natural gas can be simplified to three steps.  First, the gas is extracted from a well.  Next, the gas is transported by pipeline to a terminal like Cove Point, where it is liquefied.  Finally, the LNG is loaded onto tankers and shipped overseas.

The Commission regulates only a portion of this process.  The States have jurisdiction over extraction.  *See Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 507 (1989) (noting that "the States retain jurisdiction over * * * 'the production or gathering of natural gas' ") (quoting 15 U.S.C. § 717(b)); *id.* at 510 (explaining that the "production or gathering of natural gas" is " 'the physical acts of drawing gas from the earth and preparing it for the first stages of distribution' ") (citation omitted).  The Department of Transportation regulates the safety aspects of liquefaction facilities.  JA685 [Authorization Order P 219].  And the Department of Energy makes the policy determination of whether LNG exports are in the "public interest" under 15 U.S.C. § 717b(a).  *See* 49 Fed. Reg. 6684, 6688 (Feb. 22, 1984).  The Commission's authority is limited to "approv[ing] or

---

[2] Statoil joins in only the portions of this brief addressing BP's petition.

deny[ing] an application for the siting, construction, expansion, or operation of an LNG terminal."  15 U.S.C. § 717b(e)(1); *see also* FERC Br. 5-6.

**The Commission's Environmental Assessment.**  In assessing the Liquefaction Project, the Commission's staff prepared a comprehensive environmental assessment spanning over 200 pages.  JA263-503 [EA].  The assessment found that if the Project were constructed with the assessment's 82 recommended mitigation measures, there would be no significant impact on the environment.  JA462 [*Id.* at 186].

EarthReports offered a hodgepodge of objections to the environmental assessment.  It claimed that the assessment did not consider the upstream impact of shale gas production; did not assess the downstream impact of burning LNG in foreign countries; did not adequately respond to concerns regarding contaminated ballast water and the effect of shipping on the endangered North Atlantic right whale; and did not properly analyze the potential safety risks to nearby residents.  JA655-657, 665-666, 675-684, 686-696 [Authorization Order PP 126-130, 156-159, 184-217, 225-248].

The Commission disagreed.  It explained that there was an "insufficient causal link" between the Liquefaction Project on the one hand and domestic natural gas production and foreign LNG use on the other for those impacts to be included in the environmental analysis.  JA687-688, 694-695 [*Id.* PP 228-229,

4

246].  Moreover, even if a causal link were demonstrated, the environmental effects of increased domestic natural-gas production were so uncertain as to be unquantifiable.  JA688-691, 693 [*Id.* PP 230-237, 242].  The same was true of downstream environmental impacts from overseas LNG use; the Commission could not "determine the project's incremental physical impacts on climate change."  JA694-695 [*Id.* P 246].

The Commission also rejected EarthReports's arguments regarding contaminated ballast water, the North Atlantic right whale, and local safety.  FERC concluded that Coast Guard and other regulations regarding ballast water discharge would mitigate the risk of invasive species near the Terminal.  JA656 [*Id.* PP 128-129].  The Commission also noted that it had assessed the risk to the right whale and that adequate mitigation measures were in place.  JA660-661 [*Id.* P 142].  Finally, FERC surveyed the safety risks raised by EarthReports and concluded that each was sufficiently addressed by the environmental assessment.  JA675-684 [*Id.* PP 184-217].

EarthReports moved for rehearing, re-raising each of its arguments.  JA834, 842-866 [Rehearing Order PP 1, 22-82].  The Commission rejected them.  *Id.*

## B.    BP's Protest

BP and Statoil are both import customers at the Cove Point Terminal.  JA630 [Authorization Order PP 38-39].  Both BP and Statoil contracted in 2001

for open-access service[3] under NGA Section 7 when Dominion's predecessor built a new LNG storage tank.  JA619, 630 [*Id.* PP 4, 38].  The Commission must ensure that the rates and terms governing Section 7 customers' service, such as BP and Statoil's 2001 service, are just and reasonable.  *See* 15 U.S.C. §§ 717c(a), 717d(a).

Statoil also contracted in 2006 for *non*-open access service under NGA Section 3(e) when Dominion expanded the Terminal to include two new storage tanks and additional vaporization facilities.  JA619-620, 630 [Authorization Order PP 5, 39].  Under Section 3, the Commission could not condition its order approving Statoil's service on "any regulation of the rates, charges, terms, or conditions of service of the LNG terminal."  15 U.S.C. § 717b(e)(3)(B)(ii)(II).[4]

Congress understood that there could be operational conflicts between customers at "mixed" terminals like Cove Point, where some customers' service is regulated under Section 7 and other customers' service is regulated under Section

---

[3] In "open-access" service, an operator must provide transportation on a nondiscriminatory basis to all comers; it cannot favor its own or its affiliates' shipments.  *See Associated Gas Distribs. v. FERC*, 824 F.2d 981, 996 (D.C. Cir. 1987).

[4] Statoil's service was approved under the Commission's "less intrusive" regulatory policy established in *Hackberry LNG Terminal, LLC*, 101 FERC ¶ 61,294 (2002).  JA630 [Authorization Order P 39].  Congress codified *Hackberry* as part of Section 3 in the National Energy Policy Act of 2005, Pub. L. No. 109-58, § 311, 119 Stat. 594, 686 (2005).  *See ConocoPhillips Alaska Natural Gas Corp. & Marathon Oil Co.*, 127 FERC ¶ 61,154, at P 6 (2009).  We therefore refer directly to the statute, except where the distinction is relevant.

3(e).  Congress therefore commanded that a Commission order allowing market-based Section 3(e) service cannot result in "undue discrimination against existing customers as to their terms or conditions of service at the facility."  15 U.S.C. § 717b(e)(4).

Dominion and its customers took that requirement seriously.  As part of the 2006 expansion, Dominion and its Section 7 customers—including BP—agreed to add a new Section 30 to the general terms and conditions governing service at the Terminal that described how Statoil's Section 3(e) service would interact with service of the Section 7 customers.  *See Dominion Cove Point LNG, LP*, 115 FERC ¶ 61,337, at PP 16-19, 49 n.28, 148-151 (2006); JA871-872 [Section 30].  Section 30 provides that Statoil's service will, with certain limited exceptions, be treated as operationally equivalent to the Section 7 customers' service.  *See* JA871-872 [Section 30].

In light of the Section 7 customers' agreement to Section 30, the Commission was "satisfied that there will be no undue discrimination against the existing [Section 7] customers as to their terms and conditions of service in the critical tariff areas, such as nominations, scheduling, and operating conditions." *Dominion Cove Point*, 115 FERC ¶ 61,337, at P 150.  *Economic* terms and conditions, such as relinquishment of capacity in return for an exit fee, were not addressed by Section 30 or the order authorizing the 2006 expansion.

7

In advance of the Liquefaction Project, Dominion and Statoil agreed that Statoil would pay Dominion an exit fee and relinquish its Section 3(e) expansion service, which would free up Terminal capacity for Dominion's export customers. JA142-143 [Dominion Answer 10-11].  BP protested, arguing that allowing Statoil alone to turn back capacity was unduly discriminatory under Section 3.  JA120-132 [BP Protest].  The Commission disagreed, JA632-633 [Authorization Order PP 45-48], and denied BP's petition for rehearing, JA837-840 [Rehearing Order PP 6-17].

These petitions for review followed.

## STATUTES AND REGULATIONS

Except for those included in the addendum, pertinent statutes and regulations are attached to the Commission's brief.

## SUMMARY OF ARGUMENT

I.  The Commission's NEPA analysis was adequate.  EarthReports's primary complaint is not that the Commission inadequately analyzed the environmental impacts of the Liquefaction Project itself, but that the Commission did not analyze the environmental impacts of upstream natural-gas production and downstream natural-gas use.

NEPA, however, requires only that the Commission evaluate impacts that it has "caused"; it does not require analysis of an impact merely because it would not occur but for the project the agency is asked to authorize.  *Dep't of Transp. v. Pub.*

8

*Citizen*, 541 U.S. 752, 767 (2004).  Instead, the agency's authorization must be a legal, or proximate, cause of the impact.  And the Supreme Court has held that when an agency has no authority to prevent or regulate the impact it has been asked to examine, the agency is not the impact's legal cause.  *Id.* at 758-759.

The Commission's authorization of the Cove Point Liquefaction Project here will not cause EarthReports's alleged upstream and downstream impacts.  The States regulate natural-gas production, and the Department of Energy determines whether LNG may be exported.  The Commission is limited to reviewing the siting, construction, and operation of LNG terminal facilities.  And because the Commission cannot stop the environmental impacts of natural-gas production or consumption, NEPA did not require the Commission to take those impacts into account.

The Commission did not have to take into account the impacts of natural-gas production and overseas consumption for the additional reason that they are not reasonably foreseeable.  EarthReports assumes that the gas exported from the Cove Point Terminal will come from hydraulic fracturing in the Marcellus shale region, but the Commission explained that the Cove Point Terminal is connected to virtually all natural-gas supplies in the continental United States.  And even assuming that the exported gas will be produced in the Marcellus shale region, the

9

Commission reasonably concluded that it was not possible to meaningfully measure that production's impacts.

The same is true of the greenhouse-gas emissions generated by domestic natural-gas production and overseas natural-gas consumption. Although some tools are available to quantify the impact of greenhouse-gas emissions, the Commission reasonably found that those tools were not sufficiently reliable or helpful to inform its analysis. EarthReports may quibble with that assessment, but it has provided no reason for the Court to disturb it.

Finally, the Commission adequately addressed EarthReports's concerns about ballast-water contamination, the North American right whale, and public safety. NEPA permits the Commission to choose among experts; it did not have to credit EarthReports's.

II. The Commission also reasonably denied BP's protest. Under NGA Section 3(e)(4), the Commission's power is limited to preventing undue discrimination against Section 7 customers like BP "as to their terms or conditions of service at the facility." 15 U.S.C. § 717b(e)(4). In other words, Section 3(e)(4) prohibits only *operational* discrimination, not economic discrimination. And even BP agrees that Dominion has not discriminated against it in any operational aspect.

Even if Section 3(e)(4) applied to economic terms and conditions of service like turnback and exit fees, the Commission sufficiently explained why Statoil and

10

BP are not similarly situated, such that any discrimination against BP was not undue.  As a Section 7 customer, BP has regulatorily required protections against being stuck with excess capacity it cannot use that Statoil does not.  The Commission reasonably concluded that the difference between BP's guaranteed protections and Statoil's uncertain turnback opportunity was a relevant distinction that made Dominion's discrimination permissible.

## ARGUMENT

## I.    THE COMMISSION'S NEPA ANALYSIS WAS NOT ARBITRARY OR CAPRICIOUS.

### A.    EarthReports's Claimed Gas Production And Overseas Consumption Impacts Are Not Caused By The Cove Point Liquefaction Project.

Under NEPA's implementing regulations, an agency must evaluate environmental impacts that are "caused" by its actions.  40 C.F.R. § 1508.8. EarthReports asserts that the Commission had to analyze the effects of upstream increased natural-gas production and downstream increased overseas natural-gas usage, both of which allegedly would not occur without the export opportunities created by Liquefaction Project.  EarthReports Br. 35-39, 44-45.  EarthReports's causation argument thus rests on a classic but-for chain of reasoning:  But for the Liquefaction Project and the LNG exports it facilitates, there purportedly would be no additional gas production and no additional overseas gas consumption.  *Id.* at 37-38, 44.

11

The Supreme Court, however, has held that "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations." *Pub. Citizen*, 541 U.S. at 767.  NEPA instead requires a "reasonably close causal relationship" between the cause and the effect—a requirement similar to the "familiar doctrine of proximate cause from tort law." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983).

To " 'draw a manageable line between those causal changes that make an actor responsible for an effect and those that do not,' " courts " 'must look to the underlying policies or legislative intent' " behind NEPA and the agency's organic statute.  *Pub. Citizen*, 541 U.S. at 767 (citation omitted).  Chief among the policies underlying NEPA is the " ' rule of reason,' " which limits agencies' study of environmental impacts "based on the usefulness of any new potential information to the decisionmaking process." *Id.* (citation omitted).  Where analysis of an environmental impact would serve " ' no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency" to do the work.  *Id.* (citation omitted).

The Supreme Court has accordingly held that an agency may omit an environmental effect from its NEPA analysis where the agency has "no ability to prevent [the] effect due to its limited statutory authority over the relevant actions." *Id.* at 770.  Where an agency has no authority over the environmental impact it has

12

been asked to assess, "the agency cannot be considered a legally relevant 'cause'
of the effect." *Id.*; *accord Town of Barnstable, Mass. v. FAA*, 740 F.3d 681, 691
(D.C. Cir. 2014).

The Commission here has no ability to prevent either upstream natural-gas
production or downstream overseas natural-gas use. The NGA explicitly forbids
the Commission from regulating domestic natural-gas production, leaving it to the
States. *See Nw. Cent. Pipeline*, 489 U.S. at 507; 15 U.S.C. § 717(b). And the
Department of Energy, not FERC, decides whether LNG from the Cove Point
Terminal may be shipped overseas. *See* 49 Fed. Reg. at 6688. FERC's authority is
carefully circumscribed to reviewing Dominion's application to expand the
Terminal with the Liquefaction Project facilities. *See* 15 U.S.C. § 717b(e)(1).

EarthReports may well believe that without the Project's approval, neither
domestic gas production nor foreign gas consumption would increase. *See*
EarthReports Br. 35-39, 44-45. The Commission reasonably found otherwise, as
FERC explains (Br. 33-39), but it ultimately makes no difference. The Mexican
trucks in *Public Citizen* could not enter the United States without the agency's
challenged application and safety-monitoring programs. *See* 541 U.S. at 767, 772.
But the Supreme Court nonetheless held that the programs did not cause the trucks'
environmental impacts because the agency "ha[d] no discretion to prevent the entry
of Mexican trucks." *Id.* at 770.

13

Similarly, the Fourth and Sixth Circuits have held that even when an Army Corps of Engineers dredging permit is essential to a surface mining project, the Corps' approval need not consider the mining project's environmental effects. *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 710-711 (6th Cir. 2014); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 196-197 (4th Cir. 2009). Just as in *Public Citizen*, even though a Corps permit may be a but-for cause of the mining's environmental impacts, the Corps permit is not the *legal* cause of those impacts. Separate state regulators—not the Corps—are "responsible for determining the social and environmental impacts associated with surface mining operations." *Ohio Valley Envtl. Coal.*, 556 F.3d at 197; *see also Kentuckians for the Commonwealth*, 746 F.3d at 711; *N.J. Dep't of Envtl. Prot. v. U.S. Nuclear Reg. Comm'n*, 561 F.3d 132, 139-140 (3d Cir. 2009) (Nuclear Regulatory Commission was not required to assess the risk from an airborne terrorist attack because aviation threats are addressed by the Federal Aviation Administration and Department of Defense).

The same is true here. Separate regulators—state environmental agencies and the Department of Energy, respectively—are responsible for determining the social and environmental impacts associated with natural-gas production and exports. *Supra* at 3-4. Thus, even if EarthReports is correct that upstream gas production and downstream foreign gas consumption would not occur but for the

14

Liquefaction Project, the Commission's approval of the Project is still not the proximate cause of those effects. *See Pub. Citizen*, 541 U.S. at 770; *Kentuckians for the Commonwealth*, 746 F.3d at 711; *Ohio Valley Envtl. Coalition*, 556 F.3d at 197. And because the Commission's approval is not the proximate cause of those effects, the Commission was not required to analyze them. *Pub. Citizen*, 541 U.S. at 770.

That result is consistent with NEPA's purposes. NEPA has the twin aims of ensuring (1) that agency decisions "include informed and careful consideration of environmental impact" and (2) that agencies "inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36-37 (D.C. Cir. 2015). Where an agency has no power to stop the impact a party is worried about, analyzing the impact would not achieve these goals. Because FERC has no ability to prevent domestic natural-gas production or overseas natural-gas usage, the environmental impact of these activities "would have no effect on [FERC's] decisionmaking—[FERC] simply lacks the power to act on whatever information might be contained in the" environmental assessment. *Pub. Citizen*, 541 U.S. at 768. Similarly, informing the public about these impacts would not permit meaningful public participation in FERC's decision to approve the Liquefaction Project because the Commission "could not act on whatever

15

input" might result. *Id.* at 769. There is therefore no reason for the Commission to go through the motions of preparing the assessment. "NEPA's purpose is not to generate paperwork—even excellent paperwork." 40 C.F.R. § 1500.1(c).

Indeed, EarthReports's reasoning has no logical stopping point. In our interconnected economy, a project may "induce" any number of upstream and downstream effects. The foremen at the Cove Point Terminal may need to order pencils to carry out the Liquefaction Project, and that order may generate environmental impacts around the world. It may induce the felling of timber in Oregon, the mining of graphite in Sri Lanka, and the extraction of clay in Mississippi. The raw materials may then be shipped by boat and rail to a factory, which manufactures the pencils and sends them by truck to an office supply store in Maryland. *See generally* Leonard E. Read, *I, Pencil* (1958).[5] But EarthReports does not suggest—and rightly so—that the Commission's environmental assessment must quantify each of these environmental impacts for the pencils and the innumerable other materials used in the Liquefaction Project. The Commission, after all, is in the business of regulating natural-gas terminals, not pencil manufacturing. Yet EarthReports never says why its argument is different,

---

[5] *Available at* http://fee.org/files/doclib/20150601_ipencilpdfupdatecolor.pdf.

16

or how it is not the very "unyielding variation of 'but for' causation" the Supreme

Court condemned in *Public Citizen*.  541 U.S. at 763.

Nor is EarthReports without recourse.  If EarthReports believes that natural

gas production is bad for the environment, it should seek new federal regulation of

those activities, or "raise [its] concerns with those agencies in which Congress has

placed the primary responsibility of regulating" natural-gas production:  local and

state environmental authorities.  *Kentuckians for the Commonwealth*, 746 F.3d at

711.  And if EarthReports believes LNG exports are not in the public interest, it

may petition for review of the Department of Energy's authorizations allowing

LNG exports from the Cove Point Terminal, *see* 15 U.S.C. § 717r, even though the

Department of Energy has agreed with the Commission that gas production and

consumption impacts are not caused by gas exports under NEPA and are not

quantifiable beyond broad generalities.  *See* FERC Br. 21-25.  This case is not the

proper forum for EarthReports to air its grievances with the Nation's energy

policies.  *See Town of Barnstable*, 740 F.3d at 691 (holding that there was "no

need" for one agency to duplicate another agency's NEPA analysis, which was

being challenged in a different proceeding).

Rejecting EarthReports's arguments will ultimately help, not hurt, the

environment.  The Commission's resources are limited, and if they must be spent

analyzing impacts "not otherwise relevant to [FERC's] congressionally assigned

functions," the Commission might end up "spread so thin that [it is] unable

adequately to pursue protection of the physical environment and natural resources"

within its jurisdiction.  *Metro. Edison*, at 460 U.S. at 776.  The Court should reject

that troubling result.

### B.      EarthReports's Asserted Gas Production And Overseas Consumption Impacts Are Not Reasonably Foreseeable.

Even if the Commission's approval of the Liquefaction Project *were* the

legal cause of EarthReports's alleged upstream gas production and downstream

overseas consumption impacts, those impacts are not reasonably foreseeable or

quantifiable.  The Commission therefore did not have to include them in its

environmental assessment.

NEPA's implementing regulations require an agency to assess the "indirect

effects" of its actions, which are those "caused by the action and are later in time or

farther removed in distance, but are still reasonably foreseeable."  40 C.F.R.

§ 1508.8(b).  The regulation's foreseeability standard requires that an agency

engage in "[r]easonable forecasting," *Scientists' Inst. for Pub. Info., Inc. v. Atomic

Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973), but it does not compel an

agency to conduct "a 'crystal ball' inquiry."  *Suffolk County v. Secretary of

Interior*, 562 F.2d 1368, 1378 (2d Cir. 1977) (citation omitted).  In striking that

balance, an agency's environmental assessment need " 'furnish only such

information as appears to be reasonably necessary under the circumstances for

18

evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible.' " *Id.* (citation omitted).

The Commission's orders explained in depth why EarthReports's claimed gas production and overseas consumption effects were not reasonably foreseeable. Gas flows to the Cove Point Terminal through the Cove Point Pipeline, which is interconnected with three other interstate natural gas pipeline systems.  JA688-689 [Authorization Order P 231].  Those three pipeline systems, in turn, interconnect with other pipeline systems that "effectively provide access to essentially all of the production areas in the lower-forty-eight states." *Id.*

The Commission thus found that although "it is axiomatic that natural gas exports require natural gas supplies, the source of the gas to be exported via any individual project is speculative and would likely change throughout the operation of the project." *Id.*  There was no guarantee that the gas exported from the Cove Point Terminal would come from hydraulic fracturing at all, much less hydraulic fracturing in the Marcellus shale region, as EarthReports had claimed.  *Id.*  [*Id.* P 232].  And even if some exported gas might come from hydraulic fracturing in the Marcellus shale region, the Commission still did not have enough information to forecast its environmental effects.  The Marcellus shale region runs an estimated 600 miles north to south, from Ohio and West Virginia northeast into Pennsylvania

19

and southern New York.  *Beardslee v. Inflection Energy, LLC*, 761 F.3d 221, 224

(2d Cir. 2014).  The Commission could not know "the exact location, scale, and

timing" of future natural-gas production facilities, meaning that "the specific

details, including the timing, location, and number of additional production wells

that may or may not be drilled, are speculative."  JA693 [Authorization Order P

242].

EarthReports contends that FERC could have modeled the effects of natural-

gas production caused by the Liquefaction Project.  EarthReports Br. 39-43.  It

argues, for instance, that the Commission could estimate the number of wells

needed to support the Liquefaction Project because it did so in a different

environmental impact statement.  EarthReports Br. 39.  But EarthReports never

called that impact statement to the Commission's attention in its rehearing petition,

*see* JA731-772 [EarthReports Rehearing Pet.], and this Court may not consider

arguments first raised on appeal.  *See Wabash Valley Power Ass'n, Inc. v. FERC*,

268 F.3d 1105, 1114 (D.C. Cir. 2001) (calling this an "unusually strict requirement

that will not be ignored by the courts").  In any event, EarthReports's cited

environmental impact statement is perfectly consistent with the Commission's

conclusions in the orders on review.  FERC Br. 43-44.

EarthReports also asserts (Br. 40) that FERC "ignored information" that the

exported gas at Cove Point would come from particular producers in the Marcellus

shale region.  But the Commission specifically acknowledged EarthReports's evidence, such as it was—a press release from Cabot Oil regarding its future development plans—and assumed for the sake of argument that gas exported from the Cove Point Terminal will come from Cabot wells in the Marcellus shale region. JA690, 849-850 [Authorization Order P 233, Rehearing Order P 41].  The Commission explained, however, that even with that assumption, Cabot's press release did not permit it to meaningfully assess the scope or effect of increased natural gas production.  *Id.*  An environmental assessment stating that some amount of additional gas will be produced at some additional number of wells somewhere in the Marcellus shale region would not help the Commission "ensure that environmentally informed decisions are made."  *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1243 (D.C. Cir. 1980).  NEPA therefore did not require the Commission to produce such a vague assessment.

Perhaps aware of this problem, EarthReports argues that the Commission "easily could have obtained the contract" from Cabot containing the necessary details.  EarthReports Br. 41.  But EarthReports never says how.  Cabot was not a party to the proceedings, and the Commission therefore had no way to obtain anything from it, much less commercially sensitive data about its future development plans.  And this Court will not "fill in the blanks" of EarthReports's

argument for it.  *Power Co. of Am., L.P. v. FERC*, 245 F.3d 839, 845 (D.C. Cir. 2001).

EarthReports finally argues, relying on the Eighth Circuit's decision in *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520, 549 (8th Cir. 2003), that even if the Commission could not meaningfully forecast the *extent* of environmental impacts from additional natural-gas production, it was at least required to explain the *nature* of environmental impacts from additional natural-gas production.  EarthReports Br. 41-42.  But this Court has never relied on EarthReports's cited portion of *Mid States*, and the Eighth Circuit has never read *Mid States* as broadly as EarthReports does.  It has explained that *Mid States* was a case where "computer 'programs could be used to forecast the effects of th[e] project on the consumption of coal,' " *Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 555 (8th Cir. 2006) (quoting *Mid States*, 345 F.3d at 550), and where the agency "stated that a particular outcome was reasonably foreseeable and that it would consider its impact, but then failed to do so."  *Ark. Wildlife Fed. v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005).

This case is nothing like that.  Unlike the agency's concession in *Mid States* that modeling was possible, the Commission explained why EarthReports's proffered models would not yield meaningful results—an explanation to which EarthReports has no response.  *See* JA691, 848 [Authorization Order P 235,

Rehearing Order P 37]; *see also* FERC Br. 45-46.  And unlike the agency's inexplicable failure in *Mid States* to perform an analysis that it had agreed to undertake, the Commission has consistently maintained—in its environmental assessment, in its orders, and in other LNG terminal proceedings—that the environmental impacts of additional natural-gas production are not reasonably foreseeable.  *See* JA301 [EA at 25]; JA691 [Authorization Order P 235], JA851 [Rehearing Order P 44]; *Corpus Christi Liquefaction, LLC*, 151 FERC ¶ 61,098, at P 15 & n.30 (2015).  *Mid States* is inapt.

As the Seventh Circuit has explained in distinguishing *Mid States*, there is a "consensus" among the courts of appeals that "an agency decision may not be reversed for failure to mention a project not capable of meaningful discussion." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897, 902 (7th Cir. 2010) (citing *Town of Marshfield v. FAA*, 552 F.3d 1, 4-5 (1st Cir. 2008), *City of Oxford v. FAA*, 428 F.3d 1346, 1353 (11th Cir. 2005), and *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 182 (3d Cir. 2000)).  Reading *Mid States* as EarthReports proposes would "create an empty technicality—a requirement that agencies explicitly state that they lack knowledge about the details of potential future projects." *Id.* at 902-903.  This Court should reject that untenable interpretation, just like its sister circuits.

For similar reasons, the Commission correctly rejected EarthReports's argument (Br. 44-47) that the upstream and downstream greenhouse-gas impacts of the Liquefaction Project are reasonably foreseeable.  Primarily, EarthReports argues that the Commission should have been able to quantify greenhouse-gas impacts caused by the Project because it and other agencies have done so with other projects in the past.  *See* EarthReports Br. 45-46.  But EarthReports never confronted the Commission with those examples in its rehearing petition, JA766-768 [EarthReports Rehearing Pet. 36-38], and this Court cannot reverse the Commission for not distinguishing authorities EarthReports never mentioned on rehearing.  *See Wabash Valley Power*, 268 F.3d at 1114.

EarthReports is also incorrect that the Commission had to use "available tools," such as the "social cost of carbon" to assess the impacts of the greenhouse-gas emissions allegedly induced by the Project.  EarthReports Br. 46-47.  The Commission explained that although the social cost of carbon tool was available, it was appropriate, if at all, only in rulemakings or when comparing alternatives using cost-benefit analyses.  JA854-855 [Rehearing Order P 54].  That is because the social cost of carbon tool does not provide a consistent discount rate to reduce future social costs to present value; does not measure the incremental impacts of projects on the environment; and does not include criteria for identifying when the social costs of carbon are "significant" for NEPA purposes.  *Id.*  And because the

24

Commission was not engaging in a rulemaking or comparing alternatives on a cost-benefit basis, it had no reason to use the social cost of carbon tool to inform its analysis.  *See* JA694-695, 855-856 [Authorization Order P 246 n.214, Rehearing Order P 55].

EarthReports's only response (Br. 46) is a lonely cite to a Colorado district court case, *High Country Conservations Advocates v. United States Forest Service*, 52 F. Supp. 3d 1174, 1190 (D. Colo. 2014).  That decision has already drawn criticism, with two different district courts finding it inapplicable.  *See Wild Earth Guardians v. U.S. Forest Serv.*, __ F. Supp. 3d __, 2015 WL 4886082, at *21 (D. Wyo. 2015); *League of Wilderness Defs. v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 WL 6977611, at *26 (D. Or. Dec. 9, 2014).  And, as the Commission pointed out, *High Country*'s reasoning does not map onto EarthReports's complaints. JA694-695, 855-856 [Authorization Order P 246 n.214, Rehearing Order P 55]. The problem in *High Country* was that the agency touted the project's benefits, while at the same time refusing to consider its foreseeable costs—indeed, the agency had included the social cost of carbon measurement in its draft environmental impact statement before omitting it from the final.  52 F. Supp. 3d at 1190-91.  Here, by contrast, the Commission did not attempt to quantify the benefits of the Cove Point Liquefaction Project or approve the Project based on those benefits.  *See* JA694-695, 855-856 [Authorization Order P 246 n.214,

25

Rehearing Order P 55].  The Commission's orders therefore have none of the

hypocrisy the district court found in *High Country*.

### C.    The Commission Sufficiently Addressed EarthReports's Other Concerns.

EarthReports closes with three scattershot attacks on the Commission's

environmental assessment.  It argues that (1) the Commission did not adequately

address the risk of contamination from invasive species carried in LNG tankers'

ballast water; (2) the Commission did not sufficiently consider the risk that a

tanker will strike the endangered North Atlantic right whale; and (3) the

Commission's safety assessment was insufficient.  EarthReports Br. 47-53.  All

three arguments are meritless.

*First*, the experts at the Maryland Department of the Environment that the

Commission consulted found that existing and anticipated ballast-water

management regulations are enough to protect aquatic life near the Cove Point

Terminal.  JA655-656 [Authorization Order PP 126-127].  EarthReports's expert

disagreed.  But faced with conflicting opinions, the Commission had every right to

credit the Maryland Department's.  *See TC Ravenswood, LLC v. FERC*, 741 F.3d

112, 119 (D.C. Cir. 2013) ("[W]here the Commission weighs competing record

evidence, we defer to its reasonable choice * * * .").

More fundamentally, EarthReports's ballast-water argument misunderstands

NEPA.  The Commission conceded that, even with the Coast Guard and other

26

regulations, invasive species might still harm aquatic life near the Terminal. JA862-863 [Rehearing Order PP 72-74].  No regulatory system is perfect.  And, having disclosed the risk, NEPA did not require the Commission to mitigate it to EarthReports's satisfaction.  "NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991).  And in any event, FERC explained why it believed the Coast Guard regulations were adequate and why it was ill-suited to second-guess expert maritime agencies on appropriate ballast-water management protocols.  *See* JA862-863 [Rehearing Order PP 72, 74].  The Coast Guard's regulations govern all ships entering U.S. waters, JA329-330 [EA 53-54]; it would be nearly impossible for FERC to develop ballast-water management guidelines tailored to ships docking at the Terminal.

*Second*, EarthReports argues (Br. 50) that FERC "refused" to analyze the Liquefaction Project's impact on the endangered North Atlantic right whale and relied on "an outdated study."  But the Commission *revisited* its prior analyses and found that they remained valid.  JA863 [Rehearing Order P 76].  EarthReports may have a different view, but the Commission is allowed to credit its own reviewers and those at the National Ocean and Atmospheric Administration, which has the direct authority to protect endangered marine species.  *See Marsh v. Or. Natural*

27

*Res. Council*, 490 U.S. 360, 378 (1989) (holding that "an agency must have discretion to rely on the reasonable opinions of its own qualified experts"). And NEPA's implementing regulations explicitly permit agencies to rely on past analyses when the underlying circumstances have not changed in the interim. FERC Br. 62-63.

*Finally*, as the Commission explains (Br. 64-67), FERC reasonably analyzed and rejected each of the safety concerns EarthReports identified. And in challenging that analysis, EarthReports cites nothing in the administrative record, instead relying on allegations in the standing declarations attached to its brief. EarthReports Br. 13-14, 51-53. That is patently improper; this Court limits its review to information that was before the Commission at the time of its decision. *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095-96 (D.C. Cir. 1996). Standing declarations demonstrate a party's Article III standing, *see Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002); they cannot smuggle new merits-related facts into the record at the petition-for-review stage, *see James Madison*, 82 F.3d at 1095-96.

## II.   THE COMMISSION REASONABLY CONCLUDED THAT DOMINION DID NOT UNDULY DISCRIMINATE AGAINST BP.

### A.   Section 3(e)(4) Allows Economic Discrimination Between Section 3(e) And Section 7 Customers At Mixed Terminals.

As BP sees things, NGA Section 3(e)(4)'s prohibition on "undue discrimination" means that it should be free from differential treatment in *all* respects, including economic terms and conditions like turnback and the associated exit fees. *See* BP Br. 25.  That reading, however, flunks all of the usual tests of statutory interpretation.  It cuts important words out of Section 3(e)(4).  It conflates the NGA's distinct nondiscrimination provisions.  And it ignores Section 3(e)'s structure and purpose.  The Commission reasonably interpreted Section 3(e)(4) as allowing Dominion to treat Statoil and BP differently regarding economic terms and conditions like turnback so long as it did not discriminate against BP in its operations at the Cove Point Terminal.

Start with the text.  BP emphasizes—repeatedly—that Section 3(e)(4) forbids "undue discrimination" between Section 3(e) and 7 customers at mixed terminals.  BP Br. 27-29.  But BP stops reading too soon.  What Section 3(e)(4) actually forbids is undue discrimination between Section 3(e) and Section 7 customers at mixed terminals "as to their terms or conditions of *service at the facility*."  15 U.S.C. § 717b(e)(4) (emphasis added).  Section 3(e)(4) looks at the terms and conditions of *service at the terminal*—that is, the terms and conditions

29

governing customers' *operations*.  And BP has never been discriminated against in its operations.  The Commission found, and BP agrees (Br. 29), that "the terminal service that [BP] receives from Dominion is fundamentally the same as that provided to Statoil—Statoil receives no preference in nominating, scheduling, or the quality of terminal service provided."  JA839 [Rehearing Order P 14].

BP never grapples with the "at the facility" proviso in Section 3(e)(4), quoting it only once in its argument.  *See* BP Br. 27.  But it is a key limitation; it focuses the Commission on not all possible differences between Section 3(e) and Section 7 customers, but on differences that relate to operations at the LNG terminal.  BP essentially excises the words "at the facility" from the statute, an approach that is contrary to the "endlessly reiterated principle of statutory construction" that "all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage."  *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995).

Furthermore, BP's expansion of Section 3(e)(4)'s narrow nondiscrimination clause contravenes the NGA's structure in two ways.  First, it ignores the differences among the NGA's various nondiscrimination provisions.  In Section 4, Congress forbade natural gas companies from "(1) mak[ing] or grant[ing] any undue preference or advantage to any person or subject[ing] any person to any undue prejudice or disadvantage, or (2) maintain[ing] any unreasonable difference

30

in rates, charges, service, facilities, or in any other respect."  15 U.S.C. § 717c(b).

In Section 5, Congress similarly outlawed "any rule, regulation, practice or

contract" that is "unduly discriminatory or preferential."  *Id.* § 717d(a).  In both,

Congress cast the Commission's net widely—it has the duty to stamp out *any*

undue discrimination or unjust preference it finds.  *See Ali v. Fed. Bureau of

Prisons*, 552 U.S. 214, 219 (2008) (recognizing that " 'read naturally, the word

'any' has an expansive meaning' ") (citation omitted).

Had Congress wanted Section 3(e)(4) to be equally broad, it would have

used a similar construction.  But Congress gave the Commission narrower

authority instead, telling FERC to ensure there is no "undue discrimination against

existing customers *as to their terms or conditions of service at the facility*," 15

U.S.C. § 717b(e)(4).  That distinction matters.  Courts "refrain from concluding

* * * that the differing language in * * * two subsections has the same meaning in

each."  *Russello v. United States*, 464 U.S. 16, 23 (1983).

BP's version of Section 3(e)(4) creates yet another form of surplusage.  If

Section 3(e)(4) is so broad as to encompass *any* form of discrimination between

Section 3(e) and Section 7 customers, then Section 3(e)(4)'s nondiscrimination

mandate is no different than those in Sections 4 and 5.  Congress would have no

reason to have added Section 3(e)(4) to the NGA, and "[t]raditional principles of

statutory construction counsel against reading acts of Congress to be superfluous."
*Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401 (D.C. Cir. 2004).

BP's reading of Section 3(e)(4) is also structurally inconsistent with the rest of Section 3(e).  In Section 3(e)(3)(B)(ii)(II), Congress prevented FERC from conditioning an order authorizing Section 3 service on "*any* regulation of the rates, charges, *terms, or conditions of service*."  15 U.S.C. § 717b(e)(3)(B)(ii)(II) (emphasis added).  Then, in, Section 3(e)(4), Congress carved out a narrow exception to that broad exemption:  An order authorizing Section 3(e) service at a terminal with Section 7 customers cannot "result in * * * undue discrimination against existing customers as to their terms or conditions of service at the facility." *Id.* § 717b(e)(4).

The Commission's orders read Sections 3(e)(3)(B)(ii)(II) and 3(e)(4) harmoniously.  Under the Commission's interpretation, FERC cannot regulate the terms and conditions of Section 3(e) service at all, except to prevent undue operational discrimination against Section 7 customers.  *See* JA839-840 [Rehearing Order P 14].  Under BP's interpretation, Section 3(e)(4) takes back at mixed terminals all of the regulatory freedom that Section 3(e)(3)(B)(ii)(II) bestowed; FERC can regulate the terms and conditions of service at those terminals without limitation.  BP's interpretation is thus untenable.  This Court " 'refuse[s] to conclude that with one hand Congress intended to enact a statutory

32

rule * * * but, with the other hand, it engrafted an open-ended exception that would eviscerate the rule.' " *Mitchell v. Fed. Bureau of Prisons*, 587 F.3d 415, 421 (D.C. Cir. 2009) (citation omitted).

BP's position is also contrary to Section 3(e)'s overarching purpose. In BP's view, a terminal operator must give Section 7 customers all the same economic terms and conditions as Section 3(e) customers or provide some good reason for the disparity. That reduces Section 3(e) customers' economic terms of service to the lowest common Section 7 denominator. The point of the 2005 addition of Section 3(e), like the *Hackberry* policy it codified, was to allow free negotiation of the economic and other terms of Section 3(e) service and spur additional investment in natural-gas infrastructure. *See Hackberry*, 101 FERC ¶ 61,294 at PP 23-24 (finding that encouraging market-based Section 3 service "may provide incentives to develop additional energy infrastructure"). BP's reading undermines that deregulatory purpose, and courts do not " 'interpret federal statutes to negate their own stated purposes.' " *King v. Burwell*, 135 S. Ct. 2480, 2493 (2015) (citation omitted).

Finally, BP's current construction of Section 3(e)(4) conflicts with its previous understanding of the statute. When Statoil's Section 3(e) service was added to the Cove Point Terminal, BP agreed to a settlement that included adding Section 30 to the Terminal's general terms and conditions of service. *See*

33

*Dominion Cove Point*, 115 FERC ¶ 61,337, at PP 16-19, 49 n.28, 148-151.  But

Section 30 did not—and does not—address economic terms and conditions like

turnback of capacity and the associated exit fee.  JA871-872.  It simply describes

how Statoil's service will interact with the service of Section 7 customers like BP.

*Id.*  And the Commission found, given BP's agreement to Section 30, that "there

will be no undue discrimination against the existing [Section 7] customers as to

their terms and conditions of service in the critical tariff areas, such as

nominations, scheduling, and operating conditions."  *Dominion Cove Point*, 115

FERC ¶ 61,337, at P 150.  If BP truly understood Section 3(e)(4) to encompass

*economic* terms and conditions, then it should not have agreed to a Section 30 that

addressed *operational* terms and conditions alone.

BP briefly attempts to defend its reading of Section 3(e)(4).  It argues that

operational discrimination at mixed terminals is covered by Section 3(e)(4)'s

prohibition against "degradation of service to existing customers," so "undue

discrimination against existing customers at the facility" must include economic

terms and conditions or else it would be surplusage.  BP Br. 37.

Not so.  A terminal operator adding Section 3(e) service could leave a

Section 7 customer's operational terms and conditions of service unchanged, but

give the Section 3(e) customer better ones.  There would be no degradation; but

there would be undue discrimination.  Conversely, a terminal operator adding

Section 3(e) service could give all customers—Section 3(e) and 7 alike—less favorable operational terms and conditions of service than the Section 7 customers had previously.  There would be no discrimination among customers; but the Section 7 customers' service will have been degraded.  Section 3(e)(4)'s degradation and undue-discrimination clauses prohibit distinct conduct.

With Section 3(e)(4) appropriately cabined to operational discrimination, BP's arguments drop away.  BP argues that the Commission's orders render Section 3(e)(4) "essentially meaningless."  BP Br. 28.  Hardly.  If Dominion were to give Statoil preferential access to Terminal facilities or priority in scheduling tanker deliveries, the Commission could invoke Section 3(e)(4) to prohibit that conduct.  *See* JA839-840 [Rehearing Order P 14] (rejecting BP's surplusage argument on this ground).  That Section 3(e)(4)'s scope is not as broad as BP would like does not mean it has no scope at all.

BP further argues that FERC provided "no reasoned basis" to find that it and Statoil are not similarly situated for turnback purposes when they are similarly situated for operational purposes.  BP Br. 29.  But with Section 3(e)(4) properly limited, the Commission's reasoning was perfectly reasonable.  Because Section 3(e)(4) is concerned with only operational terms of service, that Statoil is a Section 3(e) market-basis customer and BP is a Section 7 Commission-regulated customer is a sufficient reason for Dominion to treat Statoil differently as to economic terms

35

of service like turnback and exit fees.  *See* JA632, 839-840 [Authorization Order P 46; Rehearing Order P 14].  Differences in economic terms and conditions between Section 3(e) and Section 7 customers are not differences that Section 3(e)(4) permits the Commission to regulate.

The best that can be said for BP's argument is that it tries to identify an ambiguity in Section 3(e)(4):  Do the words "terms or conditions of service at the facility" refer to *all* terms and conditions relating to service at a mixed LNG terminal or only those terms and conditions relating to a customer's operations at the LNG terminal?  For the reasons just discussed, the NGA's text, structure, and purpose compel the conclusion that Section 3(e)(4) is limited to just operational terms and conditions.  *See supra* at 29-36.  But if there were any doubt, FERC's operations-only reading is a reasonable one, and this Court is bound to defer to the Commission's reasonable interpretation of the NGA.  *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 331 F.3d 1011, 1016 (D.C. Cir. 2003); *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1083-84 (D.C. Cir. 2002); *see also* FERC Br. 71-73.  Either way, BP's challenge should be rejected.

### B.   Even If Section 3(e)(4) Applies To All Terms And Conditions Of Service, The Commission Sufficiently Explained Why Statoil And BP Are Not Similarly Situated.

The Court need go no further to deny BP's petition.  Section 3(e)(4) does not apply to economic discrimination like turnback opportunities and exit fees, and the

Commission correctly held as much.  But even if Section 3(e)(4) applies to all

terms and conditions of service, the Commission adequately explained why Statoil

and BP are differently situated, such that any discrimination against BP was not

undue.

As BP admits (Br. 25), the NGA does not forbid all discrimination between

customers, just "undue" discrimination.  Thus, for BP to prevail on its

discrimination claim, it must prove not only that it has been treated differently

from Statoil, but that the Commission unreasonably determined that BP and Statoil

are not "similarly situated" for turnback purposes.  *Washington Water Power Co.*

*v. FERC*, 201 F.3d 497, 504 (D.C. Cir. 2000).  BP cannot.

The Commission explained that the difference in Section 3(e) and Section 7

regulatory regimes was "a relevant one."  JA839 [Rehearing Order P 13].  Section

7 customers like BP have Commission-enforced protections that reduce the risk a

customer will be stuck with capacity it cannot use.  *Id.*  For instance, BP has by

regulation the ability to release—essentially sublease—its capacity to another

shipper.  *Id.*; *see also* 18 C.F.R. § 284.8(b)(1); *Williston Basin Interstate Pipeline*

*Co. v. FERC*, 519 F.3d 497, 498 (D.C. Cir. 2008).  Statoil, by contrast, has only the

protections it negotiated with Dominion.  That is a relevant distinction.

BP points out that release is generally valuable in a rising market.  With

domestic natural gas cheap these days, no one—BP claims—will want to sublease

its import capacity.  BP Br. 32.  Maybe.  But the Commission's finding was not that BP's guaranteed release right and Statoil's negotiated turnback opportunity are economic equivalents.  JA839 [Rehearing Order P 13].  The Commission's finding was that the fact that BP's release right is guaranteed, whereas Statoil's turnback opportunity was uncertain, is a relevant distinction that made BP and Statoil not similarly situated.  *Id.*  And where "a rational, non-discriminatory basis exist[s] for the difference in situation," there is no undue discrimination.  *Complex Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992, 1013 (D.C. Cir. 1999) (per curiam).

BP alternatively argues that if its release rights are relevant, the Commission should have reviewed Statoil's contract to determine whether Statoil has release rights similar to BP's.  BP Br. 33-35.  BP, however, never argued in its rehearing petition that the Commission should have compared its regulatory protections to Statoil's contractual rights.  JA810-832 [BP Rehearing Pet.].  And the Commission can hardly be faulted for undertaking "no examination" (BP Br. 35) of a topic that BP did not raise.  *See Wabash Valley Power*, 268 F.3d at 1114.

In any event, BP's argument is meritless.  The relevant difference is not that BP has release rights and Statoil does not, but that BP's release rights are *guaranteed* by Commission regulation, whereas Statoil's are subject to the vagaries

38

of the market and its negotiations with Dominion. *See* JA839 [Rehearing Order P 13]. The difference is in the certainty of the right, not its existence.

        Finally, with rhetorical flourish, BP alleges that Statoil's turnback opportunity was a "sweetheart deal" meant to facilitate future collaboration between Statoil and Dominion's parent company. BP Br. 38-41. But, as the Commission explained, Dominion was under no obligation to offer BP a turnback opportunity. JA840 [Rehearing Order P 16]. And because Dominion was under no obligation to offer an opportunity to BP, Dominion's motivations for offering the opportunity to Statoil were irrelevant. *See id.* Whether Dominion and Statoil are sweethearts or sworn enemies, the two reached an arm's-length accommodation where Statoil paid Dominion for the privilege of turning back its Terminal capacity. *See* JA143 [Dominion Answer 11]. The Commission did not have to dig deeper than that.

    Anyway, BP's smoking gun (Br. 40-41)—a vague statement from the CEO of Dominion's parent company that Dominion would "work with" Statoil in the future—is anything but. The statement was an impromptu response to an analyst's question on a conference call, and did not suggest, much less concede, that Statoil's turnback opportunity was a *quid pro quo* for future development deals between the two companies. Moreover, Dominion and Statoil both vehemently denied that Dominion "receive[d] from Statoil any commercial value associated

39

with any other infrastructure projects as consideration for the early termination of the Cove Point Expansion contracts."  JA141 [Dominion Answer 9 n.19]; *see also* JA196 [Statoil Answer 7] (calling BP's allegation "groundless" and "wholly unsupported by fact").  BP has not unearthed any evidence to the contrary; its conspiracy theory simply does not add up.  *See* FERC Br. 80-81.

In the end, BP bears the burden of " 'demonstrat[ing] that [the Commission's] policy judgments are arbitrary or capricious, a heavy burden indeed.' "  *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C. Cir. 2010) (citation omitted).  And it is a burden that BP has not carried.  BP is no doubt disappointed that it must continue to pay for LNG import service it seemingly does not currently find valuable.  But under its tariff, BP may negotiate its own turnback-for-exit-fee opportunity, JA869 [GT&C § 5(b)(2)(i)], and BP and Dominion have in fact discussed such an opportunity.  What BP cannot do is ask this Court to conduct those negotiations for it.  BP's petition should be denied.

40

## CONCLUSION

For the foregoing reasons, and those in the Commission's brief, the petitions for review should be denied.

Respectfully submitted,

/s/ Kirstin E. Gibbs

KIRSTIN E. GIBBS
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5026
kirstin.gibbs@morganlewis.com

/s/ Catherine E. Stetson

J. PATRICK NEVINS
CATHERINE E. STETSON
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Statoil Natural Gas, LLC*

*Counsel for Dominion Cove Point LNG, LP*

February 26, 2016

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 8,737 words.

/s/ Catherine E. Stetson
Catherine E. Stetson

ADDENDUM

# TABLE OF CONTENTS

Page

**Statute:**

15 U.S.C. § 717 .................................................................................................A1

**Regulation:**

18 C.F.R. § 284.8 ..............................................................................................A3

## 15 U.S.C. § 717

**15 U.S.C. § 717r.  Regulation of Natural Gas Companies**

(a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

(b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

(c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such

A1

person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

(d) Vehicular natural gas jurisdiction.  The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

  (1) not otherwise a natural-gas company; or

  (2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

## 18 C.F.R. § 284.8

**§ 284.8.  Release of firm capacity on interstate pipelines.**

(a) An interstate pipeline that offers transportation service on a firm basis under subpart B or G of this part must include in its tariff a mechanism for firm shippers to release firm capacity to the pipeline for resale by the pipeline on a firm basis under this section.

(b)

(1) Firm shippers must be permitted to release their capacity, in whole or in part, on a permanent or short-term basis, without restriction on the terms or conditions of the release. A firm shipper may arrange for a replacement shipper to obtain its released capacity from the pipeline. A replacement shipper is any shipper that obtains released capacity.

(2) The rate charged the replacement shipper for a release of capacity may not exceed the applicable maximum rate, except that no rate limitation applies to the release of capacity for a period of one year or less if the release is to take effect on or before one year from the date on which the pipeline is notified of the release. Payments or other consideration exchanged between the releasing and replacement shippers in a release to an asset manager as defined in paragraph (h)(3) of this section are not subject to the maximum rate.

(c) Except as provided in paragraph (h) of this section, a firm shipper that wants to release any or all of its firm capacity must notify the pipeline of the terms and conditions under which the shipper will release its capacity. The firm shipper must also notify the pipeline of any replacement shipper designated to obtain the released capacity under the terms and conditions specified by the firm shipper.

(d) The pipeline must provide notice of offers to release or to purchase capacity, the terms and conditions of such offers, and the name of any replacement shipper designated in paragraph (b) of this section, on an Internet web site, for a reasonable period.

A3

(e) The pipeline must allocate released capacity to the person offering the highest rate and offering to meet any other terms and conditions of the release. If more than one person offers the highest rate and meets the terms and conditions of the release, the released capacity may be allocated on a basis provided in the pipeline's tariff, provided however, if the replacement shipper designated in paragraph (b) of this section offers the highest rate, the capacity must be allocated to the designated replacement shipper.

(f) Unless otherwise agreed by the pipeline, the contract of the shipper releasing capacity will remain in full force and effect, with the net proceeds from any resale to a replacement shipper credited to the releasing shipper's reservation charge.

(g) To the extent necessary, a firm shipper on an interstate pipeline that offers transportation service on a firm basis under subpart B or G of this part is granted a limited-jurisdiction blanket certificate of public convenience and necessity pursuant to section 7 of the Natural Gas Act solely for the purpose of releasing firm capacity pursuant to this section.

(h)

  (1) The following releases need not comply with the bidding requirements of paragraphs (c) through (e) of this section:

    (i) A release of capacity to an asset manager as defined in paragraph (h)(3) of this section;

    (ii) A release of capacity to a marketer participating in a state-regulated retail access program as defined in paragraph (h)(4) of this section;

    (iii) A release for more than one year at the maximum tariff rate; and

    (iv) A release for any period of 31 days or less.

    (v) If a release is exempt from bidding under paragraph (h)(1) of this section, notice of the release must be provided on the pipeline's Internet Web site as

soon as possible, but not later than the first nomination, after the release transaction commences.

(2) When a release of capacity is exempt from bidding under paragraph (h)(1)(iv) of this section, a firm shipper may not roll over, extend or in any way continue the release to the same replacement shipper using the 31 days or less bidding exemption until 28 days after the first release period has ended. The 28-day hiatus does not apply to any re-release to the same replacement shipper that is posted for bidding or that qualifies for any of the other exemptions from bidding in paragraph (h)(1) of this section.

(3) A release to an asset manager exempt from bidding requirements under paragraph (h)(1)(i) of this section is any pre-arranged release that contains a condition that the releasing shipper may call upon the replacement shipper to deliver to, or purchase from, the releasing shipper a volume of gas up to 100 percent of the daily contract demand of the released transportation or storage capacity, as provided in paragraphs (h)(3)(i) through (h)(3)(iii) of this paragraph.

(i) If the capacity release is for a period of one year or less, the asset manager's delivery or purchase obligation must apply on any day during a minimum period of the lesser of five months (or 155 days) or the term of the release.

(ii) If the capacity release is for a period of more than one year, the asset manager's delivery or purchase obligation must apply on any day during a minimum period of five months (or 155 days) of each twelve-month period of the release, and on five-twelfths of the days of any additional period of the release not equal to twelve months.

(iii) If the capacity release is a release of storage capacity, the asset manager's delivery or purchase obligation need only be up to 100 percent of the daily contract demand under the release for storage withdrawals or injections, as applicable.

(4) A release to a marketer participating in a state-regulated retail access program exempt from bidding requirements under paragraph (h)(1)(ii) of this section is any prearranged capacity release that will be utilized by the replacement shipper to

provide the gas supply requirement of retail consumers pursuant to a retail access program approved by the state agency with jurisdiction over the local distribution company that provides delivery service to such retail consumers.

## CERTIFICATE OF SERVICE

I certify that on February 26, 2016, the foregoing brief was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Catherine E. Stetson
Catherine E. Stetson